1
2
3
4
5
6
7
8               **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   E & J GALLO WINERY,                    CASE NO. CV-F-03-5412 AWI LJO

12               Plaintiff,          _____**ORDER ON PLAINTIFF'S SANCTIONS**
                                           **MOTION REGARDING THIRD-PARTY**
13        vs.                               **WITNESS**
                                           (Doc. 383, 468.)
14
     ENCANA ENERGY SERVICES,
15   INC., et al.,

16               Defendants.
     _____/
17

18                              __INTRODUCTION__

19          In this action alleging natural gas price fixing, plaintiff E. & J. Gallo Winery ("Gallo") seeks

20   imposition of severe sanctions against defendants Encana Corporation ("Encana Corp.") and WD

21   Energy Services, Inc. ("WD Energy") and their counsel for taking action which Gallo claims resulted

22   in cancellation of a third-party witness deposition set by Gallo.  Encana Corp. and WD Energy

23   (collectively "defendants") claim that Gallo failed to properly notice the deposition and that their

24   counsel did not cancel the deposition.  Gallo and defendants seek to impose heavy monetary sanctions

25   on the opposing side to address Gallo's sanctions claims.

26          This Court vacated the March 18, 2005 hearing on Gallo's sanctions motion and conducted

27   March 30, 2005, April 13, 2005 and May 17, 2005 evidentiary hearings to address the parties'

28   accusations. Gallo appeared by counsel Frank M. Pitre and Steven N. Williams, Cotchett, Pitre, Simon

                                            1

& McCarthy and D. Greg Durbin, McCormick, Barstow, Sheppard, Wayte & Carruth LLP. Defendants appeared by counsel Richard P. Levy, David M. Battaglia, Rory Hernandez, and Eric Maier, Gibson, Dunn & Crutcher LLP, William C. Hahesy, Jr., Sagaser, Franson & Jones, and Duane Lyons, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP.  Gibson, Dunn & Crutcher LLP appeared by counsel Stephen R. Cornwell, Cornwell & Sample.

Following the evidentiary hearings, the parties submitted further briefs, which this Court has considered.  For the reasons discussed below, this Court imposes a $102,078.97 sanction against Gibson, Dunn & Crutcher with $92,078.97 payable to Gallo and $10,000 payable to this Court.

## BACKGROUND

### Gallo's Claims

Gallo and Gallo Glass Company produce wine and wine bottles using natural gas.  Gallo is one of California's largest consumers of natural gas used to operate its furnaces. Encana Corp., a Canadian company, is North America's largest independent natural gas producer and seller and does business in California through its subsidiaries.  Encana Energy Services, Inc. ("EES") was Encana Corp.'s indirect subsidiary and sales and marketing arm in the United States.  Encana Corp. used EES to trade, hedge and speculate in natural gas, natural gas transportation contracts and natural gas market-based derivatives.  EES changed its name to WD Energy Services Inc.[1] in early 2003.

During April 2001 to June 2003, EES was Gallo's sole marketer.[2]  Gallo claims that when EES "ostensibly" worked with Gallo, EES conspired with natural gas marketers to artificially inflate natural gas prices and related commodities contracts.

On April 9, 2003, Gallo filed this action to pursue against defendants price fixing claims under the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code, §§ 16700, et seq., and claims for unfair business practices (Cal. Bus. & Prof. Code, §§ 17200 et seq.), and unjust enrichment, constructive trust and fraudulent transfer under California Civil Code, §§ 3439, et seq. Gallo alleges defendants manipulated and grossly inflated California natural gas prices and derivative

---

[1]    WD Energy was sued in this action as EnCana Energy Services, Inc.

[2]    Gallo entered into an April 26, 2001 natural gas sale and purchase agreement with Encana Corp.'s predecessor.

1    markets.

2        The parties have engaged in extensive discovery, and numerous discovery disputes have arisen.

3    Before addressing the specific dispute subject to Gallo's sanctions motion, this Court reviews the

4    history of discovery disputes.

5                    **History Of Discovery Disputes And Rulings**[3]

6        This Court issued its February 20, 2004 findings and recommendations to deny defendants'

7    motion to disqualify Judge Ishii and all other California federal judges. Defendants claimed that Judge

8    Ishii and California judges, as putative members in energy class actions, had a financial interest which

9    could be influenced by this action. Judge Ishii issued his March 29, 2004 order to adopt the findings

10   and recommendations to deny defendants' motion to disqualify Judge Ishii and all California federal

11   judges.

12       This Court's April 28, 2004 order denied defendants' motion to coordinate this action's

13   discovery with seven class actions alleging gas price fixing and centralized in the U.S. District of

14   Nevada by the Judicial Panel on Multidistrict Litigation.

15       On July 14, 2004, Gallo filed its ex parte papers to claim defendants failed to produce tape

16   recordings of telephone conversations of defendants' gas traders and to suggest defendants had

17   destroyed such tapes. Defense counsel disagreed with Gallo's comments regarding evidence

18   destruction. This Court conducted a July 15, 2004 hearing to address Gallo's concerns and to, in this

19   Court's mind, resolve the matter of defendants' production of the tapes. This Court orally admonished

20   the parties' counsel that counsel was obliged to engage in professional, ethical conduct.

21       This Court's August 6, 2004 order granted nearly all of Gallo's requests that defendants

22   produce further documents. In particular, the order required defendants to produce tape recordings of

23   telephone conversations of defendants' traders and to serve privilege logs, further written responses

24   and declarations regarding efforts to locate requested documents. The order concluded defendants had

25   withheld documents and noted:

26   ───────────────

27       [3]      The following summary addresses the discovery disputes addressed by this Court. In the interest of brevity,
     this Court does not address the voluminous law and motion activity which assigned District Judge Anthony Ishii ("Judge
28   Ishii") has encountered as well. In its June 17, 2005 brief, Gallo accurately outlines numerous of this Court's admonitions
     to defendants and findings of defendants' discovery abuses and unprofessionalism.

> In light of this Court's rulings on Gallo's motions, this Court surmises defendants and their counsel have obstructed Gallo's legitimate discovery.  This Court admonishes defendants and their counsel that if obstruction to Gallo's legitimate discovery continues, **this Court will sua sponte set a hearing** to address imposition of sanctions against defendants and their counsel.  (Bold added.)

The order denied Gallo's request to impose a monetary sanction because Gallo lacked proper documentation.

This Court's second August 6, 2004 order denied in part and granted in part WD Energy's motions to compel Gallo's further interrogatory responses and document requests.   The order concluded:

> In light of this Court's rulings on WD Energy's motions and WD Energy's fallacious arguments, this Court surmises WD Energy and its counsel pursued the motions, at least in part, **as a retort** to Gallo's motions to compel and to impose sanctions.  This Court admonishes WD Energy and its counsel that if such conduct continues, **this Court will sua sponte set a hearing** to address imposition of sanctions against WD Energy and its counsel.  (Bold added.)

The order denied Gallo's request to impose a monetary sanction because Gallo lacked proper documentation.

This Court conducted an August 11, 2004 hearing on Gallo's ex parte application to hear on shortened time Gallo's motion to reset discovery and motion dates and to impose a discovery sanction against defendants and their counsel based on failure to produce trader tapes prior to trader depositions. During the conference call with the Court, the parties' counsel agreed to extend discovery and motion dates to address Gallo's concerns.

This Court's August 12, 2004 order responded to defendants' requests to "clarify" the August 6, 2004 orders and concluded the gist of defendants' "clarification is to seek this Court's reconsideration of its orders and to present similar arguments defendants raised previously."  This Court denied defendants' requested relief.  In mid-August 2004, the parties filed numerous discovery motions.  This Court issued its August 18, 2004 order to remind the parties:

> On the record, this Court has admonished the parties' counsel that they are prohibited to harass opposing parties and counsel, that they must cooperate and proceed professionally, and that they must engage in legitimate good faith attempts to resolve discovery disputes.  This Court further admonished the parties' counsel that if there are further accusations of improper, unprofessional conduct, **this Court will set a personal appearance hearing and rule on imposing sanctions** for improper, unprofessional conduct or false accusations of such conduct.  (Bold added.)

4

This Court reminds the parties' counsel that Local Rule 37-252(b) provides in part:

> Counsel for all interested parties shall confer in advance of the filing of the motion or in advance of the hearing of the motion in a good faith effort to resolve the differences that are the subject of the motion. Counsel for the moving party or prospective moving party shall be responsible for arranging the conference, which shall be held at a time and place and in a manner mutually convenient to counsel.

The parties' counsel shall strictly comply with the conferring requirements and shall genuinely engage in good faith to resolve their discovery disputes and to precisely limit the scope of disputes which genuinely cannot be resolved. This Court will sanction the parties and their counsel for failure to strictly comply with the conferring requirements and failure genuinely to engage in good faith to resolve their discovery disputes and to precisely limit the scope of disputes which genuinely cannot be resolved.

This Court's September 16, 2004 order required defendants to provide amended answers to eight of Gallo's requests for admission but denied Gallo's request for amended answers as to dozens of its other requests for admissions which were poorly drafted.

In response to defendants' seven discovery motions, this Court's September 16, 2004 order required Gallo to produce certain computer records, documents reflecting ownership of Gallo and its related entities and privilege logs, to explain redactions in produced documents, and to produce its F.R.Civ.P. 30(b)(6) designee for a further deposition. The order denied defendants' motion to compel Gallo to produce documents regarding other energy litigation. In denying Gallo's request to impose monetary sanctions against defendants, this Court explained:

> Gallo raises legitimate concerns that defendants attempt to overreach in their demands and heavy-handedly file notices of motions to extract discovery from Gallo. Defendants raise equally legitimate concerns of Gallo's limited flexibility in responding to defendants' requests. Based on the **parties' failure to cooperate and to attempt to resolve matters**, this Court is required to intervene and as to pending and future discovery motions, to intervene early, and if necessary, often in the discovery process. (Bold added.)

The order denied Gallo's sanctions request and required the parties to arrange a conference call with this Court to address pending and future discovery disputes to address attempts at resolution and briefing schedules. The order further denied Gallo's motion to strike defense declarations and exhibits which this Court found was "petty and heightens the need for this Court's proactive involvement in discovery motions. . . . In sum, Gallo's motion to strike the defendants' response justify this Court's upfront intervention in discovery motions to better focus the efforts of counsel and to minimize further

5

1    waste of resources, in particular, unnecessary legal fees for the parties."

2         Judge Ishii's September 23, 2004 order denied defendants' motion to reconsider this Court's

3    August 6, 2004 order to require defendants to produce documents, in particular, trader tapes.

4         On September 23, 2004, this Court conducted a telephone conference with the parties' counsel

5    to address defendants' pending discovery motions and other discovery issues. This Court's September

6    23, 2004 order required: (1) defendants to notify Gallo of specific discovery addressing missing or

7    deleted e-mails; (2) Gallo to provide a further response to defense Interrogatory No. 20 "to more

8    specifically and fully define and itemize Gallo's damages"; and (3) the parties "to engage in genuine,

9    good faith meeting and conferring to address the confidential designation and disclosure of the trader

10   tapes . . . [and] discovery responses and if necessary, to contact this Court to arrange a telephone

11   conference to address disputes and their resolution."

12        After this Court conducted an October 25, 2004 telephone discovery dispute conference, it

13   ordered defendants to produce portions of tape recordings of two senior managers and Gallo "to serve

14   a further answer to Interrogatory No. 20 to provide a precise damages figure and calculation, or if such

15   information cannot possibly be provided, to explain the process upon which Gallo uses to calculate

16   damages and why Gallo is unable to provide a precise damages figure. Gallo's further answer must

17   include all information known to date and identify further information which Gallo requires and how

18   Gallo intends to acquire it."

19        Based on discovery delays, this Court's November 1, 2004 order reset discovery, motion and

20   trial dates.

21        This Court's December 16, 2004 order required defendants to search six computer hard drives

22   of eight traders for 66 terms identified by Gallo and to produce responsive documents along with e-

23   mail communications with 90 identified employees and a privilege log. The order denied Gallo's

24   request to shift to defendants costs associated with the computer discovery and related production of

25   documents. The order denied Gallo's request to impose an unspecified sanction in the absence of

26   proper support. The order further required the parties' counsel to show cause in writing why this Court

27   should not impose sanctions for the parties' failure to cooperate on and to file a joint discovery dispute

28   statement in compliance with this Court's Local Rule 37-251(a) and (c).

In early January, the parties again filed numerous discovery motions.  Judge Ishii issued his January 14, 2005 order to deny defendants' requested reconsideration of this Court's December 16, 2004 order to require defendants' computer discovery.  Due to discovery delays, this Court's January 24, 2005 order again postponed discovery cutoffs.

This Court's January 28, 2005 order granted in part and denied in part Gallo's requested discovery relief.  The order required:

    1.    Defendants to serve revised privilege logs and supplemental declarations regarding location and searches for requested documents;

    2.    WD Energy to serve its declaration that it has produced all of its traders' tape recordings; and

    3.    Encana Corp. to produce all trader tape recordings to comply with the August 6, 2004 order, to bear related expenses and to serve its declaration that all tapes were produced.

As to Encana Corp.'s trader tapes, the order explained: "Encana Corp. and its counsel have not complied with the August 6 order by merely making the Encana Corp. trader tapes available for 'listening pleasure' in Calgary.  Encana Corp. and its counsel make no attempt to suggest, let alone explain, that their failure to comply with the August 6 order is substantially justified."

The order required defendants to serve further responses to certain interrogatories and document requests but denied Gallo's requests for further responses as to others.  The order required defendants and their counsel to pay Gallo a $2,250 sanction and required Encana Corp. and its counsel to pay a $1,500 sanction to this Court for disobedience of the August 6, 2004 order to produce trader tapes.

This Court's second January 28, 2005 order granted in part and denied in part defendants' requested discovery relief.  The order denied defendants' requests to require Gallo to:

    1.    Itemize all hard drives, servers and e-mail boxes of 84 Gallo employees and which have been deleted or erased since June 2000;

    2.    Explain when and how such materials were deleted or erased, why the materials were not preserved, and why automatic destruction did not cease when Gallo recognized a potential natural gas dispute;

3.      Recover hard drives, servers or e-mails of the employees and which have been destroyed and to search for responsive documents once recovered; and

4.      Search computer hard drives, servers and other electronic data of 11 Gallo employees whom defendants characterized as "involved in Gallo's energy decisions, policies and purchases."

This Court commented on the lack of merit of defendants' computer motions:

> This Court is left with the impression that defendants manufactured this discovery dispute in response to Gallo's attempts to seek discovery regarding tapes, e-mails and computers of defendants' traders. This Court views defendants' motion as a harassing tactic to distract Gallo. Defendants' motions pending before the Court reveal their practice to counter a Gallo motion with a similar motion of their own, meritorious or not. This Court has repeatedly warned defendants to cease abusive retaliatory discovery and motion practices.
>
> . . .
>
> Defendants' papers reveal this motion retaliates for Gallo's successful motion to search the traders' computers. This motion mimics Gallo's motion, except that it lacks support or merit. The gist of defendants' position is that since the traders' computers will be searched, Gallo should endure searches. However, defendants fail to attempt to justify a search of Gallo's computers let alone its unfathomable scope, especially given that Gallo produced the relevant Supplier Development Department documents and data. Attempting to equate defendants' proposed searches with the searches of the trader computers insults this Court's intelligence.

As to defendants' trader tapes, the order further denied defendants' request to keep the tapes confidential beyond the parties' stipulated protective order. The order denied further deposition testimony regarding Gallo executives' communications with a Stanislaus Foods executive to which Gallo asserts a common interest or joint litigation privilege. The order generally denied defendants' requests for Gallo's further responses to certain interrogatories and document requests. Lastly, the order required defendants to pay Gallo $4,750 as a sanction.

Gallo's counsel sent her February 11, 2005 letter pertaining to the settlement privilege which this Court applied in its January 28, 2005 order to documents which defendants claimed they provided in connection with settlement with the Commodity Futures Trading Commission ("CFTC"). The Court's letter of the same date responded that the letter of Gallo's counsel "is not a mere clarification request and includes much argument." This Court's letter directed "the parties' counsel to meet and confer regarding documents identified" in the letter of Gallo's counsel.

8

1    This Court's February 17, 2005 letter responded to defense counsel's letter of the same date

2    and directed the parties' counsel to meet and confer regarding possession and access to Encana Corp.'s

3    trader tapes which had been delivered to defense counsel's San Francisco office.  This Court's second

4    February 17, 2005 letter responded to defense counsel's second letter of the same date regarding

5    Gallo's interrogatory response as to its alleged damages and noted that defense counsel sought sanction

6    relief subject to a motion and that this "Court will not consider the letter's requested sanction relief

7    without defendants' formal motion and Gallo's response."

8    This Court's February 23, 2005 letter responded to the letter of Gallo's counsel of the same date

9    and which again addressed application of the settlement privilege to documents which defendants

10   claimed they provided to the CFTC for settlement.  This Court's letter noted that the parties continue

11   to write letters "to address discovery matters without their joint agreement" and that again the letter

12   of Gallo's counsel "is not a mere clarification request" in that Gallo's issues are "either new to the

13   Court for which this Court cannot provide clarification and will not address informally without the

14   parties' joint agreement, or are issues on which this Court determined it would not provide Gallo's

15   requested relief."

16    Judge Ishii issued his May 4, 2005 order to deny Gallo's requested reconsideration of this

17   Court's order that documents which defendants provided CFTC are subject to the settlement privilege.

18   Due to further discovery delays, this Court's May 9, 2005 order again postponed discovery and motion

19   cutoffs.

20    In response to Gallo's motion to claim defendants disobeyed this Court's January 28, 2005

21   order to provide further interrogatory responses, this Court issued its May 11, 2005 order to require

22   WD Energy to produce at its expense for deposition(s) its person(s) most knowledgeable to locate

23   documents and communications subject to certain of Gallo's interrogatories.  With the order, this Court

24   noted it was tempted to designate certain facts in Gallo's favor and imposed a $1,250 sanction for

25   Gallo's costs to pursue the discovery sanctions motion.

26    Putting aside the myriad of other disputes, this Court turns to the third-party deposition giving

27   rise to Gallo's sanctions motion at issue here.  After Gallo filed its sanctions motion and moving papers

28   on February 23, 2005, the parties filed further papers, and this Court conducted March 30, 2005, April

9

1    13, 2005 and May 17, 2005 evidentiary hearings, after which the parties filed additional briefing.  This

2    Court will next summarize the evidence and parties' contentions.[4]

3    <u>**Deposition Setting**</u>

4         By July 17, 2004 subpoena service and a July 20, 2004 deposition notice served by United

5    States mail, Gallo set the deposition of Richard Anderssen ("Mr. Anderssen") for August 17, 2004 in

6    Houston.[5]  Mr. Anderssen is a former senior trader for defendants, and Gallo characterizes Mr.

7    Anderssen as defendants' key gas trader for California at the time giving rise to Gallo's claims.  Gallo

8    contends there are dozens of trader tape recordings to implicate Mr. Anderssen in violation of criminal

9    and civil law.  Mr. Anderssen is represented by Houston criminal defense firm Cogdell & Goodling,

10   and Mr. Anderssen's counsel indicated that Mr. Anderssen would assert his Fifth Amendment right

11   against self-incrimination at his deposition.

12        Based on scheduling conflicts, Mr. Anderssen and his counsel agreed to reschedule his

13   deposition to February 17, 2005.[6]  James M. Ardoin III ("Mr. Ardoin"), Mr. Anderssen's counsel

14   assigned to his deposition, sent a January 12, 2005 e-mail to Steven N. Williams ("Mr. Williams"), one

15   of Gallo's chief counsel in this action, to confirm Mr. Anderssen's February 17, 2005 deposition.

16   Gallo served only by e-mail a January 12, 2005 amended notice ("January 12 notice") to reset Mr.

17   Anderssen's deposition for February 17, 2005 at 9 a.m. in Houston.  The January 12 notice also set the

18   deposition of Jay Cattermole ("Mr. Cattermole") for January 24, 2005 at 9:30 a.m.  The proof of

19   service for the January 12 notice reflects it was sent to the e-mail addresses of defense counsel David

20   A. Battaglia ("Mr. Battaglia")[7] of Gibson, Dunn & Crutcher and William C. Hahesy ("Mr. Hahesy"),

21

22

23   ――――――――――
         [4]     This Court carefully reviewed and considered the hearing and deposition testimony, arguments, points and
     authorities, declarations, exhibits, objections and other evidence and papers submitted by the parties.  Omission of reference

24   to testimony, argument, a document, paper or objections is not to be construed to the effect that this Court did not consider
     the testimony, argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it

25   deemed admissible, material and appropriate for the issues raised by the parties.

26       [5]     The subpoena and deposition notice also sought documents from Mr. Anderssen.

27       [6]     In its June 17, 2005 brief, Gallo contends that defendants' discovery obstruction required postponement
     of Mr. Anderssen's deposition.

28       [7]     Mr. Battaglia is one the of lead defense counsel in this action.

local defense counsel.  The proof of service indicates the January 12 notice was served on no other defense counsel.

Mr. Williams was assigned Mr. Anderssen's deposition and a third-party witness' February 16, 2005 deposition in New York City set by defendants.  Because of scheduling and travel concerns,  Mr. Williams arranged with Mr. Ardoin to move Mr. Anderssen's deposition to 12 p.m. on February 17, 2005.  Gallo served a February 11, 2005 amended notice ("February 11 notice") only by e-mail to reset Mr. Anderssen's deposition for 12 p.m. on February 17, 2005.  The proof of service of the February 11 notice  indicates that Mr. Battaglia and Mr. Hahesy were the only defense counsel to whom the e-mail was sent.  Mr. Williams did not speak with any defense counsel about the deposition's time change.

On February 16, 2005, LegaLink, the court reporting service for Mr. Anderssen's deposition, informed Gallo's counsel that the location of Mr. Anderssen's deposition needed to be moved from LegaLink's office to a nearby hotel conference room due to a scheduling conflict.  Gallo immediately served by e-mail an amended deposition notice ("February 16 notice") to provide the hotel location, approximately three miles from LegaLink's Houston office.  The proof of service of the February 16 notice indicates that Mr. Battaglia and Mr. Hahesy were the only defense counsel to whom the February 16 notice was sent by e-mail and U.S. mail.[8]

### The February 16, 2005 E-Mails

On February 16, 2005[9] at 12:31 p.m.,[10] defense counsel Louis E. Shoch III ("Mr. Shoch") of Gibson, Dunn & Crutcher sent an e-mail to various counsel, including Mr. Williams and Mr. Anderssen's counsel, to state: "The Amended Rick Anderssen Depo. Notice and Proof of Service that you attached to the e-mail below do not match.  The Amended Notice of Depo. is dated/signed February 16, 2005 (today).  The Proof of Service is dated February 10, 2005.  Please explain or correct. Thank you."

---

[8]        The original proof of service indicates the notice was served on February 10, 2005.  Gallo's counsel served an amended proof of service to indicate correct February 16, 2005 service of the notice.

[9]        Unless otherwise indicated, all e-mails were sent on February 16, 2005.

[10]        Unless otherwise indicated, references will be to Pacific Standard Time.

Mr. Battaglia sent a 2:32 p.m. e-mail to various counsel, including Mr. Williams and Mr. Ardoin, to state:

> We received a call this morning from the Cotchett firm indicated [sic] a "relocation" of a deposition of Mr. Anderssen "tomorrow."  We have confirmed that **there is no deposition of Ric Anderssen going forward** tomorrow or Friday.  The defendants did not receive proper notice or service of this deposition on either day, and we understand the witness did not either.  Neither [defense counsel] Mr. [Rory] Hernandez nor anyone else was prepared to participate in such a deposition, and indeed the clients need to be present at the mediation on Friday.  Mr. Hernandez informed the attorneys in Houston this at the Redd deposition earlier today, when they indicated they were leaving town and that "you should speak to Mr. Williams."  We agree to a mutually agreeable date in the future and you can then serve proper notice.  (Bold added.)

Mr. Williams responded to Mr. Battaglia with a 2:41 p.m. e-mail to state: "You were properly served.  The only thing that changed today was the location.  You have no right to call the court reporter to cancel the deposition, as Rory did.  I have called them to advise them that we are going forward."  Mr. Battaglia followed up with a 2:45 p.m. e-mail to Mr. Williams and copied it to Mr. Ardoin to state: "We were not properly served and the deposition is not proceeding, as we have confirmed with Anderssen's counsel."  Mr. Williams responded with his e-mail: "You were and it is. I have spoken with Anderssen's counsel."  Mr. Battaglia sent a 2:58 p.m. e-mail to counsel, including Mr. Williams and Mr. Ardoin, to state:

> Any notice was ONLY served by email on us and local counsel and on Dan Cogdell, Anderssen's counsel.  Proper service is made pursuant to Fed Rule 5(b) (2) (D) which talks of service by hand or mail and then says that "[d]elivering a copy by any other means, including electronic means, consented to in writing by the person served."
>
> We never consented in writing to receive a deposition notice served on us by email or other means.  Nor did Bill Hahesy.  I spoke with Jimmie [Mr. Ardoin] in Dan Cogell's office, and he says that he has reviewed the file and the only notice he has received is by email and that there is no evidence of written consent on his end either.  We and Anderssen's counsel are amenable to rescheduling at an appropriate time.

Mr. Battaglia received Mr. Williams' faxed letter to "All Counsel" which stated: "Just so there is no confusion, the Anderssen depo is going forward tomorrow at Noon at the Sheraton Brookhollow, 3000 North Loop West, Houston, Texas, 713/688-0100."  In response to Mr. Williams' letter, Mr. Battaglia sent his 3:05 p.m. e-mail to counsel, including Mr. Williams and Mr. Ardoin counsel, to state:

> Note that we object to the deposition being taken in these circumstances, and object to any use of the deposition for any purpose in this or any other action.  We will not be present, and were not scheduled to be present.  It is our understanding that since neither

the witness nor the parties were properly served, the deposition will not be proceeding according to Mr. Cogdell's office.

Mr. Williams responded with a 3:08 p.m. e-mail to Mr. Battaglia to state: "We have had an agreement for email service going back over a year. This is a cheap stunt."

At 3:43 p.m., Mr. Battaglia forwarded to Mr. Williams an e-mail from Gibson, Dunn & Crutcher associate Eric Maier ("Mr. Maier") which stated:

> By the way, contrary to Williams' claim, we did not cancel the court reporter. We merely advised the court reporter that we – opposing counsel – were not showing up. In that same call, we were advised that the court reporter for tomorrow was ordered last night.

Mr. Williams responded to Mr. Battaglia in an e-mail: "That's not what the court reporter says."

Mr. Ardoin, Mr. Anderssen's counsel, sent a 3:47 p.m. e-mail to counsel, including Mr. Williams, to state: "Counsel for Richard Anderssen also object to the form of service upon Mr. Anderssen for the same reasons stated in the previous email. Therefore, we will not be producing Mr. Anderssen tomorrow for a deposition."

<u>**Gallo's Version Of Mr. Anderssen's Failure To Appear**</u>

<u>**As Stated In Its Original Moving Papers**</u>

Mr. Williams claims that upon receipt of Mr. Ardoin's e-mail he first learned Mr. Anderssen would not appear for his February 17, 2005 deposition and that at approximately 1 p.m. during a break in the February 16, 2005 New York deposition, defense counsel objected to Mr. Anderssen's deposition on grounds the notices of the new date, time and location had been served by e-mail. Gallo claims that at approximately 1:30 p.m. on February 16, 2005, Mr. Williams' assistant informed Mr. Williams that she had received a call from LegaLink that defense counsel Rory Hernandez ("Mr. Hernandez") of Gibson, Dunn & Crutcher had called LegaLink to cancel Mr. Anderssen's deposition. In his February 23, 2005 declaration, Mr. Williams states:

> At approximately [1:30 p.m.] on February 16, 2005, I received a call from my secretary Linda Clark. Ms. Clark relayed a message that she had received from LegaLink, the court reporting firm retained for the Anderssen deposition. According to LegaLink, Rory Hernandez of Gibson, Dunn had called LegaLink to advise them that the Anderssen deposition was cancelled.

In his declaration, Mr. Williams notes that he spoke with Mr. Ardoin and attributes Mr. Ardoin

13

as saying Gibson, Dunn & Crutcher attorneys attempted to persuade Mr. Ardoin not to produce Mr. Anderssen for his deposition because the amended deposition notices were improperly served by e-mail and a February 18, 2005 mediation may result in settlement to avoid Mr. Anderssen asserting his Fifth Amendment privilege at his deposition.  In his March 15, 2005 declaration, Mr. Williams states: "Mr. Ardoin told me that he was exclusively a criminal lawyer, and thus did not know what rules governed service in civil actions.  Mr. Ardoin told me that he was relying on what he was being told by defense counsel, and that he was in a difficult position because he was 'working with' defense counsel." According to Mr. Williams, at 3:30 p.m. on February 16, 2005, Mr. Ardoin called Mr. Williams to advise Mr. Anderssen would not appear for his deposition based on notice objections.

**Defendants' Version Of Mr. Anderssen's Failure To Appear**

**As Stated In Their Original Opposition Papers**

In his March 11, 2005 declaration, Mr. Battaglia claims "no recollection of receiving or having seen any emails referring to any deposition in this case . . . scheduled for February 17, 2005 until February 16, 2005, the day before."  Mr. Battaglia claims that on February 16, 2005, he first learned during a telephone call with Gallo's counsel of Mr. Anderssen's February 17, 2005 deposition and attributes the delay to being away from his office when the February 11 notice was served "after hours" and thereafter for several days when he lacked access to his e-mail.  Defendants point out that during the early afternoon of February 16, 2005, LegaLink sent an e-mail to Gibson, Dunn & Crutcher that Mr. Anderssen's deposition had been set for February 17 and 18, 2005 in Houston.

On February 16, 2005, Mr. Hernandez and Mr. Maier participated in depositions in Houston. Mr. Maier received an e-mail on his Blackberry handheld device that his law firm had just received a message that Gallo intended to depose Mr. Anderssen on February 17, 2005.  After the deposition, Mr. Maier asked Gallo counsel participating in the Houston deposition about Mr. Anderssen's deposition, and Gallo's counsel directed Mr. Maier to Mr. Williams and left for the airport.  Defense counsel claim they were unaware of Mr. Anderssen's February 17, 2005 deposition.

In his March 8, 2005 declaration, Mr. Hernandez states:

> 8.      At the time that [Gallo's counsel] left the deposition, Debra Henderson, the court reporter at [the Houston] deposition, was still in the conference room in which the deposition took place.  I mentioned to Ms. Henderson that we just received

14

information that Mr. Anderssen's deposition may proceed the following day, and I asked Ms. Henderson whether she had been hired as the court reporter for that deposition. Ms. Henderson replied that she was not scheduled to work on this case on the following day, but that she would telephone LegaLink's Houston office to find out whether a deposition in this case was scheduled. . . .

9. . . . Ms. Henderson . . . advised us that LegaLink had been hired for a February 17th deposition "last night" (i.e., the night of February 15, 2005). . . .

10. When Ms. Henderson told her colleague that defendants were not planning to attend the deposition, Mr. Maier interrupted Ms. Henderson and asked her to clarify the fact that we did not represent the party that hired LegaLink and that we were not canceling LegaLink's services for the following day. I then heard Ms. Henderson tell her colleague that we were not representing the parties that had scheduled the deposition, and I heard Ms. Henderson advise her colleague that she should telephone the party that ordered LegaLink's services for the following day.

11. On February 16, 2005, with the exception of my interaction with Ms. Henderson, as described in the preceding two paragraphs, I did not speak with anybody who is in any way affiliated with LegaLink. Nor did I attempt to contact or speak with Mr. Anderssen. In fact, I have never met or spoken with Richard Anderssen.

Defendants submitted the March 4, 2005 declaration of Britney Jeffrey ("Ms. Jeffrey"), LegaLink's Houston deposition calendar manager with whom Debra Henderson ("Ms. Henderson"), the LegaLink Houston court reporter, spoke. Ms. Jeffrey declares:

3. . . . Ms. Henderson advised me that she was with counsel for the opposing party, who told her that they may not appear at the deposition due to insufficient notice for the deposition.

4. During my conversation with Ms. Henderson, I understood that the attorneys with her were not the attorneys whose firm had booked a court reporter for the Anderssen deposition. I understood that neither she, nor the attorneys that she was with, were instructing me to cancel the court reporter for the deposition of Richard Anderssen on the following day.

5. At no time on February 16, 2005 was the deposition of Richard Anderssen removed from LegaLink's calendar.

6. At no time on February 16, 2005 did I speak with Rory Hernandez, or any other attorney from Gibson, Dunn & Crutcher.

Mr. Battaglia notes in his March 11, 2005 declaration that he communicated with Mr. Ardoin on the afternoon of February 16, 2005 "to the effect that defendants did not believe that it [sic] properly had been served with notice of the February 17, 2005 deposition pursuant to the federal rules, that the defendants were not in a position to attend a deposition on February 17 or 18, and that they would object to the deposition and any use of it in this action or any other action as a result. I further explained that our client could not attend the deposition because he was required to be present in San

15

Francisco to prepare for a scheduled mediation in this action which had been set to attempt to resolve the matter. . . . In a subsequent conversation on February 16, Mr. Ardoin indicated both to me and Mr. Hernandez that he reviewed his client file and the Federal Rules of Civil Procedure and determined Mr. Anderssen's deposition had not been properly noticed and that the deposition thus would have to be rescheduled. . . . Mr. Ardoin stated that the notice on his client had been served only by email without written consent of the witness or his client."

_____Mr. Hernandez claims that on February 23, 2005, he again advised Mr. Williams that Mr. Hernandez neither canceled Mr. Anderssen's deposition nor telephoned LegaLink regarding it.

### Ms. Henderson's Declarations And E-Mails

In response to Mr. Hernandez' March 8, 2005 declaration, Gallo filed the March 15, 2005 declaration of Ms. Henderson, the court reporter for the February 16, 2005 Houston deposition. As noted by Gallo, Ms. Henderson contradicts Mr. Hernandez: "I took the deposition . . . in the Gallo v. Encana case on February 16, 2005. The deposition concluded at approximately 4:00 p.m. While I was packing up my equipment, I engaged in a conversation with Mr. Rory Hernandez/Mr. Maier about the next day's deposition, if any, and was told that **they would not be producing the witness** for the next day." (Bold added.)

_____On March 17, 2005, Ms. Henderson sent Mr. Williams e-mails to note her discomfort "to engage in dueling affidavits" and explained:

> [Mr. Maier] proposed an alternative affidavit that I did not totally agree with the verbiage, but it did call into question some points in my memory. If the big issue here is the words 'produce his witness' then I cannot swear that he/they said those EXACT words. . . . It is possible that Mr. Maier may have simply said they would not be present versus they would not be producing the witness. I do not remember specifically the exact words. Because there are only two sides involved in this case, I may have assumed that if they were going to be present that would mean their witness would not be present for your side to depose. The only truly strong memory I have and can swear to is that there was a question about the next day's deposition going forward because of an issue of timing of the notice raised by Mr. Maier/Mr. Hernandez. Beyond that I don't know that I can add anything further.

_____Ms. Henderson followed up with a later March 17, 2005 e-mail to Mr. Williams to further explain:

> My concern and focus at that time was whether there was a deposition the next day, would I have to cancel appointments to cover it . . . & being relieved to know that since it was going to be a CNA [certificate of non-appearance] someone else could cover it.

1    Sorry, but I can't swear to either side that the specific words "my witness" were or were
2    not used, only "adequate or sufficient notice" and "not going to be there" were said.

3    _____Defendants followed up and filed Ms. Henderson's March 17, 2005 declaration wherein she
4    states:

5    I am submitting this declaration in order to clarify a statement that I made in a
     declaration that I signed on March 15, 2005, in which I discussed a February 16, 2005
6    conversation I had with Rory Hernandez and Eric Maier. From that conversation, I
     knew that Mr. Hernandez and Mr. Maier had not noticed the deposition, and I therefore
7    assumed that they represented the witness. They told me that they had not received
     adequate notice of the deposition and would not be attending the deposition. This
8    prompted the call to my office to confirm the timing of the scheduling of the deposition
     the following day.
9

10   In his March 25, 2005 declaration, Mr. Hernandez states:

11   Neither Mr. Maier nor I ever stated to any court reporter of LegaLink that we
     represented Richard Anderssen or that we "would not be producing the witness for the
12   next day." I never made such a statement to Debra Henderson, and neither did Mr.
     Maier, who was in my presence during the exchange that took place with Ms.
13   Henderson.

14                                    **Mr. Ardoin's Affidavit**

15   On March 29, 2005, Mr. Ardoin faxed to this Court his March 28, 2005 affidavit in which he
16   states:

17   _____. . . around 4:30 p.m. [EST] on February 16, 2005 I received a phone call
     followed by an email from defense counsel, David Battaglia, stating that the Defendants
18   were objecting to our deposition going forward because of improper service. They
     cited to me a rule, Federal Rule 5(b)(2)(D), which requires service by hand or mail and
19   then provides for service by "[d]elivering a copy by any other means, including
     electronic means, consented to in writing by the person served." It was then that I
20   checked our file in the office and discovered that at no point had we consented in
     writing to service by e-mail. I then went to speak with Mr. Cogdell and informed him
21   that there was an issue with service and whether it was proper under this rule. I told
     him that we should not produce Mr. Anderssen because at that moment I could find no
22   legal reason to convince me otherwise. My reason for not wanting to produce Mr.
     Anderssen was in the event that the Defendant's objection was valid, I did not want to
23   have to produce our client twice for a deposition.

24   _____I then spoke to Mr. Williams on the phone and informed him that I had no
     choice but to cancel the deposition given this rule and my interpretation of it. At no
25   time during our conversations on February 16, 2005 did Mr. Williams offer me a legal
     reason as to why I should produce my client other than to say, "(the defendants) are
26   wrong on this one." Mr. Williams has since then taken the position that he believes the
     rule is applicable only to parties and not to third party witnesses. I was not shown nor
27   have I been shown any case law by either side that stands for either one's contention
     as to how this rule is applied in practice.

28

                                            17

1  Without a compelling legal ground presented to me at that moment, and with
2  not much time to spare due to the late hour this objection was raised, I felt I had no
   choice other than to advise my client not to testify because I felt there was a service
3  issue with his notice of deposition.  My decision not to produce Mr. Anderssen was
   separate and independent from any decision by counsel for the defendants and was
   based solely on protecting my client's best interests.

4

5  <u>**Mr. Williams' March 30, 2005 Hearing Testimony**</u>

6  Mr. Williams testified at the March 30, 2005 evidentiary hearing that in this action, "documents

7  have been served routinely by e-mail, often with courtesy copies" and that he "received documents by

8  e-mail constantly."  Mr. Williams testified that Mr. Battaglia sent him an e-mail to agree "to serve

9  papers by e-mail in this case" but Mr. Williams has not located the e-mail.  At the time of the January

10  12 notice, Mr. Williams believed the service "was done in accordance" with this Court's Local Rules

11  because defense counsel "had already signed up, and we were getting papers through the e-filing

12  system that they were filing."  Mr. Williams further believes that the February 11 notice for Mr.

13  Anderssen's deposition complied with this Court's Local Rules.

14  Mr. Williams testified that prior to receiving Mr. Battaglia's 2:32 p.m. e-mail that Mr.

15  Anderssen's deposition would not proceed, Mr. Ardoin had not informed Mr. Williams that Mr.

16  Anderssen would not appear for his February 17, 2005 deposition:

17  Q.      Prior to this e-mail, Exhibit 5, had Mr. Ardoin said at any point in time that it
             was his intent not to produce the witness on the 17th either at the time it had
18           been amended, or at the location as amended?

19  A.      No, he had not.

20  Q.      Did he ever say to you that he did not believe that he had received improper
             notice of the deposition?
21
    A.      No.
22
    Q.      Did he ever tell you at any point in time that he felt that any notice of the
23           deposition had been issued as to him was improper?

24           . . .

25  A.      Before this, no.  He'd never mentioned any concern or issue about the
             deposition whatsoever.
26
    Q.      In connection with the e-mail that you had sent to him, confirming the
27           deposition back on January 12th of 2005, did he ever tell you that he wanted you
             to serve notice of the deposition by mail?
28

1       A.      No.

2       _____ . . .

3       Q.      Once again, Mr. Williams my question was at any point in time prior to your
                receipt of this e-mail, did you ever learn from Mr. Ardoin that he had any
4               objection to communications that you had made to him through the e-mail
                system?

5       A.      No.

6

7       _____ As to Mr. Ardoin's explanation not to produce Mr. Anderssen, Mr. Williams testified:

8               [Defense counsel] had told him that the defense counsel had objections to
                service.  That they had also told him that there as a mediation scheduled for the
9               following day, and that if the mediation were successful, Mr. Anderssen could then
                avoid ever having to assert his Fifth Amendment rights, and that would be in Mr.
10              Ardoin's client's interests.

11              They also told him they were objecting, as I said, on the basis of the Rules of
                Civil Procedure, as to which Mr. Ardoin said to me, "I'm a criminal lawyer.  I don't
12              know the rules, but they're telling me that the rules give them an objection to the
                deposition going forward," and that he did not know at that time what he should do.

13

14      _____ Mr. Williams testified that after Mr. Battaglia's 2:45 p.m. e-mail, he again telephoned Mr.

15      Ardoin:

16      Q.      Mr. Williams, for the purposes that the Court has indicated, what did he say?

17      A.      He indicated he'd not been able to speak to Mr. Cogdell [a partner in Mr.
                Ardoin's firm], that he was concerned because he said, quote, I have to work
18              with these people, referring to defense counsel, that he was a criminal lawyer,
                and he didn't know civil law, and he was very uncomfortable at being asked to
19              make a decision based upon how civil law might apply, and as I said, he'd not
                yet spoken to Mr. Cogdell, so thus, he'd not yet decided what was going to
20              happen with his client.

21      Q.      Okay.  So at that point in time, what was your understanding of whether or not
                this deposition was proceeding?

22
        A.      At that point in time, my understanding was it was still going forward as the
23              witness' counsel had not indicated any intention not to produce his client.

24              . . .

25      Q.      As of shortly after 2:45, the receipt of the e-mail from Mr. Battaglia that
                confirmed the deposition was not going forward, after that e-mail, and then
26              after you conversation with Mr. Ardoin, which I understand occurred shortly
                thereafter, what was your understanding of whether that deposition was going
27              forward?

28      A.      My understanding was that at that point in time, the deposition was still set to

                                              19

go forward.

Q.    Had Mr. Ardoin told you at that point in time that he was not showing up with his witness because he didn't get proper notice?

A.    No.

_____In reference to Mr. Battaglia's 2:58 p.m. e-mail that Mr. Battaglia had spoken to Mr. Ardoin and there is no evidence of written consent to e-mail service, Mr. Williams testified that Mr. Battaglia's e-mail was inconsistent with his telephone conversation with Mr. Ardoin. Mr. Williams further testified that Mr. Battaglia's 3:05 p.m. e-mail that Mr. Anderssen's deposition will not proceed because of improper service is inconsistent with his conversation with Mr. Ardoin. Mr. Williams testified that as of 3:05 p.m., he had received no warning that Mr. Ardoin would not produce Mr. Anderssen for his deposition.

Mr. Williams testified that Mr. Ardoin telephoned him to apologize that Mr. Ardoin was sending his 3:47 p.m. e-mail to state he objected to service for Mr. Anderssen's deposition and would not produce him. Mr. Williams testified that Mr. Ardoin's telephone call was the fist instance that Mr. Williams learned that Mr. Anderssen would not appear for his February 17, 2005 deposition. Mr. Williams further testified:

> I asked Mr. Ardoin to honor his agreement to produce his client as he suggested. I suggested to Mr. Ardoin that he - - if he was going to take the suggestion of defense counsel, to review Federal Rule 5 to determine whether or not that applied to him as a nonparty who agreed to produce his witness on that date. Those two things I asked him to do, sir.

Mr. Williams testified he further learned of a problem with Mr. Anderssen's deposition from his secretary's telephone call late in the afternoon of February 16, 2005. According to Mr. Williams, he telephoned Chad at LegaLink's San Francisco office and attributes Chad as saying Mr. Anderssen's deposition had been canceled based on Mr. Hernandez' statements. Mr. Williams telephoned LegaLink's Houston office, spoke to Brittany and told her he took the position that Mr. Anderssen's deposition should proceed in that Gallo set it.

Mr. Williams testified he filed Gallo's sanctions motion on good faith based on "dealings between defense counsel, and Mr. Ardoin," "several calls by defense counsel to Mr. Ardoin, the obvious fact that he was weighing what to do, and he didn't know what to do, and he was having

pressure put on him," "[n]othing said to me by Mr. Ardoin on that day," and LegaLink's Brittany not indicating "in any way that I was mistaken on anything I was asking her about." Mr. Williams further testified the he "spoke to Brittany, who did not say I was wrong in any respect in terms of someone having attempted to cancel the deposition and me directing her that it not be canceled."

As to attempting to obtain Mr. Ardoin's declaration, Mr. Williams testified that Mr. Ardoin "said he was concerned, he did not want to become more involved. But as he said in his prior call, that he still had to work with these people."

### Mr. Battaglia's April 13, 2005 Hearing Testimony

Mr. Battaglia testified at the April 13, 2005 evidentiary hearing that the January 12 notice was received on Mr. Battaglia and Mr. Hernandez' computer system and that Mr. Battaglia "reviewed it" and sent it to Mr. Hernandez and Mr. Shoch. Mr. Battaglia does not remember receiving the January 12 notice but knows he did "based on a subsequent review of the email system" which he performed about a week prior to the April 13, 2005 evidentiary hearing in preparation for it. Mr. Battaglia testified:

> I don't remember receiving it or sending it. When I went back and checked my sent items folder about a week ago, I have a record of forwarding it on to Mr. Shoch and Mr. Hernandez. When I checked my computer earlier, I checked my inbox and my deleted items folder and I did not find that email. I did not check my sent items folder at that time because I didn't have an idea that it would be sent.

Mr. Battaglia does not recall giving Mr. Hernandez or Mr. Shoch direction regarding the January 12 notice and did not know "what action they would take with it or not. . . . I had no expectations that would end up on any calendar as a result of sending it to them." Mr. Battaglia further noted that the January 12 notice included Mr. Cattermole's deposition for which Mr. Hernandez and Mr. Shoch were responsible. Mr. Battaglia testified that he does not recall reviewing the January 12 notice's proof of service to prompt an objection to e-mail service.

As to the February 11 notice of Mr. Anderssen's deposition, Mr. Battaglia testified that his computer received it by e-mail at 5:25 p.m. on February 11, 2005 after Mr. Battaglia had left the office for a brief family vacation and that Mr. Battaglia did not open the e-mail until February 16, 2005 when he returned to his office. According to Mr. Battaglia, he could not retrieve his e-mails with his hand held Blackberry device because of reception and service difficulties.

Mr. Battaglia testified that at around 11:20 a.m. on February 16, 2005, he received a telephone call from Mr. Williams' assistant that Mr. Anderssen's deposition had been rescheduled for a hotel and "that was the first that I had heard that there was a deposition the next day of Mr. Anderssen." Mr. Battaglia noted he "was surprised because I was not aware of a deposition scheduled the next day." Mr. Battaglia noted that he inquired of paralegal Mary Bellous ("Ms. Bellous")[11] whether the deposition had been "on calendar the next day" and asked Ms. Bellous and paralegal Chris Ballough ("Mr. Ballough") to attempt to find a deposition notice and they did not find a notice for Mr. Anderssen's February 17, 2005 deposition. Mr. Battaglia noted that he was unable to locate a deposition notice in his files and telephoned Mr. Maier, who attended a Houston deposition and who indicated that he and Mr. Hernandez were unaware of Mr. Anderssen's February 17, 2005 deposition. Mr. Battaglia testified: "I also believe that I . . . had checked my emails . . . in connection with looking at the hard copy and located a February 11th email, communication to me about a deposition of Mr. Anderssen that was going to occur on February 17th." Mr. Battaglia noted he received another notice for Mr. Anderssen's deposition by e-mail around 12 p.m. on February 16, 2005.

Mr. Battaglia testified that he had three telephone conversations with Mr. Ardoin on February 16, 2005. Mr. Battaglia estimated they occurred around 12-12:30 p.m., 2-2:15 p.m., and 2:45-3 p.m.[12] Mr. Hernandez joined the second and third conversations. Mr. Battaglia explained his "purpose was to check on whether there was a deposition of Mr. Andersen scheduled for the next day and how service was effectuated." Mr. Battaglia claims that on February 16, 2005, he was unaware of the January 12 notice.

Mr. Battaglia described the initial telephone conversation,  Mr. Ardoin's return call to Mr. Battaglia:

> I indicated that we had just received information that a deposition of Mr. Anderssen was supposed to occur the next day . . . and that I wanted to know whether there was a deposition the next day because this was a surprise to us.
>
> . . .

---

[11]    According to Mr. Battaglia, Ms. Bellous is a "deposition coordinator" and responsible to "keep track" of deposition scheduling and Mr. Battaglia and Ms. Bellous developed a system to calendar depositions.

[12]    In his deposition, Mr. Ardoin recalled only the two later telephone conversations with Mr. Battaglia.

[Mr. Ardoin] indicated that there was a deposition that was supposed to occur the next day, February 17th. He looked at his files and told me, in response to my questions, that the service upon us was electronic in nature. I asked him whether or not there was any other means of service, mail or hand delivery on us according to his files. He said no. He observed at that point that there was no service on him, mail or hand delivery either. I indicated that we may have an objection to the deposition because we do not believe that we had received proper service of this particular notice of deposition under Rule 5, which required service by hand delivery or mail or electronic means, if there was written consent between the parties. I indicated to him at that point that we had not consented to receive service electronically. He observed that he did not consent either.

. . .

At that time he did not tell me he would not produce the witness.

Mr. Battaglia noted he "presumed that Mr. Anderssen and Mr. Ardoin were going to present at that deposition." Mr. Battaglia testified that based on Mr. Maier's conversation with Gallo counsel Frank Pitre and Greg Durbin ("Mr. Durbin") following the February 16, 2005 Houston deposition, Mr. Battaglia surmised Gallo's counsel rejected rescheduling Mr. Anderssen's deposition. Mr. Battaglia initiated the second telephone conversation to inform Mr. Ardoin "of what we heard from opposing counsel regarding the deposition and whether it could be rescheduled. And I wanted to inform him formally of our objections to the deposition going forward given the lack of either proper or actual notice." Mr. Battaglia further testified:

I relayed something to the effect that we had tried to approach counsel about the lack of notice and about the fact that we're surprised that a deposition is going forward. And that we were told that we had bad information that it appeared that opposing counsel was not in a position at that point to reschedule the deposition. I told him that we had done a further investigation and determined that the notice that we received was only electronic in nature, that we had just become aware of the deposition, to my recollection, on the 16th, the day before. I communicated to him that there was – that we would never have set a deposition on this date because there was a mediation scheduled for February 18th and that our client, who was present at all former employee and employee depositions in this case could not be present because he was scheduled to fly to San Francisco to meet with Canadian counsel and Canadian representatives to prepare for this mediation that was scheduled on February 18th. And that there – given the circumstances, that we did not have proper notice, I recited, at this point, I think, Rule 5 of the federal rules and indicated that we had not consented to electronic notice and that we therefore were objecting to the deposition, both because of proper and lack of actual notice and circumstances. That we could not, we believe, cover this deposition and the client could not be present.

. . .

I may not have used the word "actual notice," but I told him that notice was not proper under the federal rules and I think I cited Rule 5. And then I told him that we just became aware of this deposition that day, that this was going forward. I may have

used actual notice, but that was the gist of what I was communicating.

Mr. Battaglia attributes Mr. Ardoin as responding that "based on these objections, the deposition, it appears, will need to be rescheduled and will be rescheduled." Mr. Battaglia denied that he told Mr. Ardoin that if mediation were successful, Mr. Anderssen would not need to assert the Fifth Amendment and that cancelling the deposition would be in Mr. Anderssen's best interests.   Mr. Battaglia further denied he told Mr. Ardoin that mediation would result in settlement.

Mr. Battaglia testified that at the time of the third telephone call with Mr. Ardoin, Mr. Battaglia's firm had decided not to attend Mr. Anderssen's February 17, 2005 deposition due, to among other reasons, difficulty to staff the deposition. Mr. Battaglia noted the third telephone conversation was prompted by Mr. Williams' e-mail to indicate that Mr. Williams had spoken with Mr. Anderssen's counsel and that Mr. Anderssen would be produced on February 17, 2005.  As to the third telephone conversation, Mr. Battaglia testified:

> I asked Mr. Ardoin whether the deposition was going to be proceeding the next day and proceeded to register our objections.
>
> . . .
>
> . . . I quoted to him the federal rule.  And indicated that we did not receive proper service. I also indicated the prior things that I had mentioned.  That we just found out about this.  He asked for a citation to the federal rule, the exact citation and indicated that at the end of our conversation, he would confirm in writing to the parties that the deposition would have to be rescheduled if the rule was as I recited it to him.

Mr. Battaglia further testified regarding the third telephone conversation:

> I received an email from Mr. Williams indicating he had spoken with Mr. Anderssen's counsel and the deposition was going forward.  That's how I interpreted it.  I called Mr. Ardoin to see whether the deposition was going forward or not.  And we had a communication where I set forth the reasons again why we objected to it going forward.  He told me that the deposition would be rescheduled.  If the rule is as I quoted it because he thought that there was not proper service in the circumstances.
>
> . . .
>
> I was advocating my client's objections to the deposition so that he would understand them and hopefully appreciate them and that the deposition could be rescheduled.  I did not know whether or not it was going to be rescheduled or not.  Ultimately, he told me he would confirm by written email that the deposition was not going to go forward.  I didn't receive that email until later in the day.  I did not know whether it was going forward or not.  But I wanted to be sure that our objections to this deposition going forward, that my client had, were clear and that he appreciated what our objections were.

1    Mr. Battaglia's testimony continued:

2    Q.    Was it your purpose in advocating your client's position forcefully at two and
           2:15 and at 2:45 to three to convince Mr. Ardoin not to produce his witness the
3          next day?

4    A.    As you frame that, yes.

5          . . .

6    A.    Mr. Ardoin is the one who has to make a decision about whether or not he's
           going to produce his witness or not. Whether or not he believes that the
7          objections are valid or appropriate or not. . . . During the day, Mr. Williams
           was calling Mr. Ardoin,[13] according to his emails, and indicating that he was
8          trying to persuade Mr. Ardoin that the deposition should go forward, that our
           objections are not appropriate. I received this email from . . . Mr. Williams
9          and I called up to see whether it's going forward again and here's our
           objections. I then received a fax from Mr. Williams indicating that just so
10         there's no confusion, the deposition is going forward tomorrow. That's when
           I sent the next email that says, look, it's the last thing I can do here, we object
11         to it going forward. We do not have proper notice. We object to any use of
           it in this action. . . . I don't know at that point whether it's going forward or not
12         going forward based on Mr. Williams' conversations with . . . Mr. Ardoin . .
           . So that's what I mean. I'm advocating my client's position and – and hoping
13         that it is appreciated. I don't know whether it will be ultimately or not.

14         Mr. Battaglia denied that he told Mr. Ardoin that mail service was required for Mr. Anderssen's

15   deposition notice and that F.R.Civ.P. 5 applied to Mr. Anderssen as a third-party witness.  Mr.

16   Battaglia testified he does not know whether F.R.Civ.P. 5 applies to nonparties and did not know

17   whether F.R.Civ.P. 5 required Mr. Anderssen's counsel to receive notice of Mr. Anderssen's

18   deposition by U.S. mail.  Mr. Battaglia testified he did not mention this Court's Local Rules to Mr.

19   Ardoin.

20         Mr. Battaglia noted that his understanding as of February 16, 2005 and currently is that e-mail

21   service of a deposition notice is insufficient because according to this Court's Local Rules, the

22   CM/ECF system "applied to court filed records and notices therefore generated by the Court. I did not

23   think of the ECF rules in connection with this particular notice of deposition of Mr. Anderssen that

24   came up on the 16th because I am aware or was aware that it applied to court filed records."

25         Mr. Battaglia testified that Ms. Bellous no less than weekly circulated a schedule of upcoming

26   depositions in this action. The January 19, 2005 schedule does not include Mr. Anderssen's February

27   _____

28         [13]    Mr. Battaglia acknowledged that Mr. Ardoin did not confirm that Mr. Ardoin had spoken with Mr. Williams
     and that Mr. Battaglia did not ask Mr. Ardoin if Mr. Ardoin had spoken with Mr. Williams.

17, 2005 deposition but includes the January 24, 2005 deposition of Mr. Cattermole, which was jointly set by Gallo's January 12 notice.  According to Mr. Battaglia, Mr. Anderssen's February 17, 2005 deposition "was not on any calendar from January through February 11th" and not on deposition schedules circulated by Ms. Bellous because Mr. Anderssen's deposition had not been set, and "it was neither on LegaLink's schedule nor had we received mail or hand delivery notice that would make it to our records center."  Mr. Battaglia further noted: "We don't use the email of a deposition notice, never have, to put our calendar together."  According to Mr. Battaglia, since January 1, 2005, Gallo has served only Mr. Anderssen's deposition notice exclusively by e-mail and without U.S. mail or personal service.

Mr. Battaglia noted that he attempted to obtain Mr. Ardoin's declaration to oppose  Gallo's sanctions motion and drafted a declaration for Mr. Ardoin but Mr. Ardoin did not sign a declaration prepared by defense counsel.  Mr. Battaglia noted neither he nor anyone at Gibson, Dunn & Crutcher has spoken to Mr. Anderssen.

### Mr. Ardoin's April 22, 2005 Deposition Testimony

The parties' counsel deposed Mr. Ardoin on April 22, 2005 in Houston, Texas.  Mr. Ardoin testified he has been an attorney since November 2004 and devotes his practice to criminal defense with limited civil work.  Mr. Ardoin explained he has not practiced in federal court.

Mr. Ardoin confirmed that his law firm received the January 12 notice for Mr. Anderssen's deposition and that he intended when he received it to produce Mr. Anderssen for his reset deposition on February 17, 2005 at 9 a.m.  Mr. Ardoin noted he had no discussions with any defense counsel prior to Mr. Battaglia's  2:32 p.m. e-mail on February 16, 2005.[14]  According to Mr. Ardoin, when he received Mr. Battaglia's 2:32 p.m. e-mail, Mr. Ardoin intended to produce Mr. Anderssen at the relocated deposition site and had not told Mr. Battaglia that he would not produce Mr. Anderssen.

Mr. Ardoin testified he spoke to Mr. Battaglia and perhaps Mr. Hernandez[15] by telephone

---

[14]     However, later in his deposition, Mr. Ardoin noted he participated in a January 2005 speaker phone conversation with Mr. Hernandez and an attorney who represented another third-party witness and that "we just kind of glossed over the fact that Anderssen would be taking the Fifth."

[15]     Later in his deposition, Mr. Ardoin recalled Mr. Hernandez was included in the telephone conversation.

around 2:30 p.m. for an estimated five minutes during which "the majority of time it was Mr. Battaglia talking." Mr. Ardoin pointed out that the conversation addressed defense counsel's "objection to service":

> A.  They explained to me that – pretty much the content of the E-mail that they sent at [2:30 p.m.] in regards to objecting about proper notice. I asked them why they felt that the service upon them was inappropriate because of a certain rule of civil procedure, Federal Rule of Civil Procedure, and I asked them to then forward that rule to me so that I could take a look at it and make a determination whether it applied to our client or not.

> Q.  And when you say did it apply to your client or not, what did you mean by that?

> A.  Well, there was some question as to whether they were served properly. Then they asked me if we were served properly. They explained to me the rule over the phone and their interpretation of the rule and how it applied and asked if we had ever consented, in writing, to being served by E-mail. I checked our file and saw that we never consented in any way in writing. . . . . I took a look at it [rule], combined with our file, and thought that there was a problem there. There was potentially a problem there.

> Q.  Problem with service upon your client?

> A.  Yes, upon Mr. Anderssen.

> Q.  And at that point in time, was it your understanding that the rule they cited to you applied to service upon non-parties such as your client?

> A.  It – it was my understanding reading the rule myself and using what little law school and real world legal training that I have at this point that it didn't determine – to me, it didn't seem like there was a distinction between parties and non-parties so, therefore, I felt it best to not produce Mr. Anderssen the next day.

Mr. Ardoin elaborated that at that point, "I was heavily leaning toward not producing him because of the rule I had read," but had not definitively decided not to produce Mr. Anderssen. Mr. Ardoin "gave no final determination" to Mr. Battaglia and Mr. Hernandez and said: "I needed to examine the rule a little bit closer, and I would have a response to this shortly." Mr. Ardoin further noted: "I said to them that we were only served by E-mail and that we had never consented in writing, there was no consent in writing in our file to being served by E-mail." Mr. Ardoin explained that until Mr. Battaglia posed questions regarding service of Mr. Anderssen's deposition notice, Mr. Ardoin intended to produce Mr. Anderssen. Mr. Ardoin testified that Mr. Battaglia committed to reset Mr. Anderssen's deposition for a mutually convenient date.

Mr. Ardoin testified that shortly after his conversation with Mr. Battaglia and Mr. Hernandez

and at around 2:40 p.m., Mr. Ardoin spoke with Mr. Williams by telephone for an estimated five minutes.  According to Mr. Ardoin, he told Mr. Williams "there were questions about service and because of that question, that I had read the rule and was still analyzing it but my initial thought was we were not going to produce Mr. Anderssen tomorrow based on this rule."

Mr. Ardoin noted that after his telephone conversation with Mr. Williams, he had a second telephone conversation with Mr. Battaglia, Mr. Hernandez and perhaps a third Gibson, Dunn & Crutcher attorney.  Mr. Ardoin testified:

A.    . . . I still have questions about this rule.  We haven't been – we never consented in writing, and that's when they brought up the fact of the mediation and that it was going – going forward on – the next day, and I'm trying to think exactly what – the mediation was going forward the next day.  If – you know, I'm trying to think of what exactly they said about the mediation.  If there was any way to get the mediation resolved, kind of along the lines of what you were saying before, Mr. Anderssen might not have to take his – exercise his Fifth Amendment rights and I told him, "Well, you know, this rule at this point kind of gives me reason not to show up and produce our witness tomorrow."

Q.    In terms of the substance of what you said, Mr. Battaglia used words or substance to the effect that if the mediation was successful, then the likely effect would be that your client would not have assert his Fifth Amendment rights.  Did I capture that accurately?

A.    Correct.

Q.    An those were words that you recall being used by Mr. Battaglia?

     . . .

A.    Yes.

Mr. Ardoin further testified that Mr. Battaglia and Mr. Hernandez "talked about their hope . . . the mediation would be successful and that Mr. Anderssen could avoid having to go on record invoking his Fifth Amendment."  Mr. Ardoin noted that he told Mr. Battaglia and Mr. Hernandez:

"Well, this" – "this rule is good reason for me not to produce our witness, that I'm not going to produce him twice.  If y'all weren't served properly, we weren't served properly.  I'm certainly not going to produce someone to take the Fifth in two different depositions."

Mr. Ardoin noted at that point, he had determined not to produce Mr. Anderssen for a February 17, 2005 deposition because:

. . . I had read Rule 5 which said in order for service by E-mail, you need a written

28

1  consent. I looked at our file, saw there was no written consent, didn't have a whole lot
   of time to do a lot of research on it.  They had objected already.  I had received their E-
2  mail noticing an objection to the deposition going forward, but my thought process at
   that point was if that objection is sustained and I produce our witness, we're going to
3  have to come back and do this whole thing over again, and I'm not about to produce
   a witness with potential criminal exposure to take the Fifth to two separate depositions.
4

5      Mr. Ardoin testified he spoke with Mr. Williams by telephone around 3:15 p.m. for an

6  estimated five to 10 minutes.  According to Mr. Ardoin, he apologized to Mr. Williams and noted "we

7  need more time on this because I don't think service was proper.  I'd produce him if service was proper

8  but right now, I don't think it is."

9      Mr. Ardoin believes he told Mr. Williams he "was feeling pressure" from defense counsel:

10  A.    . . . I felt pressured to do something at the 11th hour.  I felt like I was put in a
           position where  had no choice other than to make a decision that could greatly
11          affect my client.

12  Q.    And in terms of the – the decision that you ultimately made about Rule 5, were
           you pretty much relying on their interpretation of the rule.
13
    A.    No, I was relying on my interpretation.  I've come to learn don't ever rely on
14          anybody else's interpretation of anything.

15          . . .

16  Q.    And was it your understanding from conversations you had with Mr. Battaglia
           and Mr. Hernandez that they believed that Rule 5 would apply to a witness like
17          your client, Rick Anderssen?

18  A.    They didn't come out and say that, but I think by the fact that they asked me to
           check and see what I – what I thought of this rule, you know, kind of implied,
19          that, yeah, you better – you better see if this applies to witnesses as well.

20          . . .

21  A.    . . . but I don't think I ever said directly, "Steve, I got to work with these guys.
           You know, we got to work together, we're a team, rallying the troops," no I
22          never said anything like that.  I would never do that.

23  Q.    As best you recall, what was the substance of the language that you used
           regarding the relationship that you had with the Gibson, Dunn lawyers?
24
    A.    Again, I think it was just regarding our relationship with them, was we were –
25          you know, we obviously represent a former employee of theirs.  I'm feeling
           kind of pressured here at the 11th hour to make a decision to do something here.
26          I think that was it.  He may have interpreted that as, you know, we have to work
           with – work with them because we're being paid by them or whatever, which
27          we weren't so –

28

Mr. Ardoin attributes Mr. Williams as saying defense counsel was wrong on the issue of e-mail service of Mr. Anderssen's deposition notice. According to Mr. Ardoin, Mr. Williams did not try to give Mr. Ardoin reasons for the deposition to proceed.

As to the influence of a mediation on Mr. Anderssen's deposition, Mr. Ardoin explained:

> Q.    So was the fact that there was a mediation scheduled a factor at all in connection with your determination not to go forward –
>
> A.    No.
>
> Q.    – with the deposition?
>
> A.    No, it wasn't because – I think this was the first mediation and I – you know, I think I concluded that just because a mediation is scheduled, it's the first mediation and I – you know, think I concluded that just because a mediation is scheduled, it's the first mediation in a massive civil suit, you know, I doubted that it was going to settle that day.
>
>        . . .
>
> A.    . . . I think what [defense counsel] said was if the mediation is successful, you know, then you wouldn't have to produce your client, not that they were trying to persuade me that that was the reason but that, hey, look, you know, if it goes forward and we're successful, then you don't have to produce it, I think trying to nudge me, but that wasn't an overriding concern to me as to why to cancel the deposition.
>
>        . . .
>
> Q.    . . . did anybody ever tell you that this matter was likely to settle at a mediation?
>
> A.    No.
>
> Q.    In fact, I think you testified that you never thought it was going to settle and that wasn't a factor in you canceling this, was it?
>
> A.    You have to be an idiot to think the thing would settle from the first try.
>
> Q.    Okay. And that was never a factor in connection with your not – with your cancellation of the deposition.
>
> A.    No.

According to Mr. Ardoin, the "primary reason" to postpone Mr. Anderssen's February 17, 2005 deposition was "I thought the rule applied to us and – and there was no written consent. You know, I didn't want to have to produce him twice, but that was kind of a secondary consideration, a secondary reason. The primary reason was I didn't think the rules had been followed." Mr. Ardoin testified he made the decision on his own to postpone Mr. Anderssen's February 17, 2005 deposition.

1    Mr. Ardoin testified that Mr. Battaglia did "not directly" tell Mr. Ardoin not to produce Mr.

2  Anderssen but that Mr. Battaglia's objection to notice of Mr. Anderssen's February 17, 2005

3  deposition was "one of the main reasons" to cancel it. Mr. Ardoin further testified:

4    Q.    Did [Mr. Battaglia], in the way that he was speaking to you, indirectly suggest
          that it would be in the best interest of your client not to appear and take the
5          Fifth Amendment for the deposition the next day for the reasons he gave you?

6          . . .

7    A.    That's – that's a fair and accurate statement.

8  Mr. Ardoin further testified:

9    Q.    You felt the pressure of the objection.  If it was an appropriate objection,
          whether or not you had been served, you wanted to make sure that things went
10         right so your witness would not go forward twice; is that right?

11         . . .

12   A.    That's correct.

13  Mr. Ardoin denied that Mr. Battaglia told him not to produce Mr. Anderssen because Mr. Ardoin

14  received inadequate notice. Mr. Ardoin noted that neither Mr. Battaglia nor Mr. Hernandez suggested

15  they could address their objections with the Court.

16    Mr. Ardoin noted Mr. Battaglia did not indicate he had received the January 12 notice:

17   Q.    Did he ever say to you on either of these conversations that, in fact, this office
          received actual notice in an E-mail on January 12, 2005 for a deposition that
18         was dated February 17, 2005?

19   A.    No.

20   Q.    Would that have made a difference to you, sir?

21   A.    Yes.

22   Q.    Why?

23   A.    I would have produced him.  The objection at this point was invalid.

24    Mr. Ardoin testified that to the best of his knowledge, Mr. Anderssen's assertion of Fifth

25  Amendment rights was "well known to counsel" and made clear "from the beginning."  Mr. Ardoin

26  noted he had no "real world" experience with F.R.Civ.P. 5 prior to Mr. Anderssen's deposition.

27  **Mr. Hernandez' May 17, 2005 Evidentiary Hearing Testimony**

28    At the May 17, 2005 evidentiary hearing, Mr. Hernandez testified that he received a January

31

13, 2005 e-mail from Mr. Battaglia with the January 12 notice for Mr. Anderssen's deposition attached. Mr. Hernandez stated: "I received the email.  I have no recollection of opening up the email, which would have had the deposition notice on it." Mr. Hernandez noted that when he received the e-mail from Mr. Battaglia, he did not open it because he was aware of the reset deposition for Jay Cattermole, which he was covering and which was also reflected on the January 12 notice.  Mr. Hernandez explained that Mr. Battaglia alerted him of Mr. Battaglia's January 13, 2005 e-mail after the March 30, 2005 evidentiary hearing and that Mr. Hernandez went back into his computer system and located the January 13, 2005 e-mail from Mr. Battaglia with the January 12 notice.  According to Mr. Hernandez, he first learned on Mr. Anderssen's February 17, 2005 deposition when he spoke with Mr. Battaglia on February 16, 2005.

Mr. Hernandez noted that he participated with Mr. Battaglia in a telephone conversation with Mr. Ardoin at about 2:15 p.m. on February 16, 2005.  Mr. Hernandez recounted the conversation:

> A.    . . . Mr. Battaglia carried the conversation.  He advised Mr. Ardoin he was getting back to him.  That we had approached Gallo's attorneys regarding the deposition, but we had been unsuccessful in resolving the matter.  Therefore Dave felt he had to register formal objections to the deposition going forward the next day.
>
> . . .
>
> Q.    What is it that – what else was said during the course of the conversation that you recall?
>
> A.    Dave registered his objections to the deposition notice.  He indicated that there had been improper service.  That we had received only email service of the deposition notice.  And that there never – that the defendants had never consented to receiving deposition notices by email.
>
> He also indicated that the client who attends the deposition of all former employees and current employees was in at – attended those depositions was not available because there was a mediation in the case on the 18th and he was scheduled to meet with counsel on the 17th to prepare for that deposition.  And that counsel for defendants were not in a position to attend the deposition given that mediation.
>
> Q.    Now, during the course of that – was there anything else that you recall being said?
>
> A.    The only other thing is that they felt that the deposition should be rescheduled to a mutually convenient time where everybody could be in attendance.
>
> Q.    And what did Mr. Ardoin say about that?

> A.  I don't recall specifics of what Mr. Ardoin said, but generally I understood Mr. Ardoin accepted those reasons and objections and that the deposition was going to be rescheduled.

Based on the conversation, Mr. Hernandez understood that Mr. Ardoin "agreed with the objections, he felt they were reasonable and the deposition should be rescheduled." Mr. Hernandez acknowledged he was unprepared for Mr. Anderssen's deposition and lacked materials, however, he had not been assigned Mr. Anderssen's deposition.

According to Mr. Hernandez, after the conversation with Mr. Battaglia and Mr. Ardoin, he and Mr. Maier had a three to four-minute conversation with court reporter Ms. Henderson:

> A.  . . . What I recall is Mr. Maier and I were talking as we came in to the conference room to pack up and leave for he air – getting ready to leave for the airport. . .  She was there and while I was talking with Mr. Maier, she seemed interested when we were talking about some deposition tomorrow. She became part of the conversation and whether she interjected herself or we asked her, I don't know.  But we started talking about a potential deposition the next day.
>
> Q.  And what were the words that you used?
>
> A.  I told her that we had just received notice of deposition that was scheduled tomorrow in this case.  And that because of that, lack of notice, that we were not in a position to attend.
>
> . . .
>
> Q.  What was her response, if any?
>
> A.  She – she seemed interested in whether there was a deposition tomorrow.  I asked her, "Are you the court reporter who was scheduled to cover a deposition in this case tomorrow?"  And she said "No."
>
> . . .
>
> Q.  And was there anything else that she said in that three to four minutes?
>
> A.  Yes.  She asked – she asked me should she call – would I like her to call up the office to see if there was a deposition in this case on calendar.  I said that would be great.  She then proceeded to call LegaLink's office in Houston.  She stated to the person on the other side, "Do we have a deposition on schedule in this case?"  She then turned around to Mr. Maier and me and told me "Yes, we have a deposition of Richard Anderssen scheduled for the 17th" and that it had been just placed on the calendar the night before."

Mr. Hernandez later testified:

> Q.  From beginning to end, can you tell me what took place insofar as the communications with Ms. Henderson at that time?

A.    Yes. I was talking with Eric and I don't know who initiated, but I knew that Ms. Henderson was interested in the topic that Eric and I were talking about. I explained to her that we had just received notice of a deposition for the next day and that we were all surprised and that we were not in a position to attend.

. . .

I then asked Ms. Henderson was she the court reporter who was scheduled for a deposition in this case tomorrow and she said no. She said that she would call her office to see if there was a deposition scheduled. And I said "thanks." She then called the office and while speaking with the person on the other side of the line, she turned around and communicated to Mr. Maier and myself that there was a deposition scheduled of Ric Anderssen for the 18th and that had just been put on there that night.

She then continued her conversation with the other person on the line and said that she was with attorneys with the case and that they were not planning to attend the deposition. At that point in time, Mr. – Eric interrupted her and said he wanted to make it very clear that we were not canceling the deposition. I recall Ms. Henderson, at the end, saying words to the effect that "you should contact our client who noticed this deposition."

Q.    When you say you recall her saying words to the effect, to whom did she say that?

A.    The person on the other line.

Q.    Did you ever know who that person was?

A.    Not at that time. But I do know it was Britney Jeffrey as of today.

. . .

Q.    During that time, did you or Mr. Maier ever tell Ms. Henderson that you represented Mr. Anderssen?

A.    Absolutely not.

Q.    Did you ever tell her that you were canceling the deposition.

A.    No. To the contrary. She was advised we weren't canceling the deposition, we weren't the party that noticed the deposition.

Q.    Did you ever tell her that the deposition was going to be canceled?

A.    No.

Q.    Did you tell her that, as far as you were concerned, the deposition was not going forward?

A.    No.

Q.    Did she ever indicate to you in any manner, words or effect that she thought the deposition was not going to go forward?

A.      No.

. . .

A.      At no time did I ever advice Ms. Henderson that I would not be producing the witness the next day.

Q.      Did Mr. Maier ever advice Ms. Henderson of that fact.

A.      Nor did Eric, no.

Mr. Hernandez testified that at 2:48 p.m. on February 16, 2005, he and Mr. Battaglia had another telephone conversation with Mr. Ardoin of an estimate five to 10 minutes.  Mr. Hernandez recounted:

Q.      Could you tell us, then, this second conversation that you had with Mr. Ardoin. Tell us what you recollect was said during the course of that conversation?

A.      Yes.  Mr. Ardoin was put on the line.  Dave proceeded to inquire whether this deposition was going forward or not.  He then registered the previous objections and formal objections that we had to the deposition going forward that being improper service.  That we hadn't consented to email service, that the client was unavailable because of the mediation.  There were attorneys in Houston, but they didn't have materials there and they were heading home. And that the deposition should be rescheduled.

During the course of the conversation, Dave was quoting from Rule 5 regarding what proper service was.  What I recall is Mr. Ardoin asking for the specific citation of the rule Dave was quoting.  Mr. Ardoin indicated that if the rule read as Dave was reading it to him, that the deposition would be rescheduled to a different point in time.  And that he would let all parties know of his decision later on.

. . .

Q.      In this second conversation, was the topic of the mediation in San Francisco brought up?

A.      Yes.  In connection that the client was going to be in San Francisco on the 17th to prepare for the mediation on the 18th and that some of the lawyers from Gibson, Dunn were going to be there with the client to prepare them for the deposition and attend the mediation.

Q.      Was there anything said in the second conversation about the fact that if the mediation were successful, Mr. Ardoin's client might not have to testify in this action?

A.      No, I don't recall that being said.

Q.      Did Mr. Ardoin, in either conversation, ever say, "Well, if the mediation is successful, maybe my client doesn't have to testify?"  Or words to that effect?

1     A.    No, I don't recall that either.

2          . . .

3     Q.    Did Mr. Ardoin ever indicate, during the course of the call, that he felt like he was being pressured to do something?

4

5     A.    No.

     Q.    Did Mr. Battaglia, in either the first or the second call ever say that it was in Mr. Ardoin's client's best interest to continue the deposition?

6

7     A.    No, I don't recall that being said.

8     Q.    When you say "I don't recall," do you have any recollection at all that that topic came up in any way?

9

10    A.    I have no recollection that that topic ever came up.

     . . .

11

12    Q.    Now, at the conclusion of this second conversation, do you – what was your understanding of what the status of the Anderssen deposition was?

13    A.    Mr. Ardoin had asked Dave for a citation to the rule. He had indicated that the rule that Dave was quoting from, if Mr. Ardoin in his reading of that rule was

14          the same, that the deposition would be rescheduled and the next – and the deposition of the 17th would not go forward. And that he would let all parties

15          know about his decision.

16         Mr. Hernandez testified he warned Mr. Williams not to seek sanctions for Mr. Hernandez'

17  cancellation of a court reporter for Mr. Anderssen's February 17, 2005 deposition:

18          . . . Before this motion was even filed, I had advised – or Mr. Williams was advised on two separate occasions, including one telephone conversation he had with me that I did

19          not cancel the court reporter. I specifically advised him in a telephone conversation, when he said he was going to bring a motion for sanctions based upon what I – that I

20          told the court reporter cancel the deposition, that that was no true, to get his facts straight.

21

22         According to Mr. Hernandez, prior to filing Gallo's sanctions motion, Mr. Williams did not indicate

23  he would seek reproval of Mr. Hernandez or Gibson, Dunn & Crutcher.

24         Mr. Hernandez denied that he called or tried to convince LegaLink to cancel Mr. Anderssen's

25  deposition, that he advised Mr. Anderssen's counsel that successful mediation might obviate Mr.

26  Anderssen's testimony, and that he had spoken to Mr. Anderssen.

27                   **Mr. Maier's May 17, 2005 Hearing Testimony**

28         Mr. Maier testified at the May 17, 2005 evidentiary hearing that he learned that Gallo sought

to take Mr. Anderssen's February 17, 2005 deposition when on February 16, 2005, Gallo counsel Mr. Durbin mentioned the deposition was set.  Mr. Maier noted that when he attempted to discuss rescheduling the Mr. Anderssen's deposition, Mr. Durbin directed Mr. Maier to contact Mr. Williams. Mr. Maier also described the "casual conversation" among Mr. Hernandez, Mr. Maier and court reporter Ms. Henderson:

> A.    I recall that Ms. Henderson joined in to the conversation that was already in progress.
>
> Q.    Okay.  And can you tell me, as best you recollect, what was said either in words or effect?
>
> . . .
>
> A.    Mr. Hernandez mentioned to Ms. Henderson that we had just received some kind of notification that day that there was going to be a deposition the following day in this case.  And we did not know about it.  We were on our way back to Los Angeles and we were not planning on attending this deposition. And he asked her whether or not she was scheduled to be a court reporter in this case on the following day.
>
> . . .
>
> A.    Mr. Hernandez and I were discussing – I was telling him what I had told you just now about my conversation with Mr. Durbin and Mr. Pitre.  And Ms. Henderson expressed an interest when she heard something about a deposition the following day.  And that's how she became involved with this conversation that was between Mr. Hernandez and me.
>
> Q.    Did you – were you present in the courtroom earlier today when Mr. Hernandez recounted that conversation?
>
> A.    Yes.
>
> Q.    Did Mr. Hernandez get it right, according to you recollection?
>
> A.    Yeah, exactly.

Mr. Maier further described the conversation with Ms. Henderson:

> Q.    Now, at some point you spoke to Mrs. Henderson while she was on the phone?
>
> A.    That's right.
>
> Q.    Could you tell me what happened there and tell me in your own words what you recall saying?
>
> A.    Ms. Henderson said in to the phone – well, she said that – she asked – she inquired whether there's a deposition.  And she turned to us and told us that "There's a deposition scheduled for Richard Anderssen tomorrow.  It was just put on our calendar last night."  She then said into the phone, "Well, I'm here

with some attorneys on the case and they didn't receive notice of this deposition and they're not going to attend.

Now, at that point, I wanted to make sure that although Ms. Henderson, who we spent several days with, knew who we were, I didn't want this to be out of context for the person on the other end of the line.  So I said, "Ms. Henderson, please explain to the person on the other end of the line that we are not the parties that noticed the deposition or scheduled the deposition and we are not canceling the deposition."

Q.   And what did Ms. Henderson say into the phone, if you recall, at that time?

A.   I don't remember her exact words, but its was to the effect that "These attorneys for opposing counsel or the other side, you should call the noticing party to make sure the deposition is still going forward."

Q.   Do you recall whether Ms. Henderson used the term "cancel" in any respect?

A.   I don't remember her using that word.  And frankly, if she did, that's something that I would have remembered.

Mr. Maier acknowledged that he did not tell Ms. Henderson that his firm did not represent Mr. Anderssen.

### Richard Levy's May 17, 2005 Hearing Testimony

At the May 17, 2005 evidentiary hearing, Richard Levy ("Mr. Levy") of Gibson, Dunn & Crutcher described himself as the "primary partner in charge" for the defense.  Mr. Levy testified as to what he described as inconsistencies with Mr. Ardoin's testimony:

Q.   And what conversation did you have with Mr. Ardoin specifically on that topic?

A.   On the 26th of March, I asked him if he was told by anyone from Gibson, Dunn & Crutcher, specifically referring to Mr. Battaglia and Mr. Hernandez, that if the mediation resulted in a settlement, that his witness might not have to testify. He had previously told me that he was informed that there was a mediation scheduled, that it had to do – it was going to go forward on the Friday.  People had to go for – on Thursday to go to San Francisco to prepare.  I asked him the followup question.

Q.   What was the followup question?

A.   Whether or not he was ever told that in the event that it settled, his witness would not have to testify.

Q.   What did he say?

A.   He said no, he was not told that.  That he concluded that from the conversation simply because he was told about the scheduling.

**Ms. Henderson's Deposition Testimony**

The parties deposed Ms. Henderson on April 22, 2005 in Houston.  As to her February 16, 2005 conversation with Mr. Hernandez and Mr. Maier regarding Mr. Anderssen's February 17, 2005 deposition and her subsequent telephone conversation with her office, Ms. Henderson testified:

> A.   Okay.  There was verbiage that there was a deposition the next day.  My understanding was there wasn't.  I had a doctor's appointment.  I asked them, you know, there's one tomorrow for sure, something, and they said yes, but they were not attending because they had not received adequate notice.
>
> I called my office and said, "Did y'all know there's supposed to be a deposition tomorrow?"  The response was, "it was just put on."
>
> And I said, "The other attorneys are not going to be there."
>
> "Oh, okay.  Well, we don't know about that."
>
> And I said, "you need to contact California [LegaLink] and make sure that this is going forward and that they know that opposing counsel is not going to be there," because if the deposition was not going forward, then I could go to the doctor.  If it was going to go forward, then I had to cancel my doctor's appointment to be able to report the deposition.
>
> . . .
>
> Q.   Now, during that conversation with your office, did you have a – did you sort of say – did you have a separate conversation while you were still on the phone with the attorneys that were still in the room, Mr. Hernandez and Mr. Maier?
>
> A.   My memory is after I talked to the office to confirm that we did have it scheduled the next day, I told them, yes, we had it scheduled.  It had just been recently put on and that the Gallo people were not booking the deposition directly with Houston, they were doing it through our California office so there could be some time lag as far as time zones. . . .

Ms. Henderson testified she did not tell Ms. Jeffrey, LegaLink's calendar manager in Houston, that Mr. Hernandez or Mr. Maier canceled Mr. Anderssen's February 17, 2005 deposition in that "[t]hey could not cancel a deposition they had not set. . . . I would not have said, 'Cancel the deposition.'"

Ms. Henderson noted she spoke to Gallo counsel on February 16, 2005 but does not recall whether the counsel was Mr. Williams.  As to that conversation, Ms. Henderson testified:

> . . .Now, what is it that you told whoever it is you spoke to on the phone about your recollection of the discussions that you had that day with the – Mr. Maier, Mr. Hernandez and your office?
>
> A.   Okay.  The discussion I had was based on my memory at the time which was

39

1                    I was packing up, deposition was scheduled, didn't know about it, Mr.
2                    Hernandez, Mr. Maier were not going to be there and I apparently said that they
were not going to produce the witness because that was my memory at the time.

    3        Q.     Did you tell them Mr. Hernandez had canceled any depositions?

    4        A.     I don't remember using the word "canceled." I simply remember saying they
weren't going to appear because of notice, they weren't going to appear because
    5                 of sufficient notice.

    6            . . .

    7        Q.     And you knew that Mr. Hernandez and Gibson, Dunn & Crutcher were not the
ones that set the deposition. Is that what you're saying?
    8

                A.     That was my understanding.
    9

10    Ms. Henderson does not recall if anyone from Gallo asked if Mr. Hernandez canceled the deposition.

11         Ms. Henderson later testified she assumed Mr. Hernandez and Mr. Maier represented Mr.

12    Anderssen:

13        Q.     Do you ever recall Mr. Hernandez or Mr. Maier telling you that they
represented the witness?
14

                A.     No, sir. That was an assumption on my part.
15

16        Q.     And, in fact, when you thought about what you had said before, did you realize
that they didn't – did not, as far as you knew, represent the witness?

17        A.     After reviewing the appearance pages from the depositions, I then remembered
they did not represent the witnesses.
18

19         Ms. Henderson noted that when she signed her March 15, 2005 declaration, she believed its

20    content was accurate: "This first declaration was my best recollection at the time." In response to Mr.

21    Williams' question whether he asked Mr. Henderson "to say anything in particular," Mr. Henderson

22    explained: ". . . I gave you my memory of they weren't going to appear following with to produce the

23    witness, which were not your words, were my words, based on the way it normally happens. You

24    normally don't have witnesses represented by attorneys." Ms. Henderson testified that her March 17,

25    2005 e-mails and her March 17, 2005 declaration are correct. As to her March 17, 2005 declaration,

26    Ms. Henderson noted:

27                I had rethought it, pulled up appearance pages because my first impression was the
focus was on whether they were going to appear because of notice or no notice. After
28               Mr. Maier's proposed declaration, it became clear to me that the words "producing a

1    witness or not producing a witness," which prompted me to pull up appearance pages,
2    review it all and realize Mr. Patterson had been representing the witness in this
     [February 16, 2005] round of depositions.

3        Ms. Henderson stated she did not speak to anyone from Gibson, Dunn & Crutcher between
4    February 16, 2005 and her deposition.

5                    **<u>Ms. Jeffrey's Deposition Testimony</u>**

6        At her April 22, 2005 deposition in Houston, Ms. Jeffrey, the Houston LegaLink deposition
7    calendar manager, recounted her February 16, 2005 telephone conversation with Ms. Henderson, who
8    was concerned that attorneys said they had insufficient notice:

9    A.    She said she was – she had just finished up a deposition for that day in this case
           and she wanted to let me know that some of the attorneys there had told her that
10         due to insufficient notice, there was a – it was likely that they would not be
           appearing at a deposition the following day and she wanted me to make – to
11         check and see if we had something scheduled on our calendar for the next day.
           I said, yes, we did and she just wanted to – me to check with our client in San
12         Francisco and our Legalink office in San Francisco to confirm it was still going.

13   Q.    Okay.  After Ms. Henderson made this phone call to you, you then called the
           San Francisco office of Legalink; is that correct?
14
15   A.    Yes, that's correct.

     Q.    And you spoke to someone there named Chad; is that correct?
16
17   A.    Yes, that's correct.

     Q.    And you asked Chad to contact the office of the attorneys who noticed the
18         deposition; is that correct?

19   A.    Correct, uh-huh.

20   Q.    Do you recall the exact words that you had with Chad when you spoke to him?

21   A.    I told him that our court reporter had been informed by some attorneys at the
           deposition that due to insufficient notice of the deposition, that it was likely
22         they would not be attending the following day and that we needed to check and
           see if, in fact, it was still going and – just to make sure so we would know for
23         the books the next day what we needed to assign.

24   Ms. Jeffrey testified that later, at around 4:30 p.m. on February 16, 2005, Mr. Williams telephoned her
25   to confirm and clarify a deposition was scheduled for the following day.

26       As to Mr. Hernandez' purported cancellation of the Mr. Anderssen's deposition, Ms. Jeffrey
27   testified:

28   Q.    Did [Ms. Hendeson] ever tell you in that one conversation you had on February

                                            41

1    16th that Rory Hernandez was canceling the deposition?

2    A.    No, not that I recall.

3    Q.    You're pretty sure of that?

4    A.    Yes.

5          . . .

6    Q.    Did you ever tell Mr. Williams or anyone from the Cotchett, Pitre firm that
           Rory Hernandez canceled the deposition?

7
     A.    No.
8

9    _____**Gallo's Sanctions Motion**_____

10   Mr. Williams appeared in Houston for the February 17, 2005 deposition at which Mr.

11   Anderssen did not appear.  Mr. Anderssen's deposition was reset for and taken on April 6, 2005.

12   With its sanctions motion, Gallo seeks:

13   1.    A terminating sanction against defendants as a result of their continuing discovery

14         obstruction and abuse and including striking defendants' answer or responsive pleading

15         to Gallo's first amended complaint;

16   2.    An issue sanction that:

17         a.    Mr. Anderssen was defendants' employee during August 16, 1999 to 2002;

18         b.    During his employment, Mr. Anderssen: (1) engaged in wash trading for

19               defendants with other natural gas companies; (2) exchanged present and future

20               prices at which defendants bought and sold natural gas with other natural gas

21               companies; and (3) engaged in and assisted to report false information to trade

22               indices to reflect what purportedly were natural gas transactions engaged in by

23               defendants;

24         c.    Such actions of Mr. Anderssen caused prices charged to consumers for natural

25               gas at PGE Citygate and in California to increase during 2000 and 2001; and

26         d.    As a result of such actions of Mr. Anderssen, prices to consumers, including

27               Gallo, of natural gas at PGE Citygate were increased over prices that would

28               have been charged but for such actions.

1    3.      An evidence sanction that recordings of Mr. Anderssen's telephone conversations are

2            admissible at trial and in connection with law and motion activity;

3    4.      An evidence sanction to preclude defendant to introduce evidence or argument to rebut

4            such admissibility or anything said in Mr. Anderssen's recorded telephone

5            conversations;

6    5.      A monetary sanction to reimburse Gallo's fees and expenses to travel to Houston for

7            Mr. Anderssen's deposition;

8    6.      A monetary sanction to reimburse this Court for its time and expenses to repeatedly

9            address the discovery misconduct and obstruction of defendants and defense counsel;

10           and

11   7.      Reproval of Mr. Hernandez and other counsel who convinced Mr. Anderssen's counsel

12           to refuse to produce Mr. Anderssen.

13       Gallo further seeks to recover $169,736.22[16] from defendants for legal fees and costs to pursue

14   its sanctions motion and to prepare for and conduct the evidentiary hearings and related discovery.

15   With its original opposition papers, defendants sought to impose a $16,000 sanction against Gallo to

16   oppose its sanctions motion based on devotion of 65 hours to prepare its initial opposition papers.

17   With its post-evidentiary hearing briefing, defendants seek to impose a $250,000 sanction against Gallo

18   for legal fees and expenses to prepare for and conduct the evidentiary hearings and related discovery.

19   Defendants base their fees on a $350 partner hourly billing rate and a $250 associate hourly billing rate

20   and claim that their fees would exceed $500,000 if customary hourly rates were used.

21                                    **DISCUSSION**

22       This Court has a duty to supervise the conduct of attorneys appearing before it. *Erickson v.*

23   *Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996); *Lokary v. Kayfetz*, 974 F.2d 1166, 1170 (9th Cir.),

24   *cert. denied*, *sub. nom.*, *Pacific Legal Foundation v. Kayfetz*, 508 U.S. 931, 113 S.Ct. 2397 (1993);

25   *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983). The Ninth Circuit

26   Court of Appeals has observed:

27   _____

28   [16]     The figure comprises fees of $155,314.50 and costs of $14,421.72.

43

> Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar. The courts, as well as the bar, have a responsibility to maintain public confidence in the legal profession.

*Gas-A-Tron of Ariz. v. Union Oil Co.*, 534 F.2d 1322, 1324-1325 (9th Cir.), *cert. denied sub nom. Shell Oil Co. v Gas-A-Tron of Ariz.*, 429 U.S. 861, 97 S.Ct. 164 (1976).

The determination to sanction is subject to a court's sound discretion. *See Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996); *Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir.), *cert. denied*, 489 U.S. 1096, 111 S.Ct. 986 (1991); *Erickson v. Newmar Corp.* 87 F.3d 298, 303 (9th Cir. 1996). "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir.) (internal quotations omitted), *cert. denied*, 493 U.S. 1035, 110 S.Ct. 757 (1990).

To seek sanctions, Gallo relies on several federal statutes and this Court's Local Rules and inherent powers.

### Local Rules

Federal judges have broad powers to impose sanctions for abuses of process. *Gas-A-Tron*, 534 F.2d at 1324-1325. The sources of power to sanction include federal statutes and procedural rules, local rules, and a court's inherent power. For instance, this Court's Local Rule 11-110 provides: "The failure of counsel or of a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions authorized by statute or Rule or within the inherent power of the Court."

This Court's Local Rule 83-184(a) addresses attorney discipline and provides:

> In the event any attorney subject to these Rules engages in conduct that may warrant discipline or other sanctions, any Judge or Magistrate Judge may initiate proceedings for contempt under 18 U.S.C. § 401 or Fed. R. Crim. P. 42,[17] or may, after reasonable notice and opportunity to show cause to the contrary, take any other appropriate disciplinary action against the attorney. In addition to or in lieu of the foregoing, the Judge or Magistrate Judge may refer the matter to the disciplinary body of any Court before which the attorney has been admitted to practice.

---

[17]   18 U.S.C. § 401 authorizes a fine or imprisonment, at a court's discretion, for contempt of its authority, and for misbehavior of any person in the court's presence "or so near thereto as to obstruct the administration of justice." F.R.Crim.P. 42(b) punishes as criminal contempt conduct which a "judge saw or heard . . . or [] committed in the actual presence of the court."

Neither this Court's Local Rules nor the Federal Rules of Civil Procedure clearly define "other appropriate disciplinary action" for attorney conduct short of criminal contempt.  Nonetheless, federal judges have an "arsenal of sanctions" to impose for unethical behavior and including monetary sanctions, contempt, dismissal and disqualification of counsel.  *Erickson*, 87 F.3d at 303.  The California Rules of Professional Conduct and the State Bar Rules of California may also provide appropriate sanctions.  *See* Local Rule 83-180(e) (adopting California Rule of Professional Conduct and applicable court decisions as standards of professional conduct in this district).

Under California law, an attorney may use only methods "as are consistent with truth, and never seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." Cal. Bus. & Prof. Code, § 6068(d).  "In presenting a matter to a tribunal, a member: (A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth; (B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice of false statement of fact or law."  Cal. Rules of Professional Conduct, Rule 5-2000.

### 28 U.S.C. § 1927

28 U.S.C. § 1927 ("section 1927") addresses counsel's liability for excessive costs and provides: "Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  The decision to award section 1927 sanctions rests in a court's sound discretion. *Wages*, 915 F.2d at 1235.

Section 1927 "applies only to unnecessary filings and tactics once a lawsuit has begun." *In re Keegan Management Co. Sec. Litig. (Keegan Management Co. v. Moore)*, 78 F.3d 431, 435 (9th Cir. 1995).  "Vexatious" is defined as "lacking justification and intended to harass." *Overnight Transp. Co. v. Chicago Ind. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983).

Section 1927 sanctions must be based on a finding that the sanctioned attorney acted in subjective bad faith.  *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir. 1983); *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989).  "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the

purpose of harassing an opponent." *West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir. 1990) (citing *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir. 1988)); *New Alaska*, 869 F.2d at 1306; *see Keegan Management*, 78 F.3d at 436; *Salstrom v. Citicorp Credit Serv., Inc.*, 74 F.3d 183 (9th Cir.), *cert. denied, sub nom.*, *Webb v. Citicorp Credit Serv. Inc.*, 117 S.Ct. 60 (1996); *MGIC Idemnity v. Moore*, 952 F.2d 1120 (9th Cir. 1991); *Toombs v. Leone*, 777 F.2d 465 (9th Cir. 1985) (court need not make express findings as to counsel's state of mind because record contained sufficient evidence to support decision); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1106 (9th Cir. 2001) ("under section 1927 attorneys are obligated to avoid dilatory tactics throughout the entire litigation"); *Shafii v. British Airways, PLC*, 83 F.3d 566, 569 (2nd Cir. 1996) (sanction warranted if meritless actions lead to conclusion that they were undertaken for improper purposes, such as delay).

In *Blodgett*, 709 F.2d at 610-611, the Ninth Circuit Court of Appeals explained section 1927's limitations:

> Section 1927 only authorizes the taxing of excess costs arising from an attorney's unreasonable and vexatious conduct; it does not authorize imposition of sanctions in excess of costs reasonably incurred because of such conduct. Similarly, cases that have considered the district court's inherent power to sanction attorneys for litigating in bad faith have related such sanctions to the amount of fees incurred by the opposing counsel, and have not based sanctions on increased costs experienced by the court.

Section 1927 sanctions cannot be imposed on non-attorneys. *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986).

**Inherent Power**

In addition, federal courts have inherent power to impose sanctions for attorney misconduct and such sanctions include an award of attorney's fees, against attorneys and parties for "bad faith" conduct or "willful disobedience" of a court order. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-766, 100 S.Ct. 2455, 2463-2464 (1980); *In re Akros Installations, Inc.*, 834 F.2d 1526, 1532 (9th Cir. 1987); *see Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3rd Cir. 1995). A district court is also inherently empowered to sanction for "willfulness or fault of the offending party." *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988); *Unigard Sec. Ins. v. Lakewood Engineering & Mfg.*, 982 F.2d 363,

368, n. 2 (9th Cir. 1992). A district court has inherent power to "impose sanctions for discovery abuses that may not be a technical violation of the discovery rules." *Halaco*, 843 F.2d at 380; *Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1557-1558 (9th Cir. 1996). However, recklessness "is an insufficient basis for sanctions under a court's inherent power." *Keegan Management*, 78 F.3d at 436. Sanctions imposed under a court's inherent powers require a finding of bad faith. *Chambers*, 501 U.S. at 55, 111 S.Ct. 2123.

A court's inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43, 111 S.Ct. at 2132. Such inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Chambers*, 501 U.S. at 42; 111 S.Ct. at 2123.

"Bad faith" means a party or counsel acted "vexatiously, wantonly or for oppressive reasons." *Chambers*, 501 U.S. at 45-46, 111 S.Ct. at 2133; *see Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-259, 95 S.Ct. 1612, 1622 (1975). Bad faith "does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar assessment of attorneys' fees." *Mark Ind., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995) (internal quotation marks and citations omitted). Bad faith is tested objectively. "[A] district court's finding of bad faith or the absence of bad faith in a particular case is a factual determination and may be reversed only if it is clearly erroneous." *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3rd Cir. 1986); *see Baker v. Cerberus, Ltd.,* 764 F.2d 204, 210 (3rd Cir. 1985); *Perichak v. International Union of Elec. Radio*, 715 F.2d 78, 79 (3rd Cir. 1983). There must be "some indication of an intentional advancement of a baseless contention that is made for an ulterior purpose, e.g., harassment or delay." *Ford,* 790 F.2d at 347.

When exercising inherent powers to sanction, a court must exercise discretion to fashion an appropriate remedy. *Erickson*, 87 F.3d at 303 (citing *Chambers*, 501 U.S. at 44-45.) When exercising discretion under its inherent sanction powers, a court is guided by considerations applicable to sanctions under the Federal Rules of Civil Procedure. Factors to consider include:

47

1.     The nature and quality of the conduct at issue;

2.     As between attorney and client, who is responsible for the culpable conduct;

3.     Whether there was a pattern of wrongdoing to require a stiffer sanction;

4.     The sanctioned party's ability to pay;

5.     Whether the wrongdoing actually prejudiced the wrongdoer's opponent or hindered the administration of justice; and

6.     The existence of mitigating factors.

*Westinghouse*, 43 F.3d at 74.

Under its inherent authority, a court may impose sanctions on counsel or a party. *See Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455. An attorney's fee award under a court's inherent power is intended to vindicate judicial authority, not to provide a substantive remedy to an aggrieved party. "The wrong was to the court." *Mark Industries*, 50 F.3d at 733.

### Terminating Sanctions

A terminating sanction, including dismissal or default, is "so harsh a penalty it should be imposed as a sanction only in extreme circumstances." *Thompson v. Housing Authority of City of Los Angeles*, 782 F.2d 829, 831 (9th Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 112 (1986). To determine whether to impose a severe sanction of dismissal or default, a court considers:

1.     The public's interest in expeditious resolution of litigation;

2.     The court's need to manage its docket;

3.     The risk of prejudice to the party seeking sanctions;

4.     The public policy favoring disposition of cases on their merits; and

5.     The availability of less drastic sanctions.

*Valley Engineers, Inc. v. Electric Engineering Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998), *cert. denied*, 526 U.S. 1064, 119 S.Ct. 1455 (1999); *In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir. 1996); *Henry v. Gill Industries, Inc.,* 983 F.2d 943, 948 (9th Cir. 1993); *United States v. Kahaluu Constr. Co., Inc.*, 857 F.2d 600, 603 (9th Cir. 1988); *Thompson*, 782 F.2d at 831.

"What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision

48

of the case.'" *Valley Engineers,* 158 F.3d at 1057 (quoting *Adriana International Corp. v. Thoeren*,

913 F.2d 1406, 1412 (9th Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1019 (1991)).

### Prior Misconduct

To evaluate the propriety of sanctions, a court looks "at all incidents of the party's misconduct."

*Adriana International Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990); *see, e.g., Kahaluu*

*Construction Co.*, 857 F.2d 600, 601-602 (9th Cir. 1988) A court may consider prior misconduct to

weigh a subsequent sanction motion. *Adriana International*, 913 F.2d at 1411; *Halaco Engineering*,

843 F.2d at 381, n. 2.  For instance, "[b]elated compliance with discovery orders does not preclude the

imposition of sanctions." *North American Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447,

1451 (9th Cir. 1986).

With these standards in mind, the Court turns to issues raised by the parties.

### Service Of Mr. Anderssen's Deposition Notice

On July 20, 2004, Gallo served by first-class mail its notice to set Mr. Anderssen's August 17,

2004 deposition.  By agreement with Mr. Ardoin, Mr. Anderssen's deposition was reset to February

17, 2005, and on January 12, 2005, Gallo served by e-mail a notice to reset the deposition.  Gallo

served by e-mail two additional notices to reset the deposition, which was ultimately set for February

17, 2005 at 12 p.m. in a Houston hotel conference room.

Gallo contends that the issue of e-mail service is a "pretext."  Gallo points to this Court's Local

Rule 5-135(g)(1) which addresses consent to e-mail service: "Unless an attorney opts out by

designating such on the registration form, registration as a filing user constitutes: (1) consent to receive

service electronically and waiver of the right to receive service by first class mail pursuant to Fed. R.

Civ. P. Rule 5(b)(2)(D)."  Gallo notes that defense counsel (Mr. Battaglia) registered on this Court's

CM/ECF system, did not opt out of e-mail service and thus consented to receive e-mail service without

mail or personal service.  Gallo contends that defense counsel's delay until late February 16, 2005 to

challenge the deposition notice equates to obstruction and that since Mr. Anderssen was subject to

subpoena, service on him of a deposition notice was unnecessary.

Defendants respond that registration with the CM/ECF system "does not waive a party's right

to receive service of all documents for which service is required by Fed.R.Civ.P. 5.  Registering for

1   the ECF system only waives a party's right to receive mail service of documents that are filed with the

2   Court through the ECF system." Defendants further contend that the CM/ECF "system clearly was

3   designed for filed documents; it does not relate to non-filed discovery materials."

4         F.R.Civ.P. 5(a) provides "every paper relating to discovery required to be served upon a party

5   . . . shall be served upon each of the parties." F.R.Civ.P. 5(b)(2)(D) authorizes service by "[d]elivering

6   a copy by any other means, including electronic means, consented to in writing by the person served.

7   Service by electronic means is complete on transmission . . . If authorized by local rule, a party may

8   make service under this subparagraph (D) through the court's transmission facilities." F.R.Civ.P.

9   5(b)(2)(D) "authorizes service by electronic means or any other means, but only if the consent is

10   obtained from the person served. The consent must be express, and cannot be implied from conduct."

11   F.R.Civ.P. 5 Adv. Comm. Notes (2001).

12         Gallo points to no specific writing by which defendants consented to e-mail service and relies

13   on defense counsel's use of this Court's CM/ECF system. Although Mr. Williams claims there is a

14   written agreement to e-mail service, he admits he cannot locate it. Nonetheless, there are grounds to

15   support Gallo's position and to negate defendants' position on e-mail service. Local Rule 5-135(g)(1)

16   carves out an exception only for service of a summons and complaint, not for discovery papers. In

17   other words, Local Rule 5-135(g)(1) prohibits electronic service of only a summons and complaint.

18   Defendants' position is questionable in that some documents in litigation (i.e., those filed with the

19   Court) could be served electronically but others (i.e., those not filed with the Court) could not be

20   served electronically and would require further first-class mail or personal service. Moreover, this

21   Court's Electronic Case File System (ECF) Registration form explains:

22        Unless an attorney expressly declines to consent . . ., registration as a Filing User
   constitutes: (1) consent to receive service electronically and waiver of the right to
23   receive service by first class mail pursuant to Federal Rule of Civil Procedure
   5(b)(2)(D); (2) consent to electronic service and waiver of the right to service by
24   personal service or first class mail pursuant to Federal Rule of Civil Procedure
   5(b)(2)(D). **Note: Service of Summons and Complaint pursuant to Federal Rule
25   of Civil Procedure 4 are not encompassed by electronic service.** Waiver of service
   and notice by first class mail applies to notice of the entry of an order or judgment. . .
26   .

27          . . .

28       . . . An attorney may expressly forego consenting to service and receipt of filed

documents by electronic service pursuant to Federal Rule of Civil Procedure 5(b)(2)(D). This decision not to consent must be by separate document in writing addressed to the Office of the Clerk. Parties not consenting to electronic service must serve and be served by the other methods specified in Rule 5. (Bold in original.)

In their original opposition papers, defendants contend they did not receive "actual notice" of Mr. Anderssen's deposition until February 16, 2005, the day before it was scheduled to proceed, because of the ineffectual electronic service. During his hearing testimony, Mr. Battaglia acknowledged the January 12 notice was received on Mr. Battaglia and Mr. Hernandez' computer system and that Mr. Battaglia "reviewed it" and sent it to Mr. Hernandez and Mr. Shoch. There is no issue that defense counsel received the January 12 notice by e-mail, and there no evidence defendants objected to the January 12 notice. Travel and logistics problems caused Mr. Anderssen's deposition to be set later in the day of February 17, 2005 and at a different location to require additional amended notices, including one e-mailed to Mr. Battaglia on February 11, 2005. Defendants challenge the January 12 and later notices to move the deposition later in the day of February 17, 2005 and its location, the latter is a matter over which Gallo had no control. Defendants' arguments of improper notice are unpersuasive, given defense counsel's acknowledgment of receipt of the January 12 notice and failure to address it until February 16, 2005.

As a fallback position, defendants argue that "even if defense counsel's interpretation of the Local Rule were incorrect, it was a reasonable interpretation." To support their position, defendants provided declarations of 11 attorneys who practice in this Court to the effect that attorney registration with the CM/ECF system waives the right to first-class mail and/or personal service for Court filed documents but not to non-filed documents, such as those pertaining to discovery. As discussed below, the effects of e-mail service and the reasonableness of defense counsel's understanding of the effects of CM/ECF registration is not this Court's focus. Defendants neither formally objected to Mr. Anderssen's February 17, 2005 deposition nor sought a protective order and such failure is commensurate to waiver of notice objections. Defendants fail to explain meaningfully why they did not pursue such action. The key issue is defense counsel's actions on February 16, 2005 to address Mr. Anderssen's deposition.

### Interference With Mr. Anderssen's Deposition

Gallo argues that despite deposition notice concerns, defense counsel was not entitled to

persuade Mr. Ardoin to cancel Mr. Anderssen's February 17, 2005 deposition.  Gallo equates such action to criminal conduct and points to 18 U.S.C. § 1512(b) which prohibits witness tampering as to:

> (b) Whoever knowingly . . . or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –
>
> > (1) influence, delay, or prevent the testimony of any person in an official proceeding;
> >
> > (2) cause or induce any person to –
> >
> > > (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
> > >
> > > . . .
> > >
> > > (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
> > >
> > > (D) be absent from an official proceeding to which such person has been summoned by legal process . . .

In addition, Gallo points to California Penal Code section 136.1 which renders witness intimidation criminal, including when a person:

> (1) Knowingly and maliciously prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.
>
> (2) Knowingly and maliciously attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law.

Gallo contends Mr. Anderssen's deposition must not be considered an isolated incident and must be viewed as defendants and defense counsel's continuing abuse, harassment and obstruction throughout this litigation.

Defendants argue Gallo "has not and cannot make a showing of any improper conduct against defendants or their counsel."  Defendants claim that defense counsel had no direct contact with Mr. Anderssen and that Mr. Ardoin independently decided not to produce Mr. Anderseen on February 17, 2005.  Defendants point out that defense counsel explained to Mr. Ardoin that:

> 1.     Defendants had been unaware Gallo intended to depose Mr. Anderssen on February 17, 2005;
>
> 2.     The February 17, 2005 mediation required "the client to be in San Francisco to

52

1    prepare";

2    3.      Defendants did not believe they were properly served with notice of Mr. Anderssen's

3           February 17, 2005 deposition and would not attend it; and

4    4.      Defendants would object to use of Mr. Anderssen's February 17, 2005 deposition.

5    Defendants further note that since Mr. Anderssen asserted Fifth Amendment rights at his April 6, 2005

6    deposition, it "cannot have a significant bearing on the outcome of this litigation."

7           The evidence reveals that Mr. Anderssen was subject to a valid subpoena and that Mr. Ardoin

8    was prepared to produce Mr. Anderssen on February 17, 2005 until defense counsel contacted Mr.

9    Ardoin.  There is no dispute that Mr. Anderssen is a key witness as to Gallo's claims, despite his

10   invocation of Fifth Amendment rights.  Defense counsel impressed upon Mr. Ardoin, a new attorney,

11   that defendants had not been properly served with Mr. Anderssen's February 17, 2005 deposition

12   notice.  Defense counsel improperly raised an issue regarding e-mail service on Mr. Anderssen which

13   was clearly not an issue since he was a non-party subject to a subpoena and not subject to  F.R.Civ.P.

14   5. Despite claiming he did not know whether F.R.Civ.P. 5 applied to Mr. Anderssen,[18] defense counsel

15   led Mr. Ardoin on a path to raise an issue in Mr. Ardoin's mind that F.R.Civ.P. 5 and related service

16   issues applied to Mr. Anderssen.

17          Defense counsel did not stop there.  According to Mr. Ardoin, defense counsel raised the

18   potential that successful mediation may avoid Mr. Anderssen's deposition and his invocation of Fifth

19   Amendment rights.  Mr. Ardoin acknowledged he felt pressured based on the timing of defense

20   counsel's notice objections.  Of key importance, Mr. Ardoin noted he would have produced Mr.

21   Anderssen on February 17, 2005 had he known defense counsel received the January 12 notice by e-

22   mail.  Mr. Battaglia acknowledged that he was "advocating" his clients' position to avoid Mr.

23   Anderssen's February 17, 2005 deposition.

24          Although defendants claim they did not control Mr. Anderssen, the evidence demonstrates, at

25   a minimum, that defense counsel influenced Mr. Ardoin not to produce Mr. Anderssen for his February

26   17, 2005 deposition.  The evidence reveals that defense counsel and Mr. Ardoin were in close

27

28   [18]      This Court finds less than credible Mr. Battaglia's assertion that he did not know whether F.R.Civ.P. 5 applied to non-parties.

53

1 communications on February 16, 2005 and that defense counsel guided Mr. Ardoin down a path of

2 defense counsel's choosing.  In his declaration, Mr. Battaglia explains he communicated to Mr. Ardoin

3 that Mr. Battaglia did not believe Gallo had properly noticed the February 17, 2005 deposition, that

4 defendants "were not in a position to attend" a February 17 or 18, 2005 deposition, and that mediation

5 would proceed on February 18, 2005 "to attempt to resolve the matter."  Defense counsel further

6 indicated defendants would object to use of Mr. Anderssen's February 17, 2005 deposition.  To support

7 his decision not to produce Mr. Anderssen, Mr. Ardoin's February 16, 2005 communications parroted

8 the service issues raised by defense counsel.

9          Although defendants "did not demand or instruct Mr. Anderssen not to appear for a

10 deposition," they influenced him through Mr. Ardoin to postpone his deposition and dangled the

11 prospects he need not testify if settlement were reached at mediation.  Defendants' threat to oppose

12 use of Mr. Anderssen's February 17, 2005 deposition placed Mr. Ardoin in a predicament of a potential

13 second deposition of Mr. Anderssen.  There is nothing to suggest Mr. Ardoin would not have produced

14 Mr. Anderssen for a February 17, 2005 deposition but for defense counsel's interference.  It bears

15 repeating that Mr. Ardoin testified he would have produced Mr. Anderssen had he known that defense

16 counsel received the January 12 notice by e-mail.

17          Of key concern to this Court is that defense counsel had several options other than influencing

18 Mr. Ardoin not to produce Mr. Anderssen.  As noted by Gallo, defense counsel made no attempt to

19 reach Gallo's counsel by telephone to address the matter.[19]  Defense counsel failed to exercise other

20 less drastic options, including to:

21          1.       File formal objections to Mr. Anderssen's February 17, 2005 deposition, not attend the

22                   deposition, and file an appropriate post-deposition motion;

23          2.       File formal objections to Mr. Anderssen's February 17, 2005 deposition, attend the

24                   deposition, and file an appropriate post-deposition motion;

25 / / /

26 / / /

27

28          [19]      Although Mr. Maier briefly discussed Mr. Anderssen's deposition with Mr. Durbin and Mr. Pitre in
Houston, the evidence reveals Mr. Battaglia took the lead to address the issue.

3.      Waive objections and attend the deposition given defense counsel knew Mr. Anderssen would assert Fifth Amendment rights;[20] or

4.      Apprise the Court of the issue and use this Court's informal discovery dispute resolution process to address the matter immediately.

According to the evidence, defense counsel attempted to address an internal calendaring error and/or attempted to obtain a strategic advantage to avoid Mr. Anderssen's deposition prior to the mediation. Despite motives, defense counsel did not act out of surprise or complete innocence. As this Court has noted, defense counsel are experienced and from a prominent law firm and clearly were aware of less drastic options.

As such the question turns to whether interference with Mr. Anderssen's deposition warrants imposition of sanctions. This Court finds it does. The result of defense counsel's interference was to vex and to burden Gallo and this Court with significant discovery disputes and proceedings, including three full court days for the evidentiary hearing. Defense counsel's manipulation of the events resulting in cancelling Mr. Anderssen's February 17, 2005 deposition lacked justification based on other available options and in turn thwarted Gallo's legitimate discovery. The evidence reveals defense counsel raised unmeritorious issues regarding service to dissuade Mr. Ardoin to produce Mr. Anderssen. The evidence reflects willful action to avoid Mr. Anderssen's February 17, 2005 deposition. Quite simply, defense counsel manipulated the late-hour events to achieve a desired result – avoidance of Mr. Anderssen's February 17, 2005 deposition prior to the first mediation session.

The import of defense counsel's conduct was to delay Mr. Anderssen's deposition. Although such conduct is warrants imposition of sanctions, it is not rise to the level of criminal in that defense counsel's position throughout was to conduct Mr. Anderssen's deposition at a later date and which occurred. Nonetheless, this Court's Local Rule 83-180(e) obligates attorneys appearing in this Court not to engage in conduct that "interferes with the administration of justice." Defense counsel's interference with Mr. Anderssen's February 17, 2005 deposition thwarted Gallo's legitimate discovery

---

[20]      This Court finds less than credible Mr. Battaglia's notion that he did not know to which questions Mr. Anderssen would assert Fifth Amendment rights in that the evidence made clear Mr. Anderssen intended to assert such rights to all substantive questions.

1   and in turn administration of justice.

2   **Mr. Hernandez' Communications With Ms. Henderson**

3   In its original papers, Gallo claimed Mr. Hernandez informed LegaLink that Mr. Anderssen's

4   February 17, 2005 deposition was canceled.  The issue regarding Mr. Hernandez' purported conduct

5   arises from Ms. Henderson's apparent misunderstanding as to whom Mr. Hernandez and Mr. Maier

6   represented.  The evidence reveals that Ms. Henderson originally believed Mr. Hernandez and Mr.

7   Maier represented a witness.  Ms. Henderson recanted her original belief that Mr. Hernandez and Mr.

8   Maier said they would not be producing a witness.  The sheer weight of evidence is that Mr. Hernandez

9   and Mr. Maier communicated that they would not attend a February 17, 2005 deposition and nothing

10  more of substance.

11  In connection with communications with Ms. Henderson, Mr. Hernandez and Mr. Maier did

12  not obstruct Mr. Anderssen's deposition and did not engage in gamesmanship, discovery abuses or

13  unprofessional conduct.  Initially, Gallo had good reason to believe Mr. Hernandez or Mr. Maier had

14  indicated the witness would not be produced based on Ms. Henderson's March 15, 2005 declaration.

15  Ms. Henderson's March 17, 2005 e-mails reflect that she had backed off her assertion in that either she

16  initially spoke too quickly without grasping whom Mr. Hernandez and Mr. Maier represented or that

17  she was intimidated to retract her original belief.  Gallo could reasonably conclude either possibility.

18  Defendants fault Gallo for failing to confer with defense counsel prior to pursing Gallo's

19  sanctions motion.[21]  Defendants point to this Court's Local Rule 37-251(b) which imposes a conferring

20  requirement for discovery motions.  Defendants ignore the rule's prior subsection (a) which notes the

21  rule applies to motions pursuant to F.R.Civ.P. 26-37.  Gallo seeks its relief outside the discovery rules

22  and thus was not technically required to confer.  Defendants' argument that Gallo seeks to bypass

23  F.R.Civ.P. 37 is unavailing in that Gallo's motion does not address defendants' failure to produce a

24  witness subject to court order.

25  Nonetheless, the issue of Mr. Hernandez' purported remarks apparently could have been

26

27  [21]   This Court finds such accusation ironic in that defendants have failed to demonstrate their compliance with

28  conferring requirements in connection with past discovery disputes which defendants raised without merit.  Gallo claims that further conferring would have been futile.

resolved in cool contemplation without a rush of emotion.  Given the history of this action, this Court concludes that emotion unseated calm reflection as the parties have engaged in a death match of hubris and ego, leaving it to this Court to ferret out who is the more culpable.  This Court is not impressed with Gallo's accusations regarding Mr. Hernandez' purported comments to Ms. Henderson and questions why Gallo continued to pursue aggressively the matter after Ms. Henderson's recant of her original belief.  However, the confusion over the issue alleviates Gallo of the heavy sanctions which defendants seek to impose.

### Sanctions Award

This Court turns to the unsettling issue of sanctions imposition.  Gallo seeks a laundry list of sanctions, including striking defendants' answer or responsive pleading, issue sanctions regarding Mr. Anderssen's conduct, evidentiary sanctions regarding Mr. Anderssen's recorded telephone conversations, and an award of legal expenses.  The requested issue and evidentiary sanctions target Mr. Anderssen's assertion of the Fifth Amendment privilege.  As such, a question arises whether Gallo seeks to pounce on the circumstances to offset the effects of assertion of the Fifth Amendment privilege and to gain advantage it would not otherwise have.  Although Mr. Anderssen is an important witness to Gallo and despite defense counsel's wrongs, Gallo fails to substantiate heavy terminating, issue and evidentiary sanctions when lesser sanctions will more appropriately address the wrongs at issue.

In light of the past discovery abuses, the matter of Mr. Anderssen's deposition compelled this Court aggressively to supervise and review the conduct of counsel.  This Court repeatedly warned counsel to cease gamesmanship, discovery abuses and obstruction, demanded counsel to act professionally, and admonished that this Court will conduct evidentiary hearings to address accusations of discovery abuses and unprofessionalism.  In addition to its orders compelling defendants further discovery responses, production, etc., this Court sanctioned defendants and their counsel $9,750 prior to the dispute over Mr. Anderssen's deposition.  With Gallo's current sanctions motion pending, this Court sanction defendants and their counsel another $1,250.  Defense counsel blatantly ignored this Court's shots over the bow and repeated warnings which are detailed above and in Gallo's papers. Quite simply, defense counsel's conduct regarding Mr. Anderssen's deposition invited the evidentiary

1   hearing and ensuing devotion of expense and time to the parties and their counsel.

2          This Court finds a further monetary sanction against Gibson, Dunn & Crutcher is in order.

3   Although tempted to single out individual attorney(s), this Court concludes that interference with Mr.

4   Anderssen's February 17, 2005 deposition is a product of a culture which permeates the portion of

5   Gibson, Dunn & Crutcher involved in this matter.  That culture promoted obstruction, gamesmanship

6   and flagrant disregard of this Court's orders to result in increased discovery abuses and to smear the

7   legal profession and standards to which attorneys are to be held.  Although Gallo seeks nearly

8   $169,736.22 to reimburse its fees and costs to pursue its sanctions motion and to prepare for and to

9   conduct the evidentiary hearing, Gallo fails to substantiate such a heavy sanction given the nature of

10  this dispute and its continued aggressive pursuit of dubious claims regarding Mr. Hernandez' purported

11  comments to Ms. Henderson.  This Court questions neither the accuracy of Gallo's time devoted to this

12  matter nor the reasonableness of its billing rates and costs, especially given those of defendants.

13  However, this Court concludes that only half of Gallo's time was reasonably and necessarily devoted

14  to the issues giving rise to this Court's sanctions award.  Accordingly, this Court imposes a

15  $102,078.97 sanction against Gibson, Dunn & Crutcher with $92,078.97[22] to be paid to Gallo to defray

16  its fees and expenses to pursue its sanctions motion and $10,000 to this Court.  The sanction payable

17  to this Court is pursuant to this Court's inherent authority and responsibility to regulate its docket, to

18  promote judicial efficiency and to deter frivolous filings.  *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123.

19  This Court has inherent authority to end conduct which is abusive of the judicial process, and such

20  inherent power is not displaced by other statutory sanctioning power.  *Jones v. Bank of Sante Fe*, 40

21  F.3d 1084, 1089 (10th Cir. 1994).

22  / / /

23  / / /

---

24

25      [22]      This figure comprises half of Gallo's requested fees ($77,657.25) plus its requested $14,421.72 costs.  This figure is 37 percent of the discounted $250,000 sought by defendants.

26              Defense counsel claim their fees exceed $500,000 based on their customary rates.  Using a defense partner-
27  associate averaged hourly billing rate of $300, defense counsel would have devoted 1,667 hours to this matter ($500,000 divided by $300 averaged hourly rate).  If this Court discounted 1,667 hours by 75 percent (416.75 hours) and applied such discount to the $77,657.25 fees award, Gallo would be awarded fees at a $186 hourly rate ($77,657.25 divided by 416.75
28  hours).  The $77,657.25 fees award is well within the low reasonable range.

1

**CONCLUSION AND ORDER**

2          For the reasons stated above, this Court ORDERS Gibson, Dunn & Crutcher, no later than

3   August 5, 2005 and absent a stay of this order, to pay Gallo $92,078.97 and to pay this Court $10,000.[23]

4   The check for the Court's portion shall be payable to the Clerk, U.S. District Court and bear this

5   actions's case number.  Gibson, Dunn & Crutcher shall notify this Court in writing that the respective

6   sanctions have been submitted to Gallo and this Court's clerk.  The $102,078.97 sanctions are assessed

7   against Gibson, Dunn & Crutcher, and not against defendants as clients.  The sanctions are not to be

8   passed onto defendants for payment in any form.  This Court reminds Gibson, Dunn & Crutcher of its

9   self-reporting obligation under California Business and Professions Code section 6068(o).

10          IT IS SO ORDERED.

11  **Dated:    July 5, 2005**                                   **/s/ Lawrence J. O'Neill**
    66h44d                                               UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28          [23]     This Court is authorized to impose a sanction payable to the Court. *See Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 267 (10th Cir. 1995).