**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| E. & J. GALLO WINERY, | ) | CV F 03-5412   AWI LJO |
| | ) | |
| Plaintiff, | ) | TENTATIVE MEMORANDUM |
| | ) | ORDER AND OPINION |
| v. | ) | DENYING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| ENCANA ENERGY SERVICES, INC., | ) | JUDGMENT ON THE |
| a Delaware corporation, formerly known | ) | GROUNDS OF PREEMPTION |
| as PANCANADIAN ENERGY | ) | AND FILED RATE DOCTRINE |
| SERVICES INC.; ENCANA | ) | |
| CORPORATION, a Canadian | ) | |
| corporation, formerly known as and | ) | [Document 494] |
| successor to PANCANADIAN | ) | |
| ENERGY CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

The court has considered the arguments and submissions of the parties with regard to Defendants' motion for summary judgment on the grounds of preemption and filed rate doctrine. The following is the court's proposed order denying Defendants' motion. The court takes the unusual step of issuing this proposed order so that the parties may focus their oral arguments.

## INTRODUCTION

This is an action for damages and declaratory relief by plaintiff E. & J. Gallo Winery ("Gallo") against defendants EnCana Corp. ("EnCana"), a Canadian producer of natural gas, and WD Energy Services, Inc. ("WD") (formerly EnCana Energy Services, formerly Pan

Canadian Energy Services, Inc.), a wholly-owned marketing subsidiary of EnCana Corp. (collectively, "Defendants").  On January 24, 2005, Gallo filed its first amended complaint for damages, disgorgement/restitution , constructive trust, and injunctive relief (the "FAC"). The FAC alleges both state and federal antitrust claims.  Defendants have filed two motions for summary judgment and Gallo has filed one motion for partial summary judgment.  In the instant motion, Defendants move for summary judgment on all claims set forth in the FAC on the grounds the federal claims are barred by the filed rate doctrine and the state claims are preempted under federal law.  Federal question jurisdiction exists pursuant to 28 U.S.C., section 1331.  Venue is proper in this court.

## PROCEDURAL HISTORY

The original complaint in this action was filed on April 9, 2003.  On August 28, 2004, Defendants filed a motion to limit Gallo's damage claim to those damages actually demonstrated by Gallo.  The court granted in part Defendants' motion to limit Gallo's claims but granted Gallo leave to amend its complaint.  On January 24, 2005, Gallo filed its FAC alleging essentially identical claims for relief as the original complaint, but clarifying that Gallo was seeking damages for itself and all its subsidiary companies.  Defendants filed a motion to dismiss on February 9, 2005.  The grounds asserted by the motion to dismiss were *res judicata* and improper forum.  The motion to dismiss the FAC was denied on July 6, 2005.  Defendants have filed a petition for writ of mandamus with the Ninth Circuit Court of Appeal challenging this court's denial of the motion to dismiss on the ground of *res judicata*. That petition is pending as of this writing.

The instant motion for summary judgment was filed on July 25, 2005.  Gallo filed their opposition to Defendants' motion for summary judgment on August 15, 2005. Defendants' reply was filed on August 23, 2005.

## FACTUAL BACKGROUND

This motion requires the court to revisit its decision of May 14, 2004, ("May 14

2

Order") denying Defendants' motion for dismissal on the same grounds raised in this motion. The issues raised by this motion implicate primarily questions of law, rather than of fact. Prior decisions of this court have summarized the factual background of this case, and the court borrows from the factual backgrounds presented in those decisions and from Gallo's statement of disputed facts to provide a general factual context for the discussion that follows.

In its Separate Statement of Disputed Material Facts, Gallo alleges that since prior to 2000, Gallo has purchased natural gas for use in its wineries located in Modesto, Livingston, and Fresno, and for its Gallo Glass Company, a wholly-owned subsidiary located in Modesto. In 2000 and through March 2001, Gallo purchased natural gas from Coral Energy Resources, P.P.  Beginning in April 2001, Gallo purchased natural gas from PanCanadian Energy Services, Inc., predecessor of defendant WD Energy Services, Inc.  The natural gas Gallo purchased from Defendants entered California at PG&E Citygate, located on the California-Oregon border.

In its May 14 Order, the court summarized the basic concepts of the natural gas marketplace as follows:

> Natural gas is produced primarily in Canada and certain portions of the United States and shipped across state lines in pipelines whose aggregate capacity is controlled by [WD] and other similar corporations.  Until the mid-1980's the commodity price of natural gas was combined with the transportation costs and sold by state-regulated entities at a "bundled" price. Historically, the bundled price represented the commodity price of gas as quoted on the New York Mercantile Exchange (which is a price quoted in relation to a specific location on the Texas-Louisiana border) and the "basis differential," or "basis" which is the differential between the commodity price and the price paid at the California border.  Thus, the "basis" generally reflected the cost of pipeline transportation from the point of production to the California border.
> In the Mid-1980's industry practice changed to allow the "unbundling" of the commodity pricing of natural gas from its transportation cost component.  Large scale consumers were allowed to separately negotiate the commodity costs paid to supplier/producers and the basis or transportation costs.  Gallo alleges that from the late 1990's and continuing to the present, there was excess pipeline capacity and the resultant competition forced the basis differential to very low levels, sometimes less than zero.  Because the basis differential portion of the bundled natural gas price remained low during

3

that period, the price of natural gas in California remained competitive with prices paid in other states.

May 14 Order at 3.

In its order of July 6, 2005, denying Defendants' motion to dismiss the FAC, the court summarized the claims alleged in the FAC as follows:

> Commencing in the Summer of 2000 and continuing until late 2001, by their marketplace behavior and agreement as to pricing, defendants, and the unnamed co-conspirators, avoided competing with each other in the pricing and sale of "bundled" natural gas in California, in the pricing and sale of interstate gas transportation contracts into California in the secondary (or replacement) market, and in the pricing and sale of the derivatives supposedly derived from California natural gas market prices. This agreement is evidenced by, among other things, the daily exchange of price information by and among defendants and the unnamed co-conspirators and the use of computer software programs and websites by defendants and the unnamed co-conspirators to collusively establish Defendants' and the unnamed co-conspirators' price of "basis" and thus the price of bundled natural gas pricing (and vice-versa) at artificially high levels during the relevant time.
>
> [¶ . . . ¶]
>
> Defendants and the unnamed co-conspirators also agreed to do "wash" transactions under which they simultaneously bought and sold from each other the same natural gas and natural gas "basis" swaps and other commodities <u>at the same price on the same day</u>. The "wash trades" created the false appearance of demand for and shortage of supply of natural gas and natural gas transportation into California. The " wash trades" also served as a method of communicating collusive price information and collusively manipulating the supposedly independent third party published indexes of prices used to determine the settlement amount of natural gas contracts and natural gas derivatives, including "basis" swaps.

FAC at ¶¶ 19, 21.

The focus of this motion is on the role of the Federal Energy Regulatory Commission ("FERC") in regulating sales of natural gas in interstate commerce. Although the exact contours of FERC's regulatory reach are a topic for the discussion below, the following brief outline of the historical trends of FERC with respect to the regulation of natural gas sales provides a factual context for the discussion that follows:

> The traditional natural gas market structure consisted of three segments: producers, interstate pipelines and local distribution companies ("LDCs"). The Natural Gas Act ("NGA") of 1938, 15 U.S.C., section 717 *et seq.* did not require interstate pipelines to offer transportation services to third

4

parties wishing to ship gas. General Motors Corp. v. Tracy, 519 U.S. 278, 283 (1997). Consequently, pipelines developed monopolistic power over "purchase of gas at the wellhead and monopoly power in the market for the sale of gas to LDC's." Id. Under this regime, pipelines purchased gas at the wellhead from producers under long-term contracts. FERC regulated the prices at the wellhead and the prices charged by pipelines to the LDC and large utility consumers. Tenneco Gas v. FERC, 969 F.2d 1187, 1193 (D.C. Cir. 1992).

Congress began the process of deregulation of the natural gas marketplace in 1978 with the passage of the Natural Gas Policy Act ("NGPA"), 15 U.S.C., sections 3301-3432. General Motors, 519 U.S. at 283. The NGPA deregulated gas prices at the wellhead resulting in a spot market[1] where prices were much lower than prices in long-term pipeline contracts. Consumers, however did not receive the benefit of the deregulation because pipeline owners were able to use their monopolistic power over pipeline access to prevent spot market sales that were in competition with their own sales. Tenneco Gas, 969 F.2d at 1193.

FERC took the next step by promulgating Order No. 436 "which contained an 'open access' rule providing incentives for pipelines to offer gas transportation services." General Motors, 519 U.S. at 284. Pipelines were encouraged to "transport gas for all marketers, or shippers, through blanket open-access authorizations. [Citation.] Once a pipeline received authorization to conduct open-access transportation, it was required to sell capacity on a first-come, first-served basis to any shipper requesting the same service." Tenneco Gas, 969 F.2d at 1193. A result of Rule 436 was that pipeline companies shed their market role and formed marketing and sales subsidiaries to take advantage of the newly deregulated market. Id. FERC completed this phase of deregulation by promulgating Rule 636 "which required all interstate pipelines to 'unbundle' their transportation from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas." General Motors, 519 U.S. at 284.

In February of 2002, FERC acknowledged that Enron and other gas and electricity trading companies may have manipulated electric or gas markets in the west, and ordered a fact-finding investigation. See Order Directing Staff Investigation, 2002 WL 32001559 (F.E.R.C. Feb. 13, 2002). In March of 2003, FERC issued a report that concluded energy price manipulation was widespread, both geographically and with respect to the large numbers of energy trading companies engaging in manipulative behavior. The report also concluded the mechanism for reporting gas price indices was "fundamentally flawed." "Traders had the ability to manipulate the published indices and they did so." Final Report on Price Manipulation in Western Markets, FERC (2003).

---

[1]      Black's Law Dictionary, seventh edition, defines "spot market" as "a market (esp. in commodities) in which payment or delivery is immediate." In the context of natural gas, the "spot market" has been defined as "a market for gas not committed to long-term gas purchase contracts." Sabine Corp. v. ONG Western, Inc., 725 F.Supp. 1157, 1167 (W.D. Oklahoma 1989).

FERC Order No. 644 issued November 17, 2003, addressed the problems raised in the report of March, 2003. See Order No. 644, 2003 WL 22758080 (F.E.R.C.) (Provided at Tab No. 1). Among other things, FERC established a "Code of Conduct for Unbundled Services" that declared certain forms of transactions illegal, including "wash trades" and other forms of collusive behavior. Id. at 28. Order 644 also provides a code of conduct for holders of blanket marketing certificates and specified that FERC could impose penalties of disgorgement and/or loss of blanket certification for violation of the code of conduct. Id. at 29. In its discussion, FERC noted its jurisdiction "under the GNA includes all *sales for resale* by interstate and intrastate pipelines and LDCs and their affiliates, other than their sales of their own production. The commission's jurisdiction also includes a category of sales by entities that are not affiliated with any pipeline or LDC. Such entities are those making sales for resale of gas that was previously purchased and sold by an interstate or intrastate pipeline or LDC or retail customer." Id. at 4 (italics added).

May 14 Order at 5-7.

## UNDISPUTED MATERIAL FACTS

Defendants have submitted a list of six undisputed facts focusing primarily on the nature of Gallo's damage claims and the basis for the calculation of the amount of those claims.

1.    Plaintiff has alleged that Defendants engaged in a conspiracy and acted in furtherance of such a conspiracy by, among other allegations "wash trading" or "false reporting."

2.    Plaintiff claims that this purported conspiracy had the effect of causing wholesale prices for natural gas at PG&E's CityGate to increase for a period of time, to which their natural gas purchase contracts were tied.

      Note: Gallo vigorously disputes this fact. At the core of Defendants' motion, and Gallo's disputation, is Gallo's contention that Defendants' activities artificially inflated published index prices for natural gas, which, in turn artificially inflated the *retail* price paid by Gallo. At issue is whether Gallo's damages must be calculated with reference to price changes in Wholesale rates or whether Gallo's damages may be calculated solely with reference to *retail* pricing, which is not subject to FERC oversight. The court will resolve this issue in the discussion that follows.

3.    Plaintiff claims to have been damaged by the difference between the prices for natural gas that it actually paid, based on existing PG&E CityGate prices, and the prices for natural gas [Gallo] alleges it would have paid, based on PG&E CityGate prices [Gallo] claims would have existed but for the alleged misconduct.

4.    [Gallo's] experts have developed four alternative hypotheses under which they estimate what PG&E CityGate prices  - wholesale natural gas prices - would have been absent the alleged misconduct.

      Note: Gallo disputes the proffered undisputed material fact, again on the ground the

6

prices that have been estimated are *retail* prices that would have been charged absent the misconduct.  Again, the issue will be resolved in the discussion that follows.

5.    Plaintiff's experts agree that the PG&E CityGate prices that they estimate under any of their hypotheses are not prices that were actually paid during the relevant time frame, and instead are estimates based on factors they contended are relevant.

Note: Gallo does not dispute the proffered fact but contends the fact is irrelevant.

## PARTIES' REQUESTS FOR JUDICIAL NOTICE

### A.  Defendants' Requests for Judicial Notice

Defendants have made two requests for judicial notice of a number of documents submitted in support of their motion for summary judgment on the grounds of preemption and filed rate doctrine.  Defendants first request for judicial notice requests that the court take judicial notice of document comprising chapter IV of a FERC report titled Final Staff Report on Price Manipulation in Western Markets, Fact-Finding Investigation fo Potential Manipulation of Electric and Natural Gas Prices, Docket No. PA02-2-000 (March 26, 2003), and a FERC press release dated August 30, 2004, covering the results of FERC's investigation of price manipulation in 2003.  These two documents are appended as tabs 1 and 2, respectively, to Defendants request for judicial notice.  In addition, Defendants request the court take judicial notice of a total of six orders issued by FERC from 1995 to 2005 relating to FERC's oversight activities in the natural gas marketplace.  The FERC orders are provided by Defendants in their Appendix of Authorities. Gallo objects to the Final Staff Report on the ground only one chapter is included out of a much larger report.  Gallo objects to the FERC news release on the ground the news release is not relevant to the matter at hand. Gallo does not object to Defendants' request for judicial notice of the six FERC orders.

In its Supplemental Request for Judicial Notice, Defendants ask the court to take judicial notice of two documents, the first titled Reporter's Transcript of Proceedings of Nov. 29, 2004 Hearing, Sierra Pacific Resources, et al. v. El Paso Corp., No. CV-S-03–0414-JCM-RJJ (D. Nev. 2004) (docket no. 163), and the second titled Minutes of the Court Sierra Pacific Resources, et al. v. El Paso Corp..No. CV-S-03–0414-JCM-RJJ (D. Nev. 2004)

7

1   (docket no. 161).  Gallo has not objected to Defendants' Supplemental Request for Judicial

2   Notice.

3            A district court may take judicial notice pursuant to Rule 201 of the Federal Rules of

4   Evidence of the records and reports of administrative bodies, <u>Interstate Natural Gas Co. v.</u>

5   <u>Southern California Gas Co.</u>, 209 F.2d 380, 385 (9th Cir. 1953), and of orders or decisions or

6   proceedings of any federal or state court.  <u>Holder v. Holder</u>, 305 F.3d 854, 866 (9th Cir.

7   2000).  Th court has reviewed the documents referenced in Defendants' requests for judicial

8   notice and finds all documents are suitable for judicial notice except for the FERC press

9   release dated August 30, 2004, covering the results of FERC's investigation of price

10  manipulation in 2003.  The FERC press release has been reviewed and the court has

11  determined it is not relevant to the issue currently before the court.  With the exception of this

12  document, Defendants' request for judicial notice will be granted.

13           **B.  *Gallo's Request for Judicial Notice***

14           Gallo has requested the court take judicial notice of a total of fourteen documents,

15  mostly filed documents related to FERC proceedings and FERC orders and reports.

16  Defendants object only to Gallo's submission of the complete  FERC report titled Final Staff

17  Report on Price Manipulation in Western Markets, <u>Fact-Finding Investigation fo Potential</u>

18  <u>Manipulation of Electric and Natural Gas Prices</u>, Docket No. PA02-2-000 (March 26, 2003).

19  Defendants object to Gallo's request for judicial notice of the entire report on the ground

20  Gallo seeks to use information contained in the report for the truth of the matters asserted

21  therein.  Defendants contend such reliance on the contents of the report constitute

22  impermissible hearsay. Because the report is the report of a federal agency, it is a document

23  of which the court may take notice.  The discussion that follows and the conclusion reached

24  by the court do not depend in any way on the contents of the report.  Defendants' objection is

25  therefore overruled as moot.

26

27

28                                          8

# LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party.  <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); <u>Calderone v. United States</u>, 799 F.2d 254, 259 (6th Cir. 1986); <u>see also</u> <u>E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico</u>, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); <u>Ruffin v. County of Los Angeles</u>, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

        In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the

10

1  inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45

2  (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

3                                    **DISCUSSION**

4         As this court observed in its May 14 Order, "[t]he authority of FERC is plenary within

5  its jurisdiction.  In re California Wholesale Electricity Antitrust Litigation, F.Supp.2d 1072,

6  1076 (S.D. Cal. 2003)."  Doc. 74 at 7.  FERC's plenary authority within its jurisdiction

7  implicates two legal theories, preemption and the "filed rate doctrine," both of which

8  Defendants rely upon in their motion for summary judgment. The court addresses

9  Defendants' preemption argument first.

10  **I. Preemption of State Claims**

11         Defendants contend Gallo's state law claims are barred because the regulatory system

12  instituted by Congress under the Natural Gas Act, 15 U.S.C., section 717 *et seq*., and the

13  Natural Gas Policy Act ("NGPA"), 15 U.S.C., sections 3301-3432, preempts state law claims

14  that impinge upon the FERC's exclusive jurisdiction over all wholesale sales of natural gas in

15  interstate commerce.  The scope of federal regulation of natural gas is set forth in the Natural

16  Gas Act at 15 U.S.C., section 717(b) as follows:

17              The provisions of this chapter shall apply to the transportation of
        natural gas in interstate commerce, to the sale in interstate commerce of
18      natural gas for resale for ultimate public consumption for domestic,
        commercial, industrial, or any other use , and to natural gas companies
19      engaged in such transportation or sale, but shall not apply to any other
        transportation or sale of natural gas or to the local distribution of natural gas or
20      to the facilities used for such distribution or to the production or gathering of
        natural gas.

21
     As the Supreme Court observed in Panhandle Eastern Pipe Line Co. v. Pub. Serv.
22
     Comm'n of Indiana, 332 U.S. 507 (1947), observed:
23
        Three things and three only Congress drew within its own regulatory power,
24      delegated by the act to its agent the Federal Power Commission.[2]  These were:
        (1) the transportation of natural gas in interstate commerce; (2) its sale in
25      interstate commerce for resale; and (3) natural gas companies engaged in such

26  ───────────────

27      [2]        Federal Power Commission was the predecessor of the FERC.

28                                          11

1    transportation or sale.

2    Id. at 516.  The line separating sales falling within the Gas Act's regulatory jurisdiction and

3    those that fall without is "thus clear and complete. [The line] cut[s] sharply and cleanly

4    between sales for resale and direct sales for consumptive use."  Id.  The provisions of the

5    NGPA do not expand FERC's jurisdiction with respect to retail sales of natural gas to

6    consumers for use.

7        Defendants do not contend the sales of natural gas to Gallo were other than direct

8    sales for consumptive use; that is, retail sales that expressly lie outside FERC jurisdiction.

9    Rather, Defendants contend Gallo's action is preempted because Gallo, in order to establish

10   its claims for damages,  "must engage in speculative rate-setting, or must ask this court or

11   jury to do so, in order to establish any damages."

12       The issue of federal preemption of state-law claims is closely related to the issue of

13   whether the filed rate doctrine applies in a particular case.  California ex rel. Lockyer v.

14   Dynegy, Inc., 375 F.3d 831, 852 (9th Cir. 2003) ("Dynegy").  "The filed rate doctrine

15   requires 'that interstate power rates filed with FERC or fixed by FERC must be given binding

16   effect by state utility commissions determining intrastate rates.'  [Citation.] When the filed

17   rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through

18   the Supremacy Clause. [Citation.]" Entergy Louisiana, Inc. v. Louisiana Pub. Serv. Comm.,

19   539 U.S. 39, 47 (2003).  State law claims that arise from intrastate transactions that would

20   normally be outside FERC jurisdiction are barred where the application of the state law

21   would in any way alter the rate or tariff set by FERC.  See id. at 49-50 (state law that alters

22   costs allocated by tariffs set by FERC preempted).  Similarly, state law may not regulate in

23   areas normally within FERC jurisdiction, such as first sales of gas in interstate commerce,

24   even though the Natural Gas Policy Act removes those specific sales from FERC's rate-

25   setting authority.  See Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of

26   Mississippi, 474 U.S. 409, 422 (1986) (state may not enact ratable-take regulations for first

27

28                                              12

1   sales to interstate pipelines even though the NGPA removes first sales from FERC rate-

2   setting).   State law claims are not preempted, however, where the action does not relate to

3   wholesale sales in interstate commerce and the state claims seek only to enforce FERC-set

4   rates or tariffs, or where claims do not require the court to second-guess rates or tariffs set by

5   FERC.  See, e.g. Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F.Supp.2d

6   631, 638-640 (S.D. W. Va. 2005) (plaintiffs seeking only to enforce tariff not barred by filed

7   rate doctrine or preemption).  Neither FERC's plenary powers within its jurisdiction nor the

8   filed rate doctrine prevent actions by consumers against natural gas sellers where examination

9   of the filed rate is not implicated.  See, e.g., Columbia Steel Casting Co. v. Portland General

10  Elec. Co., 103 F.3d 1446, 1464 (9th Cir. 1996), as amended on rehearing , 111 F.3d 1427,

11  1446 (9th Cir. 1997); County of Stanislaus, 114 F.3d at 864-865 (collecting recent exceptions

12  to the filed rate doctrine); Stein v. Pacific Bell Telephone Co., 173 F.Supp.2d 975, 984 (N.D.

13  Cal. 2001).

14          The transactions out of which this action arises, the retail sales of natural gas to an

15  end consumer, lie outside the statutory scope of FERC regulation.  Consequently,

16  preemption, if it is to apply at all, can only apply if Gallo's claims require the court or the

17  jury to make findings that would, in some way, alter or second-guess tariffs or rates set by

18  FERC.  In other words, Defendants' contention that Gallo's action is barred by preemption is

19  analytically indistinguishable from its contention that the action is barred by the filed rate

20  doctrine.  Since the filed rate doctrine applies to state law actions as federal preemption under

21  the Supremacy Clause, invocation of preemption where the issue is whether a plaintiff's

22  claims interfere with FERC-determined tariffs or rates, is mere repetition of the filed rate

23  doctrine argument.  The court therefore incorporates Defendants' preemption argument into

24  its discussion of the applicability of the filed rate doctrine, inasmuch as Defendants'

25  contentions with respect to both arguments are settled on the same law and facts.

26

27

28                                                    13

## II. Filed Rate Doctrine

Defendants contend Gallo's claims are barred because the determination of damages for each of the claims pled requires the court or the jury to "engage in speculative rate-setting," which is prohibited by the filed rate doctrine. Gallo counters with two contentions that were raised previously and discussed in this court's May 14 Order denying Defendants' motion to dismiss. First, Gallo contends the filed rate doctrine does not apply here because there is no evidence rates were ever filed with, or any tariff determined by, FERC and, even if the filed rate doctrine did apply, the damages Gallo alleges it suffered can be ascertained without any speculation as to filed rates or tariffs.

### A. When Does the Filed Rate Doctrine Apply?

In its May 14 Order the court observed:

> The filed rate doctrine arises out of the plenary power of FERC to regulate rates and other aspects of the interstate wholesale market in natural gas. In re California Wholesale Electricity Antitrust Litigation, F.Supp.2d 1072, 1077 (S.D. Cal. 2003). "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question. [Citation.]" Transmission Agency of N. Ca. v. Sierra Pacific Power Company, 295 F.3d 918, 929 (9th Cir. 2002). "Since the 1920s, the 'filed rate' or 'filed tariff' doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services. [Citation.]" County of Stanislaus v. Pacific Gas and Electricity Co., 114 F.3d 858, 862 (9th Cir. 1997). The filed rate doctrine applies to rates charged by natural gas companies. See Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 573 (1981).

May 14 Order at 8.

The court concluded that where there was no evidence that any rates had been filed with FERC or that FERC had imposed any tariff[3], the filed rate doctrine did not apply. The

---

[3]        The term "tariff" in the context of FERC jurisdiction over wholesale sales of natural gas appears to be conceptually broad to include not only the Black's Law Dictionary definition of "[a] schedule listing the rates charged for services provided by a public utility . . . ." but also such regulatory determinations as allocation of costs, Entergy, 539 U.S. at 49-50, penalties for violations of the tariff's provisions, California ex rel. Lockyer, 375 F.3d at 853 n.25, and market protocols governing sales through state regulatory structures. Pub. Utility Dist. No. 1 of Snohomish County v. Dynergy Power Marketing, Inc., 384 F.3d 756, 762 (9th Cir. 2004) ("Snohomish"). The filed rate doctrine therefore applies to more than just rates; "it extends to

analysis that follows is complementary to the court's analysis in its May 14 Order, which will not be repeated here. Rather the court will focus most closely on the authorities cited by the parties as having added to the legal landscape since the May 14 Order.

The essence of Defendants' argument regarding the applicability of the filed rate doctrine is that recent case authority demonstrates that the applicability of the filed rate doctrine is not confined to situations where rates are filed. Rather, Defendants argue, recent case authority indicates the filed rate doctrine encompasses rates set by markets even though the market-set rates are not filed. Defendants rely principally on County of Stanislaus v. Pacific Gas & Electric Co., 114 F.3d 858 (9 Cir. 1997); Dynergy, 375 F.3d at 853; Snohomish, 384 F.3d at 7762; Pub. Util. Dist. No. 1 of Gray's Harbor County v. IDACORP, Inc., 379 F.3d 641, 651-651 (9th Cir. 2004) (Gray's Harbor"); and In re Western States Natural Gas Antitrust Litigation, 368 F.Supp.2d 1110, 1116 (D. Nev. 2005) ("Western States"), for the proposition that courts have applied the filed rate doctrine to situations such as the one at bar where the rates being challenged are market-based and not filed or approved by FERC. A brief summary of each of these decisions is in order.

County of Stanislaus appears to be the first Ninth Circuit case to examine the preclusive effect of the filed rate doctrine in a case involving allegations of violation of both state and federal antitrust statutes through anti-competitive manipulation of the natural gas market. In County of Stanislaus, the court held the claims of both "core and non-core"[4] customers of the defendant natural gas companies were barred by the filed rate doctrine. County of Stanislaus, 114 F.3d at 866. The events that formed the basis of the action in

---

the services, classifications, charges, and practices included in the rate filing." Stand Energy Corp. v. Columbia Gas Transmission Corp., 373 F.Supp.2d 631, 635 (S.D. W. Va. 2005).

[4]     A non-core customer is defined in County of Stanislaus as "large commercial and industrial consumers that are capable of purchasing gas from alternative sources." Core customers are small, mainly residential consumers who lack source options for natural gas. 114 F.3d at 860. It appears from the factual context presented in County of Stanislaus that all the plaintiff consumers were retail purchasers of natural gas.

County of Stanislaus occurred between 1988 and 1993. Id. at 860. The plaintiffs alleged a Canadian gas producer that was a wholly owned subsidiary of defendant PG&E conspired to increase the price paid above the prevailing market rate for wholesale Canadian Gas. Plaintiffs also contended defendant companies conspired to prevent access by competitors to the PG&E gas transmission lines. Id. at 860. The court reviewed the extensive regulatory oversight that was in place at the time over both pricing and interstate pipeline access and noted particularly that price paid by plaintiffs to defendants had been filed and reviewed by FERC and had been deemed "reasonable." Id.. at 860-861. The court held that neither federal nor state claims could challenge rates that had been reviewed by FERC, or volumes of gas that had been allocated and approved as a result of FERC oversight. Id. at 866.

Dynegy is a case involving allegations of unfair business practices under California law by California electricity consumers against a large number of electrical power trading companies. The court noted that the system of electrical power distribution was overseen at the time of the events giving rise to this action by two non-profit, non-governmental public benefit corporations; the Independent System Operator ("ISO") and the Independent Power Exchange ("PX"). The function of the ISO was to "manage the flow of electricity across the grid and balance supply and demand in real time." Dynegy, 375 F.3d at 835. The function of the PX was to "oversee an auction system for the sale and purchase of electricity on a nondiscriminatory basis to meet the electricity loads of exchange customers." Id. The court observed that the PX "was subject to the jurisdiction of the [FERC] , and it operated pursuant to FERC -approved tariffs and FERC-approved wholesale rate schedules." Id. With regard to the defendants' claims of federal preemption of state law claims, the Dynegy court explained FERC's jurisdictional reach as follows:

> [O]ur cases specifying the nature and scope of exclusive FERC jurisdiction make clear that the interstate 'transmission' or 'sale' of wholesale energy pursuant to a federal tariff – not merely the 'rates' – falls within FERC's exclusive jurisdiction. States do, of course, have jurisdiction over certain sales, but we have enunciated a bright-line distinction between wholesale sales, which fall within FERC's plenary jurisdiction, and retail sales, over

16

which the states exercise jurisdiction.

Id. at 851.  The Dynegy court found California's state claims preempted by FERC's exclusive jurisdiction over the interstate wholesale electrical market.  Id. at 852.  In addressing the related filed rate doctrine, the court observed that the filed rate doctrine is "'not limited to rates per se.' [Citation.]" Id. at 853.  The court further held:

> Under the filed rate doctrine, the terms of the filed tariff "are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities'" of the contracting parties. [Citations.] As a result, "the filed rate doctrine bars all claims – state and federal – that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed." [Citation.]  Thus, to the extent that California argues that the companies owe "obligations . . . *beyond those* set out in the filed tariffs . . . [such claim] is also barred by the filed rate doctrine.

Id. at 853 (internal citations omitted, emphasis in the original).

In Snohomish, a consumer utility in Washington sued several electrical power trading companies that were trading in the California energy market for alleged violations of California antitrust and consumer protection laws.  In Snohomish, there were no rates set or approved by FERC; rather the rates charged by the defendants were wholesale rates set by the "market."  Snohomish, 384 F.3d at 760-762.  Because the plaintiff was a utility who purchased power for resale, the market rates complained of by the plaintiff were wholesale rates.  The court rejected the plaintiff's contention that their claims under California law were not preempted because the wholesale rates paid were set by the market and were not filed with or reviewed by FERC prospectively.  Rather, the court noted, as it did in the earlier Dynegy case, that the wholesale electrical power market in California is regulated by the FERC indirectly through the PX and the ISO and through its review of the tariffs filed by both the PX and the ISO describing market rules and protocols.  Id. at 761.  The court concluded that where FERC approved tariffs governed the wholesale market, the only remedy for the aggrieved plaintiff is to pursue its claims before the FERC because the state law claims were preempted.  Id. at 762.

Greys Harbor is a case that arose out of facts that are very similar to those of

17

Snohomish. In Greys Harbor, the electrical power market that was alleged to have been manipulated was the wholesale power market located in Idaho, rather than in California. The claims in Greys Harbor appear to be primarily common law contract claims, rather than state law claims. Greys Harbor, 379 F.3d at 645. The court, in examining plaintiff's claims for relief, concluded that, even though the complaint presented its claims for relief as contract claims for rescission, reformation and unjust enrichment, the court could not grant plaintiff's claims for relief without determining the fair wholesale market price for energy. Id. at 645-646. In finding that FERC's exclusive jurisdiction over wholesale sales of power in interstate commerce preempted plaintiff's common law or state law claims, the court reasoned as follows:

> The fact that the rates at issue in this case are market based does not alter this conclusion. Idaho Power Company's authority to charge market-based rates comes from FERC. Before allowing Idaho Power Company to charge market-based rates, FERC first confirmed that Idaho Power did not have , or had adequately mitigated, market power in generation and transmission and could not erect other barriers to entry. [Citation.] Further, the ability to charge market-based prices comes with certain filing requirements, including providing FERC with individual service agreements for contracts such as the one at issue here. [Citation.] Even in the context market-based rates, FERC actively regulates and oversees the setting of [wholesale] rates.

Id. at 649.

Similarly, the Greys Harbor court examined the plaintiff/appellant's contention that the filed rate doctrine does not apply where there is no filed rate and where the rate paied is set by the deregulated market place. Id. at 651. In holding that the filed rate doctrine does apply where the wholesale rates are set by the market, the court observed:

> . . . as described above, the market based regime established by FERC continues FERC's oversight of the rates charged. FERC only permits power sales at market-based rates after scrutinizing whether "the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry. [Citation.] According to FERC, these conditions assure that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable. [Citation.] This oversight is ongoing, in this case requiring Idaho Power Company to provide notice of any change in status, to file an updated market analysis every three years, and to file various sales agreements and transaction summaries.

18

1    Id.at 651.

2         Perhaps significantly, the wholesale sales in Grey's Harbor do not appear to have

3    been conducted under the auspices of a state coordinating agency equivalent to California's

4    PX or ISO.  Thus, Grey's Harbor appears to stand for the proposition that FERC authority

5    over the determination of the fairness of wholesale rates is exclusive even if the rates are set

6    by a deregulated marketplace over which FERC exercises only *de minimis* prospective

7    control and retrospective review pursuant to a filed tariff involving only the oversight

8    necessary to demonstrate the trader lacks market power.

9         From a review of the foregoing cases as well as other cases cited by the parties in their

10   briefs, and from the court's own review of appellate authority, the court concludes that no

11   appellate authority has, to this point, addressed specifically the issue raised in this motion.

12   That is, neither the Supreme Court nor any appellate court has determined whether the filed

13   rate doctrine applies where the plaintiff challenges the fairness of a retail rate paid for natural

14   gas and where the retail rate that was paid is not directly referent to a wholesale rate or tariff

15   that has been filed with FERC.

16        The court, having  reviewed such appellate authority as exists concludes the aggregate

17   of case authority points to a three-step inquiry to determine whether the filed rate doctrine

18   applies in a given case:  First, the court must determine whether the action directly challenges

19   the fairness of a rate paid or a tariff that has been filed.  Stand Energy, 373 F.Supp.2d at 638-

20   640 (actions seeking only to enforce tariffs do not implicate filed rate doctrine); Greys

21   Harbor, 379 F.3d at 652 (district court may determine if contract was formed under

22   circumstances of unilateral or mutual mistake as to market dysfunction).  The second inquiry

23   is whether the sales that are the subject of the action are jurisdictional; that is, whether the

24   sales were wholesale sales in interstate commerce. Dynegy 375 F.3d at 851 (retail sales or

25   wholesale sales that are intrastate lie outside FERC jurisdiction).  If the first and second

26   questions are answered affirmatively, the inquiry is essentially over since only minimal

27

28                                            19

exercise of regulatory control is sufficient to place the transaction within exclusive FERC jurisdiction. Grays Harbor, 379 F.3d at 651.  However, if the sale giving rise to the action is not jurisdictional; that is, it is a retail or intrastate sale, then the court must make a third inquiry to determine if the retail rate paid is pegged specifically to a rate or tariff that was filed with FERC and was either prospectively or retrospectively approved by FERC such that the court, in order to grant relief, must make a determination of the fairness of the wholesale rate or tariff . See County of Stanislaus, 114 F.3d at 863 (damages not an available remedy where claim challenges rates that were submitted to and approved by FERC); Greys Harbor, 379 F.3d 651 (FERC has exclusive jurisdiction over market-based rates where entry conditions into the market are subject to FERC oversight and rates are retrospectively reviewed according to a filed tariff) .  The first two elements of this three-part test are more-or-less self evident.  The third element requires some explanation.

The third inquiry – whether the rate paid in a retail sale is pegged specifically to a rate or tariff that was filed with FERC and was either prospectively or retrospectively approved by FERC – focuses on the limited extent of FERC's jurisdiction over rate-setting.  In Carnation Company v. Pacific Westbound Conference, 383 U.S. 213 (1966), the Supreme Court addressed the issue of the immunization of defendants from antitrust actions in actions where rate-setting was carried out pursuant to a federally regulated scheme.  The court opined:

> Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions. [Citation.]  We have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry.

Id. at 217-218.

The extent of FERC jurisdiction cannot be viewed expansively to include all rate setting, whether retail or wholesale.  "Three things and three only Congress drew within its own regulatory power, delegated by the [Natural Gas] Act to its agent the Federal Power

Commission.  These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.  Panhandle Eastern Pipeline Co., 507 U.S. at 516.  "The line of the [Natural Gas Act] is thus clear and complete.  It cuts sharply and cleanly between sales for resale and direct sales for consumptive uses.  No exceptions were made in either category for particular uses, quantities or otherwise."  Id. at 517.

Together, the decision in Panhandle Eastern Pipeline, with its attention to the clearly established boundaries of FERC jurisdiction, and Carnation Company, with its reluctance to infer immunity to regulation under the Sherman Antitrust Act, informs this court's determination as to the burden placed on a defendant who seeks to invoke the filed rate doctrine.  The court concludes such a defendant is obliged to show affirmatively that the remedy requested by the plaintiff actually impinges on a determination that is within exclusive FERC jurisdiction such that the granting of relief would have the effect of undoing a determination that lies solely within FERC's domain or usurps some aspect of rate or tariff setting that is solely within FERC jurisdiction.   The connection must be more than conjectural.  Where "rates [are] truly left to the market, with no filing requirement or FERC supervision at all, the filed rate doctrine would by its terms no longer operate."  Town of Norwood Massachusetts v. New England Power Company, 202 F.3d 408, 419 (1st Cir. 2000).

In short, the focus of the third inquiry is on the extent of FERC's jurisdiction.  It is not sufficient that the defendant who wishes to invoke the filed rate doctrine merely point out that the dispute is over rates charged by a trading company.  The filed rate doctrine does not preclude antitrust actions in federal court where FERC jurisdiction is completely lacking.  The filed rate doctrine will not apply where the defendant wishing to invoke the doctrine in the context of a dispute arising out of non-jurisdictional sales of natural gas cannot point with some precision to some rate or tariff that has been filed by FERC that is directly implicated

by the plaintiff's claim for relief.

The foregoing analysis does not offend the underlying considerations served by the filed rate doctrine. "'The considerations underlying the [filed rate] doctrine . . . are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.' [Citation.]" Arkansas Louisiana Gas Co., 453 U.S. at 577-578. The jurisdictional focus of the analysis proposed here comports with the jurisdictional concerns that underlie the filed rate doctrine by giving careful consideration in non-jurisdictional sales to those facts that could bring the sales at issue within exclusive FERC jurisdiction. Further, by focusing on the question of whether rates charged in non-jurisdictional sales were actually pegged to some rate or tariff set by FERC at the time the sales occurred, district courts preserve FERC's authority to later regulate pricing practices that were formerly left strictly to the market. FERC has "no power to alter a rate retroactively." Id. at 578. Thus, any determination by a court of rates that FERC has not set, or of a tariff FERC has not filed, does not intrude on FERC jurisdiction because FERC cannot later set or approve those rates or tariffs.

### B.  Does the Filed Rate Doctrine Apply in This Case?

In this case Gallo is challenging the rates it was charged for natural gas it purchased from WD and consumed in its operations. There is no doubt the sale of natural gas to Gallo was a non-jurisdictional retail sale and no doubt Gallo's claims for relief require this court to determine whether the rates it was charged were fair. Thus, in accordance with the three-part test discussed above, the resolution of Defendant's filed rate defense requires the court to determine whether the retail rates paid by Gallo were pegged specifically to a rate or tariff that was filed with FERC and was either prospectively or retrospectively approved by FERC such that the court, in order to grant relief, must make a determination of the fairness of the wholesale rate or tariff. For the reasons that follow, the court will find the rate that Gallo challenges is not a rate that was subject to FERC rate-setting, nor was the rate set in the

context of a tariff that was filed by FERC.

There is some ambiguity as to what rate, if any, the price paid by Gallo was pegged to. Gallo provides evidence that from 2000 through March 2001, Gallo purchased gas from Coral Energy Resources, L.P. at a rate that was determined by natural gas indices published in either the Natural Gas Intelligence index or the Gas Daily index. See Declaration of Bruce C. Hungate and exhibit "A" appended thereto. The Natural Gas Sale and Purchase Agreement ("Agreement") that was in force during the time relevant to this action does not reference any particular rate. See Exhibit "B" to Hungate Declaration. The terms of the Agreement provide as follows with respect to pricing:

> Nomination Procedures:  A Sales Term may be comprised of one or more months and Sales Terms need not be uniform during the term of this Agreement.  Buyer and Seller may orally agreed upon the length of the Sales Term, Level of Obligation, Price per MMBtu, Daily Sales Volume, Pipeline, and Delivery Point with respect to sales and purchases (each a "Transaction").  Buyer and Seller shall promptly execute a confirmation in the form of the attached Exhibit "A" (a "Confirmation").

> ¶ . . . . ¶

> Price:   The price to be paid at the Delivery Point by Buyer to Seller for all gas purchased and sold hereunder shall be the price specified in the then effective Confirmation.  Said price shall be expressed on an MMBtu (dry) basis.

Although the Agreement does not specify any particular reference point for the rates paid, Gallo has alleged, and Defendants do not dispute that during the period beginning June 1, 2000, and ending December 31, 2001, the prices Gallo paid were tied to either the NGI or the Gas Daily Index. This time period incorporates the time relevant to Gallo's action. Consequently, the court will assume for the remainder of the discussion that the price Gallo paid under the Agreement was pegged to the NGI or the Gas Daily Index.

Defendants' extensive argument that the filed rate doctrine applies in this case is underpinned by three fundamental contentions. First, Defendants contend that in order for Gallo to compute its damages resulting from Defendants' alleged collusive behavior, Gallo must propose a hypothetical rate which is the rate that would have been charged in the

23

absence of the alleged market manipulation and base their damages on the difference between this hypothetical rate and the rate Gallo actually paid.  Second, Defendants contend it does not matter whether the hypothetical rate Gallo seeks to prove is retail.  See Doc. 494 at 17-18. Rather, Defendants cite Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953 (1986), and Entergy La. Inc., 539 U.S. at 43 n.1, 46, 49-50, for the proposition that states may not make determinations as to retail rates by finding FERC-approved wholesale rates unreasonable.  Third, Defendants argue that Gallo's calculation of damages necessarily implies a determination of FERC-approved rates because retail rates necessarily contain a component of wholesale rate and, pursuant to the cases previously mentioned, district courts may not make determinations as to the reasonability of these rates.

Gallo does not dispute that in order to calculate their damages, they will be required to prove a hypothetical rate that would more likely than not have existed but for Defendants' alleged anti-competitive behavior.  Therefore, the validity of Defendants' argument turns on Defendants' contention that it does not matter that the sales to Gallo were retail sales and that the rates charged, although retail rates, cannot be examined for fairness without necessarily making prohibited inquiries into rates that are wholly within FERC jurisdiction.

### 1.  Cases Cited by Defendants do not Establish the Retail Gas Sales to Gallo are Within FERC's Exclusive Jurisdiction

The cases cited by Defendants for the proposition that the filed rate doctrine bars claims that challenge only end-user rates do not establish that proposition.  Both Nantahala Power and Entergy La. Inc. deal with attempts by *states* to regulate aspects of natural gas trading that impact interstate trade which is wholly within FERC jurisdiction.  Both Entergy and Nantahala dealt with the attempts of states to regulate cost allocations between electrical energy producers where the cost allocations had been previously determined through FERC-approved tarriffs. See  Entergy La. Inc., 539 U.S. at 50; Nantahala Power, 476 U.S. at 970-971.  Here, state regulation to allocate cost is not at issue.  In this case there is no attempt at

24

state regulation at all. Rather, here a private buyer is challenging the *retail* rates it paid as a result of Defendants' alleged anticompetitive behavior. Defendants have presented no appellate or Supreme Court authority to support their proposition that the filed rate doctrine prevents *private parties* from challenging the fairness of rates charged in *retail sales*.

### 2. Defendants' Implied Contention that Retail Rates Have a Wholesale Component is Without Foundation

Implicit in Defendants' argument that County of Stanislaus and related cases prohibit Gallo from attempting to prove a hypothetical rate that would have been charged absent Defendants' alleged misconduct is the contention that retail rates for natural gas necessarily imply examination of wholesale rates. Defendants refer to the "wholesale component of the retail rate" without presenting any authority for the proposition that a retail rate has a wholesale component. To this court's knowledge, there is no legally established connection between wholesale rate structure and retail rate structure.

While it may be common to conceptualize the retailer as selling a product at a rate that is determined by the addition of the retailer's overhead and profit margin to the wholesale cost, this conceptualization is not legally determined and becomes less applicable where, as here, the wholesaler and retailer are the same entity. Certainly it is within the discretionary power of the wholesaler/retailer to establish retail rates that are more than, less than, or the same as wholesale rates. See Town of Norwood, 202 F.3d at 418 (describing "price squeeze" as condition where wholesaler/ retailer maintains retail sales rates lower that wholesale rates).

In the absence of any authority to the contrary, the court must assume that where, as here, the disputed rates are the rates charged by an entity acting as both wholesaler and retailer, the legal nature of the rate is determined by the legal nature of the transaction. Wholesale rates are the rates charged in wholesale sales and retail rates are the rates charged in retail sales. The court can find no authority for the legal conceptualization of retail rates as

having a "wholesale component."  Indeed, the conceptualization the court has chosen is necessary because to conceive of a retail rate for natural gas as having a wholesale component would bring virtually all disputes concerning rates charged in non-jurisdictional transactions within FERC's exclusive jurisdiction thereby obliterating the bright-line distinction enunciated in Panhandle Eastern Pipeline Co. between sales for resale occurring in interstate trade that fall within FERC's exclusive jurisdiction and retail sales falling outside FERC jurisdiction.  It is this blurring of the distinction between FERC-regulated and non-FERC regulated sales the court seeks to avoid by requiring the Defendants demonstrate a concrete connection between the hypothetical rates Gallo will seek to establish to demonstrate its damages and rates that come within FERC jurisdiction specifically because they are wholesale rate subject to FERC regulation.

### 3. The Rates Gallo Seeks to Prove were Inflated are Not Rates Falling Within FERC's Exclusive Jurisdiction

Gallo alleges and Defendants do not dispute that the retail rates they were charged were tied to indices published in the NGI or the Gas Daily Index.  Daily and monthly price indices are compiled and published by several privately-owned trade press entities.  Policy Statement on Natural Gas and Electric Price Indices, 104 FERC P 61121, 2003 WL 21725984 (F.E.R.C.) at **2 (provided at Tab 2 of Supplemental Appendix of Authorities in Support of Defendant's Motion for Summary Judgment (Filed Rate Doctrine and Federal Preemption).  The system of published price indices is voluntary and traders may or may not report transactions to the publication services that are responsible for publishing the indices. Id. at **9.

The indices published in the NGI or the Gas Daily Index are closely linked to rates, but are not rates themselves.  The published index represents a compilation of submitted and verified information gathered from voluntary submissions of trading activity and is published as a price representing trading activity at each location.  Id. at **2.  The index may be used by

natural gas traders for any number of purposes:

> Price indices are widely used in bilateral natural gas and electric commodity markets to track spot and forward prices. They are often referenced in contracts as a price term; they are related to futures markets and used when futures contracts go to delivery; basis differentials in indices are used to hedge natural gas transportation costs; indices are used in many gas pipeline tariffs to settle imbalances or determine penalties; and state commissions use indices as benchmarks in reviewing the prudence of gas or electricity purchases.

Id.

Neither the conditions under which information is submitted to the index publishing services, nor the means by which the indices themselves are computed are matters of FERC oversight or regulation. As the District Court of Nevada observed in a class action case nearly identical to the one at bar:

> At the time of Defendants' alleged wrongdoing, FERC did not regulate the "spot market" or "wash sales." In fact the alleged price fixing agreements as well as the alleged false price postings which form the basis of Plaintiffs' Complaints all occurred on privately owned and operated websites, computer programs, and trade publications. [. . . .] Plaintiffs do not allege Defendants manipulated any FERC regulated price index.

In re: Western States Wholesale Natural Gas Antitrust Litigation, 346 F.supp.2d 1123, 1134 (D. Nev. 2004). While the Nevada District Court made its observations in the context of a challenge to the court's removal jurisdiction, this court has seen no evidence that would contradict the Nevada court's conclusion that the published indices are private and were, during the relevant time period, entirely unregulated by FERC.

Defendants argue that, because they marketed natural gas pursuant to blanket marketing certificates issued by FERC, their sales come under FERC jurisdiction. Defendants further argue that in the process of issuing the blanket marketing certificates FERC determined that "sellers of short-term or long-term firm gas supplies (whether they be pipelines or other sellers) will not have market power over the sale of natural gas." Defendants' Memorandum at 16 (quoting FERC Order No. 636, 57 Fed. Reg. at 13,297). Defendants argue that, under the decision in Greys Harbor, the issuance of blanket marketing

certificates by FERC constitutes a prior determination by FERC as to the fairness of the rates. Defendants contend the rates Gallo will attempt to establish have been constructively filed with FERC, thereby rendering Gallo's challenge of the fairness of the rates impermissible under the filed rate doctrine. Defendants' argument is unpersuasive.

The central issue is the extent of FERC's jurisdiction with respect to *retail* sales of natural gas. As has been discussed previously, FERC's blanket marketing certificates, and the attendant determination that the sellers did not have market power over natural gas sales pertains only to wholesale sales because wholesale sales mark the boundary of FERC's jurisdiction. FERC's blanket marketing certificates cannot have any applicability to Defendants' retail sales activities because FERC has no oversight authority with respect to retail sales. While wholesale rates *derived from* published index values may come within FERC's exclusive jurisdiction, it does not follow that retail rates that are derived from the same indices also come within FERC's jurisdiction. This is because the indices, as previously discussed, are not rates themselves but are privately derived, unregulated values calculated and published entirely without FERC approval or oversight and used voluntarily by market participants. Defendants offer no authority to support the proposition that the fact that wholesale rates and retail rates may be set relative to the same index brings that index within FERC jurisdiction. Certain natural gas wholesale rates could, in theory, be pegged to values on, for example, the New York Stock Exchange. That would not bring the New York Stock Exchange under FERC jurisdiction.

The court is aware of, and has reviewed the memorandum opinion and order of the Nevada District Court in In re: Western States Wholesale Natural Gas Antitrust Litigation, 368 F.Supp.2d 1110 (D. Nev. 2005). In that class action case, the court addressed the issue of whether the filed rate doctrine precluded the plaintiffs' antitrust action against several natural gas trading companies that were alleged to have committed anticompetitive acts essentially identical to the acts alleged by Gallo against Defendants. It is not entirely clear

from the published opinion whether the plaintiffs in that case included both wholesale and retail purchasers of natural gas.  An examination of the list of attorneys and their clients tends to indicate that at least some of the plaintiffs were retail purchasers.  The Nevada District Court dismissed all claims against the defendant gas trading companies on the ground that the action was prohibited by the filed rate doctrine and dismissed the action.  Id. at 1117.  This court assumes the dismissal was as to all the listed plaintiffs although that assumption could be erroneous.

Assuming, *arguendo*, that the <u>Western States Wholesale Natural Gas Antitrust Litigation</u> included at least one plaintiff who was a retail gas purchasers and assuming the dismissal on the ground of the filed rate doctrine was as to all plaintiffs, this court respectfully disagrees with the outcome reached by the Nevada District Court.  As this court has discussed, the retail purchaser stands in a fundamentally different relationship to the seller as far as FERC jurisdiction is concerned.  While a district court might be prevented by operation of the filed rate doctrine from examining a wholesale rate derived from a non-regulated published index, that same court is not prevented from examining a retail rate derived from the same non-regulated index.  The apparent fact the Nevada court considered both wholesale purchases and retail purchases as coming equally under FERC jurisdiction is the point of departure by this court from the Nevada court's conclusion.  In this court's opinion, the difference between the legal status of the retail purchaser and the wholesale purchaser in their relationship to FERC oversight makes all the difference with respect to the filed rate doctrine.

The court concludes Defendants have failed to meet their burden to show there is no issue of material fact as to the applicability of the filed rate doctrine to the present case where a retail rate is challenged and the proof of damages does not require the court to examine the fairness of a rate or tariff that has been filed by FERC.  Summary judgment is therefore not warranted.

29

THEREFORE, it is hereby ORDERED that:

1.   Gallo's request for judicial notice is GRANTED as to all documents presented for judicial notice.

2.   Defendants' request for judicial notice is DENIED as to their request for judicial notice of the FERC news release only, and is GRANTED as to all other documents presented by Defendants for judicial notice.

3.   The parties shall be present for oral argument to be heard on September 28, 2005, at 9:00 a.m. in courtroom 3.  Oral argument shall be confined to the issues raised in this proposed order.

4.   The parties may, if they so choose, submit briefs summarizing the arguments they intend to raise at oral argument.  Such briefs shall be not more than ten (10) pages in length and shall be filed and served not later than Friday, September 23, 2005.

5.   The court shall take the matter under submission as of the close of oral argument on September 28, 2005, and shall issue its final order within ten (10) days of that date.


IT IS SO ORDERED.

**Dated:   September 14, 2005**          **_____/s/ Anthony W. Ishii_____**
h2ehf                                    UNITED STATES DISTRICT JUDGE

30