1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT FOR THE
9                    EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  E. & J. GALLO WINERY,                         ) | CV F 03-5412   AWI LJO |
| 12                        Plaintiff,              ) | MEMORANDUM OPINION |
|                                                   ) | AND ORDER ON |
| 13        v.                                      ) | PLAINTIFF'S MOTION FOR |
|                                                   ) | PARTIAL SUMMARY |
| 14  ENCANA ENERGY SERVICES, INC.,                ) | JUDGMENT ON LIABILITY |
|     a Delaware corporation, formerly known  )     | OF DEFENDANT ENCANA |
| 15  as PANCANADIAN ENERGY                        ) | ENERGY  CORP. UNDER |
|     SERVICES INC.; ENCANA                        ) | THEORY OF |
| 16  CORPORATION, a Canadian                      ) | PRINCIPAL/AGENT |
|     corporation, formerly known as and           ) | |
| 17  successor to PANCANADIAN                      ) | |
|     ENERGY CORPORATION,                          ) | Doc. # 504 |
| 18                                                ) | |
|                          Defendants              ) | |
| 19  _____)      | |

20
21
22
23          This is an action for damages and declaratory relief by plaintiff E. & J. Gallo Winery

24  ("Gallo") against defendants EnCana Corp. ("EnCana"), a Canadian producer of natural gas,

25  and WD Energy Services ("WD"), formerly EnCana Energy Services, Formerly Pan Canadian

26  Energy Services, Inc.  WD, a Delaware corporation, is a wholly-owned marketing subsidiary

27  of EnCana.  In the instant motion, Gallo seeks summary adjudication on the issue of whether

28

WD's parent company, EnCana,[1] can be held liable under agency theory for acts by WD Energy Services giving rise to liability under Gallo's first, second and third claims for relief. For the reasons that follow, Gallo's motion will be denied.

## PROCEDURAL HISTORY

The First Amended Complaint ("FAC") was filed on January 24 2005. The instant motion for summary adjudication on the issue of EnCana's liability under agent/principal theory was filed on July 25, 2005. Defendant's opposition was filed[2] on August 15, 2005. Gallo's reply was filed under seal on August 23, 2005. On October 17, 2005, the court granted Defendants' motion for certificate of applealability as to the court's order of September 30, 2005, denying Defendants' motion for summary judgment on the grounds of filed rate doctrine and federal preemption (hereinafter the "September 30 Order"). The court's order of October 17 stayed further proceedings in this case pending judgment by the Ninth Circuit Court of Appeal on Defendants' interlocutory appeal of the court's September 30 Order. The judgment of the Ninth Circuit Court of Appeal affirming this court's order of September 30 Order, was received by this court on December 6, 2007. The stay that had been imposed pending interlocutory appeal was lifted on November 21, 2007.

## GENERAL FACTUAL BACKGROUND

The general background facts of this case have been recited in numerous prior orders of the court and need not be repeated here. For purposes of the this discussion, the critical facts are not related to Gallo's allegations of improper trading activity, but to the business

---

[1]      Hereinafter "Defendants" refers to WD, EnCana, and their predecessors collectively.

[2]      The docket report indicates EnCana's opposition was lodged on August 15, 2005, together with an application to file under seal. It is not clear whether that request was granted. The court will, as a precaution, grant EnCana's request to file its opposition under seal and deems the opposition filed on August 15, 2005.

relationship between the two defendant entities, EnCana and WD, formerly EnCana Energy

Services, Inc., formerly Pan Canadian Energy Services, Inc.  For the sake of maintaining

continuity with the court's September 30 Order and with the opinion of the Ninth Circuit

Court of Appeal, filed on September 19, 2007, affirming the September 30 Order, the court

will refer throughout this discussion to "EnCana" and "WD."  The term "EnCana" as used

here refers to EnCana Corporation, as well as its predecessors, Pan Canadian Energy Corp.,

and Pan Canadian Petroleum ("PCP"), as well as to Pan Canadian Energy, Inc.  Similarly, the

term "WD" refers to WD Energy Services, as well as its predecessors EnCana Energy

Services, and Pan Canadian Energy Services, Inc.  Because a good deal of the factual

background and discussion that follows pertains to the evolution of the corporate entities

involved in this action, the court finds it necessary in some instances to specifically refer to the

entities that preceded either EnCana or WD.  In this context, the term "PCES" refers to Pan

Canadian Energy Services including both PCES, Canada and PCES, Inc.

## UNDISPUTED MATERIAL FACTS

### II.  Plaintiff's Factual Allegations

Gallo alleges fourteen "undisputed facts," each supported by numerous factual

elements drawn from discovery sources and alleged in individual undisputed material facts,

that, in sum, support Gallo's contention that WD and its predecessors are agents of EnCana

and its predecessors acting with actual authority for purposes of liability arising from the

unlawful acts of WD traders.  The fourteen "undisputed material facts" are:

1.  EnCana publicly described and internally referred to PCES as its North
American natural gas marketing arm and natural gas business unit that
operated from offices in the U.S. and Canada, and PCES accepted this
role.

2.  EnCana perceived the "PanCanadian" brand had value and chose to
have PCES use the PanCanadian name, logo and tagline.

3

3.     PCES understood it represented EnCana in the marketing of natural gas in North America.

4.     EnCana set up and operated the U.S. and Canadian marketing and trading operations as an integrated function in many important respects, including senior management, budgeting, strategic planning, risk management, credit, detailed reporting to senior management of EnCana, and bonus program.

5     EnCana defined the primary objectives of PCES to include enhancing the value of EnCana's natural gas production and obtaining the best prices for that production, and PCES agreed to those objectives.

6.     EnCana designated PCES as the exclusive marketer for its natural gas in North America and designated the U.S. operations (now WD) as the exclusive marketer in the United States.

7.     EnCana required the U.S. operations of PCES (now WD) to purchase and market sufficient natural gas to fill all of the capacity on the long-term pipeline commitments even though the cost of that gas was higher than other gas available to the U.S. operations.

8.     EnCana required the U.S. operations of PCES (now WD) to hold the pipeline commitments for the benefit of EnCana even though it was not common or typical for a marketing company to hold such commitments and even though the costs of those commitments literally made the difference of whether the U.S. operation was profitable or not.

9.     EnCana employed a bonus program for the traders, marketers and originators a PCES that was designed to encourage them to increase profits.

10.    Encana required the U.S. operations (now WD) to sell the gas on terms that were acceptable to EnCana (and EnCana never objected to any of the prices the U.S. operations received.)

11.    EnCana required the PCES personnel to comply with business and ethical standards that EnCana set, but did not prohibit or even address wash sales, talking to competitors about prices or making false transaction reports to trade publications, nor did EnCana even provide any training on what was illegal price fixing.

4

12.  EnCana set the transfer pricing to the United States in 1998 at a Canadian index price plus the cost of the long term pipeline commitments without any negotiations with PCES.  Then, when California prices reached record levels, EnCana changed the pricing in early 2001 to U.S. index prices and reaped more than $50 million of additional profits on gas shipped on the pipeline to California without any negotiations with PCES and without even amending the written transfer pricing agreement governing those transfers.

13.  The incorporation of the U.S. operations in a U.S. subsidiary that EnCana named PanCanadian Energy Services, Inc. (now WD) was part of an overall tax strategy of EnCana.

14.  In 2000 and 2001, PanCanadian Energy Services, Inc. marketed in the U.S. more than 30% of EnCana's total natural gas production and generated more than 40% of EnCana's total consolidated revenue.

Doc. # 504 at pp. 3-4.

Due to the very large number of individually alleged "undisputed material facts" that are proffered by Gallo, and the almost-equally large number of additional facts proffered by Defendants, the court will refer to the above-listed of fourteen as the proposed "summarized material facts."  In the discussion that follows, the term "UMF" refers to Gallo's proposed individual undisputed material facts.

**II.  Defendant's Opposition and Additional Facts**

Generally, Defendants do not directly dispute the undisputed material facts proffered by Gallo.  Rather, Defendants offer, with respect to those facts they oppose, additional facts that tend to cast the undisputed material fact in the context of actions taken independently by WD without the control of EnCana.  Defendants also proffer a large number of "additional material facts" that, in sum, seek to support Defendants' contention that the business decisions that Gallo claims evince control over WD by EnCana were actually business decisions that were carried out by WD for the benefit of WD.  The court will examine the parties' factual allegations as they pertain to Gallo's contentions in the discussion that follows.

5

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party always bears the initial responsibility of informing and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles,

607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual

dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings,

but is required to tender evidence of specific facts in the form of affidavits, and/or admissible

discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita,

475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749

(9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material,

i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

evidence is such that a reasonable jury could return a verdict for the nonmoving party,

Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.

1987).

   In the endeavor to establish the existence of a factual dispute, the opposing party need

not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed

factual dispute be shown to require a jury or judge to resolve the parties' differing versions of

the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus,

the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of

Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

   In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(9th Cir. 1982).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam); <u>Abramson v. University of Hawaii</u>, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir. 1987).

## DISCUSSION

**I. General Legal Framework for Principal/Agent Liability**

"The law allows corporations to organize for the purpose of isolating liability of related corporate entities. [Citation.] Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary." <u>Bowoto v. Chevron Texaco Corp.</u>, 312 F.Supp.2d 1229, 1234 (N.D. Cal. 2004).  Among the "unusual circumstances" where law will hold a parent corporation liable for the acts of a subsidiary are: (1) where the circumstances of the organization of the two entities are such that the corporate form should be disregarded (often referred to as "alter ego" liability); (2) where the subsidiary acts as an agent of the parent corporation; and, (3) where the parent corporation aids, abets or ratifies the acts of the subsidiary corporation.  <u>See</u> <u>id.</u> at 1235.

In the present motion, Gallo seeks summary judgment as to the liability of EnCana on the theory that WD acted as an agent[3] of EnCana when WD traders engaged in the wash trades

---

[3]    The court notes that Gallo's FAC alleges liability against EnCana on the theories of alter ego and aiding, abetting or ratification, as well as on agency theory.  The court expresses no opinion as to EnCana's liability on Gallo's theories of alter ego or aiding and abetting.

and other anti-competitive practices that Gallo alleges harmed Gallo.  Gallo applies the

principal/agent theory of liability against EnCana with respect to its first three claims for

relief.  Those claim allege, in order, violation of the Sherman Antitrust Act, 15 U.S.C. § 1,

violation of California's Cartwright Act,  Business and Professions Code §§ 16720, et seq.,

and violation of California' Unfair Competition Law, Business and Professions Code §§

17200, et seq.

      With respect to Gallo's Sherman Act claim, the existence of an agency relationship

between EnCana and WD is determined according to federal common law, which relies on the

Restatement of Agency[4] in the context of alleged antitrust violations.  With regard to Gallo's

claims under California's Cartwright Act and the Unfair Competition Law, a principal may be

held liable for the unlawful anti-competitive acts of an agent where the agent has "actual or

ostensible authority."  California Civil Code § 2330.  The parties appear to agree that the

determination of whether a principal/agent relationship exists under state law requires the

same analysis as is required under federal common law.

      The independence of a subsidiary from the parent corporation is to be presumed.

California v. NRG Energy, Inc., 391 F.3d 1011, 1025 (9th Cir. 2004), *rev'd on other grounds*

*by* Powerex Corp. v. Reliant Energy Services, Inc., 127 S.Ct. 2411 (2007).  In order to

overcome the presumption that WD is independent of EnCana, Gallo will be required to show

that WD "'is so extensively controlled by [EnCana] that a relationship of principal and agent

is created.' [Citation.]" Id.  The Restatement (Third) of Agency defines agency as:

---

    [4]    Gallo and most of the case authority cited by Gallo relies on the Restatement
(Second) of Agency.  The Restatement (Third) of agency was published on May 17, 2005, and
was therefore authoritative at the time this motion was filed.  The court will refer to Restatement
(Third) of Agency and will discuss any significant differences with the Restatement (Second) of
Agency should they arise.

1
2
3

> . . . the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

4
5
6
7
8
9

Section 1.01. Thus, to demonstrate that an agency relationship exists between EnCana and WD, Gallo must show that: (1) there was a manifestation by EnCana that WD would act on EnCana's behalf; (2) WD accepted or consented to so act; and, (3) that it was understood that EnCana would be in control of WD's undertaking on EnCana's behalf. Bowoto, 312 F.Supp.2d at 1239.

10
11
12
13
14
15
16
17
18
19

    With respect to the acts of an agent giving rise to liability against the principal, the principal may be held directly liable if the agent "acts with actual authority or the principal ratifies the agent's conduct." Restatement (Third) of Agency § 7.03 (2005). The principal may be held vicariously liable for the acts of an agent where "the agent is an employee who commits a tort [or tort-like] act while acting within the scope of employment," or where the employee acts with apparent authority on behalf of the principle. Id.; see also Am. Soc. Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 577 (1982) (upholding liability on apparent authority theory in the context of antitrust claim).

**II. Manifestation by EnCana and Assent by WD and its Predecessors**

20
21
22
23
24
25
26
27
28

    Gallo's proffered summarized material facts numbered 1, 2, 3, 5, and 6 are aimed at establishing EnCana's purpose in allocating its marketing and "midstream" activities to entities that eventually became WD, EnCana's marketing subsidiary in the United States, and PCES Canada, EnCana's Canadian marketing subsidiary. The proffered summarized material facts are also offered to establish that EnCana's predecessor, PCP, manifested its intention that PCES, Inc. should act on PCP's behalf in marketing natural gas in the United States and that PCES, Inc. assented. The summarized material facts are: (1) EnCana publicly described and

10

internally referred to PCES as its North American natural gas marketing arm and natural gas

business unit that operated from offices in the U.S. and Canada, and PCES accepted this role;

(2) EnCana perceived the "PanCanadian" brand had value and chose to have PCES use the

PanCanadian name, logo and tagline; (3) PCES understood it represented EnCana in the

marketing of natural gas in North America; (5) EnCana defined the primary objectives of

PCES to include enhancing the value of EnCana's natural gas production and obtaining the

best prices for that production and PCES agreed to those objectives; and (6) EnCana

designated PCES as the exclusive marketer for its natural gas in North America and

designated the U.S. operations (now WD) as the exclusive marketer in the United States.

  As an initial matter, the court notes that Gallo, through its individual proffered

undisputed material facts in support of the foregoing summarized material facts, makes much

of how the marketing entities were referred to in internal and external communications by

EnCana and by the marketing entities themselves.  The common law of agency clearly

establishes that how the parties or entities refer to themselves or one another is not

determinative of a principal/agent relationship.

> An agency relationship arises only when the elements stated in § 1.01 are
> present.  Whether a relationship is characterized as agency in an agreement
> between parties or in the context of industry or popular usage is not controlling.

Restatement (Third) of Agency, § 1.02 (2005).

> Whether a relationship is one of agency is a legal conclusion made after an
> assessment of the facts of the relationship and the application of the law of
> agency to those facts.  Although agency is a consensual relationship, how the
> parties to any given relationship label it is not dispositive.  Nor does party
> characterization or nonlegal usage control whether an agent has an agency
> relationship with a particular person as principal.  The parties' reference to
> functional characteristics may, however, be relevant to determining whether a
> relationship of agency exists.

Id. at cmt. a.  "The party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence."  Id. at cmt. d.

Although the terms used by parent and subsidiary to refer to themselves or each other are not determinative of an agency relationship, such facts may go to support the arguments of the party asserting an agency relationship that one party manifested intent that the other should act on its behalf, and the other party assented.  Id. at cmt. a.  Such is the case here.

The individual undisputed material facts proffered by Gallo to support the above-listed summarized material facts provide a useful historical context for the evaluation of the relationship of the two entities with respect to the issues of manifestation and assent.  Based on Gallo's proffered individual material facts and on Defendants' objections thereto, the court finds the following facts not to be materially disputed.

EnCana's predecessor, PCP, internally divided its activities with regard to natural gas into three groups.  "Upstream activities" pertain to the exploration and drilling for, and production of, natural gas at the wellhead.  "Midstream activities" pertain to the transportation of produced natural gas to distant markets through pipelines.  "Marketing activities" pertain to the sales of natural gas produced by PCP/EnCana to third party wholesale or retail buyers.  In 1995 PCP entered into a marketing arrangement with National Gas & Electric ("NG&E") to market natural gas in the United States.  On June 1, 1996, NG&E became a wholly owned subsidiary of PCP.  NG&E continued to market PCP's gas in the United States up to 1998.

In 1998 PCP combined its marketing for electricity and natural gas in the United States and Canada to form Pan Canadian Energy Services.  While there is some dispute as to when, or if, the United States and Canadian branches of PCES became separate entities, it is generally agreed that by the time of the trading activities giving rise to this action, the midstream and marketing activities in the United States were carried out by PCES, Inc., a United States corporation located in Delaware and doing business principally in Texas.  The marketing and midstream activities in Canada were carried out by "PCES, a Division of Pan

12

Canadian Petroleum, Limited" (hereinafter "PCES Canada").

The gas produced by EnCana or its predecessor was sold exclusively to either PCES Canada for marketing in Canada, or to PCES, Inc. for marketing in the United States. In addition to the gas purchased from EnCana by either PCES Canada or PCES, Inc., both marketing subsidiaries purchased natural gas from other producers. The volume of gas produced by EnCana and sold to PCES Canada or PCES, Inc. is termed "equity volume," and the volume purchased from other suppliers is termed "third party volume." The equity volume produced by EnCana constituted about one-third of the total volume purchased by PCES, Inc. in the years at issue in this case.

Gallo proffers a number of undisputed material facts that allege that in various statements to the public and in some internal communications, EnCana or its predecessor, PCP, referred to PCES Canada and PCES, Inc. as being the same entity. Gallo also alleges that PCP repeatedly referred to PCES, Inc. as its "marketing arm" or "marketing division." As previously noted, how EnCana or PCP or either of the marketing entities referred to themselves, either internally or externally, does not determine the existence or non-existence of an agency relationship. However, the individual undisputed material facts proffered by Gallo do establish that the labels used by the parties are reflective of the underlying undisputed fact that all of the natural gas that was produced by PCP/EnCana was sold in the United States by PCES, Inc. Likewise, all of the natural gas sold in Canada that was produced by PCP/EnCana was sold by PCES Canada.

Gallo's proposed undisputed material facts numbered 77 through 84 are aimed in various ways at proving that a primary objective of PCES included "enhancing the value of EnCana's natural gas production." Gallo offers no facts to indicate that "enhancing the value of" is different from "selling," or that it implies anything more about the relationship between PCES, Inc. and EnCana beyond the acknowledged fact that PCES, Inc. is the sole marketer of EnCana's natural gas in the United States.

13

There is no real dispute that PCP/EnCana manifested an intent that PCES, Inc. would represent PCP/EnCana's effort to sell the natural gas it produced in Canada in the United States market.  That PCES, Inc. assented to carry out PCP/EnCana's intent is evidenced by the facts that PCP/EnCana established PCES, Inc. as its marketing subsidiary in the United States and PCES, Inc./WD did, in fact, sell all of the gas that was produced by EnCana that was sold in the United States.  See Comind, Companhia De Seguros v. Sikorsky Aircraft, 116 F.R.D. 397, 404 (D. Conn. 1987) (wholly owned subsidiary had no choice but to accept role as parent's sole marketer of product in foreign country).  The court finds Defendants' efforts to distinguish Comid on factual grounds unpersuasive.  The court finds that Gallo has met its burden to allege undisputed material facts sufficient to show that (1) PCP/EnCana manifested an intent that PCES, Inc. should act on EnCana's behalf to market natural gas produced by EnCana; and, (2) that PCES, Inc. assented to so act.

**II.  Control of Subsidiary by Parent**

The issue that is sharply contested in Gallo's instant motion for summary judgment is whether Gallo can allege undisputed material facts sufficient to show that EnCana retained a right of control over PCES, Inc. to such a degree that there remains no disputed issue of material fact that PCES, Inc. functioned as the agent of EnCana.  As an initial matter the parties disagree as to the evidentiary burden Gallo faces because it would have the burden at trial to prove that PCES, Inc. was the agent of EnCana at the time of the events that gave rise to this action.   Defendants cite Synbiotics Corp. v. Heska Corp., 137 F.Supp.2d 1198, 1201-1202 (S.D. Cal. 2000) for the proposition that, where the moving party would have the burden of proof at trial, the moving party must make an evidentiary showing sufficient for the court to hold that no reasonable jury could possibly find for the non-moving party.  Gallo contends Defendants substantially overstate the standard and that they need only prove there is no material fact with respect to each element of their claim that WD/PCES, Inc. is an agent of PCP/EnCana.

14

Although the moving party that would have the burden of production and proof at trial is sometimes described as carrying a "relatively heavier burden" in the context of a motion for summary judgment, Mateo v. M/S Kiso, 805 F.Supp. 761, 774 (N.D. Cal. 1991), the difference is actually one of quantity of proof rather than standard of proof. Where the moving party would bear the burden of production and persuasion as to a claim or affirmative defense at trial, the moving party must *affirmatively* prove the lack of *any* issue of material fact as to each element of the claim/defense pled. Id.; see Synbiotics, 137 F.Supp.2d at 1201 (moving party cannot rely on opposing party's lack of evidence where moving party would have burden of production at trial). In the context of making the required *affirmative* showing, the court sees no basis for any distinction between the absence of any material issue of fact, as asserted by Gallo, and the requirement that the moving party must "'establish beyond peradventure *all* of the essential elements . . . .'" of the claim/affirmative defense. Mateo, 805 F.Supp. at 775 (emphasis in original). In each case, the party having the burden must present admissible evidence as to each element of the claim and the opposing party need only produce evidence sufficient to raise a genuine issue of material fact as to any one element in order to defeat the motion. Fed. R. Civ. P. 56(c).

While the court rejects the proposition that the standard (as opposed to the quantity) of proof is greater where the moving party would have the burden of proof at trial, there is one practical sense in which Gallo, as the moving party, may be said to carry a heavier burden with respect to the issue of proof of control of the subsidiary by the parent. This "heavier burden" arises from the fact that a district court does not "weigh evidence" and must make every inference in favor of the non-moving party. Suzuki Motor Corp. v. Consumers Union of the U.S., Inc., 330 F.3d 1110, 1140 (9th Cir. 2003). While a jury can weigh the aggregate of many factors to determine if, on balance, it is more likely than not that PCP/EnCana asserted a level of control over PCES that would give rise to a principal/agent relationship, the court ruling on a summary judgment motion cannot. Thus, a jury considering many factors, each

pointing inconclusively toward the conclusion that PCP/EnCana controlled PCES, could weigh the aggregate of the factors to find there was an agency relationship.  The court, on the other hand,  would be required to deny the summary judgment motion if no single fact or combination of facts established control as a matter of law.   The court would be required to infer in favor the non-moving party that a jury, finding no conclusive evidence of control, could rationally come to the conclusion there was not a level of control necessary to infer an agency relationship.

Further, the requirement that a court must make every necessary inference in favor of the non-moving party means that, with respect to every undisputed material fact that relies on an inference in order to support the moving party's contention, the non-moving party need only offer some additional fact that tends to negate the inference in order to defeat the factual support for the motion.  As will be discussed *infra*, a significant proportion of the UMF's Gallo relies upon require an inference to be applicable to the issue of EnCana's control over WD.  Thus, where Gallo's argument relies to a significant extent on facts that require an inference in Gallo's favor, any proffer of additional evidence by Defendants that tends to support an opposing inference will be sufficient to negate Gallo's proffer.

The court must address each of Gallo's proposed summary material facts, and the individual undisputed material facts that support them, to see if any one proffered summary fact or proffered individual undisputed material fact is truly undisputed and, if so, whether it establishes a principal/agency relationship as a matter of law.  If no such fact or combination of facts are found, Gallo will not prevail on its summary judgment motion even though each of the proposed summarized material facts may weigh in favor of a finding of a principal/agent relationship.

### A.  Legal Framework for Analysis of Control

The control the principal exerts over the subsidiary must be more than mere ownership of the stock, Restatement (Third) of Agency, § 1.01 cmt. f(2) (2005), and more than the

16

supervision of "finance and capital budget decisions" and responsibility for the setting of general policies and procedures for the subsidiary.  United States v. Bestfoods, 524 U.S. 51, 72 (1998).  Proof  that the parent corporation appoints members to the subsidiary's board of directors or hires its officers is also not sufficient to establish a principal/agent relationship. Transamerica Leasing, Inc. v. La Republica de Venezuela, F.3d 843, 849 (D.C. Cir. 2000). The determination of whether a principal/agent relationship exists between a parent corporation and its subsidiary involves a fact-intensive inquiry into the extent to which the parent exercises control over the activities of the subsidiary.  NRG Energy, 391 F.3d at 1025. "'There is no agency relationship where the alleged principal has no right of control over the alleged agent.' [Citation.]"  Bowoto, 312 F.Supp.2d at 1239.

How much control the parent must exert over subsidiary in order for liability to attach against the parent under principal/agent theory is a subject over which courts have long struggled.  Transamerica Leasing, 200 F.3d at 849.  "The question defies resolution by 'mechanical formula[e],' for the inquiry is inherently fact-specific."  Id.  The type of control that typifies the principal/agent relationship is control over the operations of the agent that lie outside the controls normally imposed by contract between a provider and receiver of services. Restatement (Third) of Agency, § 1.01 cmt. f(1) (2005).  As the Restatement puts it:

> The power to give *interim* instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.

Id. (emphasis added).  Based on the context of the discussion in the Restatement, the court concludes that the term "interim instructions" as used by the Restatement means instructions that go beyond the scope of instructions of a customer to a provider or a buyer to a seller and that encompass basic and substantial business decisions that would normally be made internally by officers, directors or employees of the subsidiary.

A review of case authority indicates there are two basic formulations for the

17

determination of whether a parent company's authority over a subsidiary is such that a principal/agent relationship is established.  See Bowoto, 312 F.Supp.2d at 1241-1242.

In the first formulation, the court focuses on the parent corporation's control over the operations of its subsidiary.  Bowoto, 312 F.Supp.2d at 1241; see also Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523, 540-541 (5th Dist. 2000) ("Sonora Diamond").  In this formulation, an agency relationship is proved "if a parent corporation exercises such a degree of control over its subsidiary that the subsidiary can legitimately be described as only a means through which the parent acts."  Sonora Diamond, 83 Cal.App.4th at 541.[5]  "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy."  Id. at 542.

In the second formulation, the court asks whether "the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign[6] corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar service."  Doe v. Unocal Corp., 248 F.3d 915, 928 (9th Cir. 2000) ("Unocal") (quoting Chan v. Society

---

[5]     As a state appellate court decision, Sonora Diamond is not authoritative in this court.  However, each proposition cited herein from the decision in Sonora Diamond is supported by both state and federal case authority.  The court therefore finds the Fifth District's decision in Sonora Diamond persuasive for the proposition(s) cited.

[6]     Unocal is typical of the case type where agency issues seem to arise most often.  In Unocal, the principal/agent relationship is asserted as the basis for the court's ability to assert personal jurisdiction over the foreign parent based on the acts of its United States subsidiary.  See Unocal, 248 F.3d at 930-931 (finding no jurisdiction based on plaintiff's failure to establish agent/principal relationship).  See also Modesto City Schools v. Riso Kagaku Corp., 157 F.Supp. 2d 1128, 1136 (E.D. Cal. 2001) (denying challenge to jurisdiction over foreign corporation based on actions by it United States marketing subsidiary).  The Northern District in Bowoto noted that a number of the cases cited approach the issue of agency as a means of establishing jurisdiction over foreign entities.  Like the court in Bowoto, this court finds that cases that approach the issue of principal/agency relationships in the context of jurisdiction are instructive where the issue is the establishment of liability in that they illustrate the considerations that are relevant to the determination of the principal/agent relationship.  See Bowoto, 312 F.Supp.2d at 1243.

Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)).  "At an irreductable minimum, the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that its 'presence substitutes for the presence of the principal.' [Citation]"  Id. at 930.

In Sonora Diamond, the Fifth District Court of Appeal termed the formulation set forth in Unocal the "representative services doctrine."  Sonora Diamond, 83 Cal.App.4th at 543. Relying on Gallagher v. Mazda Motor of America, Inc., 781 F.Supp. 1079, 1085 (E.D. Penn. 1992), the Sonora Diamond court observed that the representative services doctrine applies where the function the subsidiary is performing "assists the parent's *own* business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary."  Sonora Diamond, 83 Cal.App.4th at 543 (emphasis in original).  In the context of establishing personal jurisdiction over a foreign party, this court has used an analytical approach identical to the "representative services doctrine" analysis as set forth in Sonora Diamond and Doe v. Unocal Corp.  In Modesto City Schools v. Riso Kagaku Corp., 157 F.Supp.2d 1128 (E.D. Cal. 2001), the court rejected the foreign defendant's contention that a finding of day-to-day control over the subsidiary corporation was necessary in order to impute the court's jurisdiction over the subsidiary to the parent.  Id. at 1134-1135.  The Modesto City Schools court held that it is not true that the issue of  "control is wholly irrelevant to the general agency test.  Rather, the court finds that it is not the *sine qua non* of the general agency test."  Id. at 1134.

Because EnCana is not a holding company and because WD and its predecessors existed to help EnCana conduct EnCana's business by marketing the gas EnCana produced, this court concludes that the analysis employed in Modesto City Schools, and termed the "representative services doctrine" in Sonora Diamond may be applied in this case.  Gallo need not prove that EnCana directed the day-to-day activities of WD, although such proof might be sufficient to deem the subsidiary the agent of the parent.  Gallo may show that WD functioned as the agent of EnCana if it can show that WD "engaged in some meaningful activity" in

California on behalf of EnCana such that WD's presence in California "substitut[ed] for the presence of the principal." " Unocal, 248 F.3d at 930.

As noted previously, the determination of whether the amount of control exerted by EnCana over WD is of a degree and kind that the relationship between the two should be deemed that of a principal/agent is a determination that is not susceptible to analysis by simple formulae. Transamerica Leasing, 200 F.3d at 849. As has been observed:

> . . . different control relationships inhere in different multinational structures, and we lose sight of the economic realities if we insist on masking these distinctions behind simplistic formulae. The kind of "day-to-day- control," to the extent such a nebulous concept can be made concrete, will vary depending on the kind of subsidiary involved. Thus, while "day-to-day control" might be required to attribute the activities of a relatively autonomous manufacturing subsidiary to its conglomerate parent, this by no means implies such a requirement as to a wholly-owned sales and marketing subsidiary which is the conduit for the sales of a single product in the [domestic] market.

Boulova Watch Co. v. K. Hattori & Co., Ltd., 508 F.Supp. 1322, 1343 (E.D. N.Y. 1981). "A foreign manufacturing subsidiary selling entirely to its own market and to third countries will obviously have more of a life of its own than a wholly-owned sales and marketing subsidiary." Id.

### B. EnCana's Operational Control over WD

Gallo argues that, using either the operational control test or the representative services test, the undisputed facts of this case illustrate that EnCana asserted control over WD. The court will begin by examining Gallo's fourteen proposed undisputed material and/or corresponding groups of Gallo's facts to determine whether those facts establish that EnCana asserted operational control over WD as a matter of law. The court will then examine Gallo's alleged undisputed material facts under the representative services formulation.

### 1. Gallo's Preliminary Factual Allegations; Summary Facts 1, 2, &3

Gallo's proffered summarized material facts numbered 1, 2, and 3 were discussed above in connection with the court's analysis of the issues of manifestation of intent by

PCP/EnCana and assent by WD/PCES, Inc.  As previously noted, most of Gallo's proffered individual undisputed material facts supporting summary material facts 1, 2, and 3, including those facts that reflect how the parties labeled themselves and each other, do not address the issue of control.  Among Gallo's proffered individual undisputed material facts, however, there are two that warrant some comment because they appear at first blush to bear upon the issue of control exerted on WD by EnCana.

The two proffered undisputed material facts that may possibly go to the issue of EnCana's control over WD are found at Gallo's undisputed material fact ("UMF") # 35, and UMF # 37.  Gallo's UMF # 35 alleges "Mr. Elias conceded that with respect to PCP's [. . .] natural gas production sold in California in the latter part of 2000 and the early part of 2001, PCES, Inc. made the same margin they would have without the high prices and it was the parent company that benefitted from the price increases that occurred."  Doc. # 658 at 25.  The implication is that PCP so controlled PCES, Inc. that the latter was prevented from capturing a share of the sharp rise in prices of natural gas that occurred in 2000 and 2001 because the parent company controlled the profit margin PCES, Inc. could realize, thereby directing the benefit from the inflated price of natural gas to the parent.  It is undisputed that a sharp rise in natural gas prices occurred in 2000-2001 and it is also undisputed that PCP/EnCana realized profits substantially in excess of the amount budgeted in 2000 as a result of the spike in natural gas market prices.

Defendants point out that Mr. Elias' deposition testimony, upon which Gallo relies for its proffered undisputed material fact, continues on to state that while PCP/EnCana reaped the benefit from the increase in profit margin from the sale of their equity volumes of natural gas, the third-party producers of gas that PCES, Inc. marketed benefitted similarly.  Id.  While Gallo contends its undisputed material fact is not disputed, the remainder of relevant portions of Mr. Elias' testimony implies that the fact that PCES, Inc. could not have raised its profit margin was because of economic realities in the natural gas marketing sector at the time.

21

While Gallo's proffered UMF # 35 at least raises the possibility that PCP/EnCana had a direct role in determining PCES, Inc.'s profit margin, Defendants have pointed to the same evidence to show that the inability of natural gas marketers to increase their profit margins was widespread in the gas marketing sector and not indicative of PCP/EnCana's direct control. Because the court can make no inferences in favor of Gallo if EnCana can offer any support for an opposing inference, the court cannot conclude as a matter of law that the fact that PCES, Inc.'s profit margin remained the same during the natural gas price spike of 2000-2001 was a result of control over PCES, Inc.'s marketing activities by PCP/EnCana.

Gallo's UMF # 37 alleges that "[a]t the direction of senior management of PCP [. . .], hedges were put on for the price of natural gas in December 2000.  The total gain on the hedges put on at Malin (located near the Oregon/California border) was more than $40 million."  Doc. # 658 at 27.  The court has reviewed the portion of the deposition of Mr. Andrew Brink submitted in support of Gallo's UMF # 37.  The deposition testimony submitted supports the allegation that between December 1, 2000 and January 31, 2001, the senior management of PCP either directly placed, or caused their risk management division to place, hedges on deliveries to the Oregon-California border for deliveries between November of 2001 and October of 2002.  The cited deposition testimony also indicates PCP/EnCana profited from the hedges in the amount of about $14.5 million.

What the cited deposition testimony does not show is any connection between PCP's hedging activities and PCES, Inc.  The proffered undisputed material facts do not reveal, for example, who placed the hedge, what risks were addressed by hedging and who the counterparty was.  In order to accept Gallo's proffered material facts as indicating that PCP's hedging activities indicated that PCES, Inc. was acting in the role of PCP's agent, the court would be required to infer that PCP was hedging risks that actually belonged to PCES, Inc. and that the hedges that PCP placed addressed that risk.  The cited deposition testimony and other associated facts do not make the required showing and, as previously stated, the court

22

may not make inferences in the moving party's favor.

### 2. PCP/EnCana's Set-Up of its Marketing Subsidiaries

Gallo's fifth summarized material fact alleges that "EnCana set up and operated the U.S. and Canadian marketing and trading operations as an integrated function in many important respects, including senior management, budgeting, strategic planning, risk management, credit, detailed reporting to senior management of EnCana, and bonus program." In broad terms, Gallo's argument has three logical elements.  First, Gallo alleges individual undisputed material facts that tend to show that PCES, Inc. and  PCES Canada functioned as two divisions of a single entity, PCES, which reported to PCP/EnCana's senior management. See Gallo's UMF # 93.  Second, Gallo alleges individual facts to support its contention that PCP/EnCana senior officers were appointed to and served as officers and board members of PCES Canada/PCES, Inc.  See Gallo's UMF # 103.  Third, Gallo alleges individual facts that support its contention that PCP/EnCana controlled the terms of a number of PCES policies and practices including PCES's risk management policy, see Gallo's UMF # 128, performance incentive policy, see Gallo's UMF # 123, and a credit  policy.  See Gallo's UMF # 141.  Gallo also alleges that PCES, Inc. regularly prepared budgeting and marketing reports for PCP/EnCana at the direction of the latter.  See Gallo's UMF's ## 117 - 119.

Although each element of Gallo's argument is vigorously disputed by Defendants, the court will assume for the moment that Gallo's individual material facts are not disputed and that each of the lines of argument listed above are proven.  The initial question is whether the individual material facts proffered by Gallo, and which the court will assume are true, are sufficient in and of themselves to establish that WD/PCES, Inc. functioned as an agent of PCP/EnCana.  The court must conclude that Gallo's proffered summary material fact and the supporting individual undisputed material facts, while they may indicate the possibility or even the probability of the existence of a principal/agent relationship, do not establish that relationship as a matter of law.

23

As an initial matter, Gallo does not directly explain how the alleged connection between PCES, Inc. and PCES Canada furthers its argument that PCES, Inc. is an agent of PCP/EnCana.  Assuming, *arguendo*, that PCES Canada and PCES, Inc. are two divisions of the same company (again, an allegation vigorously denied by Defendants), the connection between the two is only important insofar as the control asserted by PCP/EnCana over one could be deemed to be asserted over both.  The court assumes this is true for purposes of the present discussion.  In making that assumption, the court will proceed to determine if any facts alleged as to either PCES Canada or PCES, Inc. are sufficient to show the level of control necessary to deem either PCES entity an agent of PCP/EnCana as a matter of law.

"The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence."  Sonora Diamond, 83 Cal.App.4th at 542.  As previously noted, the extent of communications between parent and subsidiary, the degree to which the subsidiary's policies are set by the parent, and degree to which parent and subsidiary share officers and directors are important considerations in the determination of whether a principal/agent relationship might exist, Bowoto, 312 F.Supp.2d at 1243; Modesto City Schools, 157 F.Supp.2d at 1135.  However, that some or all of these factors may be present to some degree in a parent/subsidiary relationship is not sufficient to determine that the relationship is one of principal/agent as a matter of law.  See United States v. Bestfoods, 524 U.S. 51, 72 (1998) (parental supervision of finance and capital budget decisions and articulation of general policies and procedures not indicative of principal/agent relationship); Calvert v. Huckins, 875 F.Supp.674, 678-679 (E.D. Cal. 1995) (interlocking directors and officers, consolidation of activities of parent and subsidiary into annual report, provision of legal services between parent and subsidiary and underwriting of promissory notes by parent corporation is usual business practice that is not necessarily

24

indicative of principal/agent relationship).[7]

Viewed in light of the foregoing, Gallo's allegations with regard to EnCana officers and board members functioning as PCES officers and board members, and PCES regularly preparing reports to EnCana at the direction of the latter are not sufficient to conclusively establish that PCP/EnCana controlled PCES to the extent that the later should be deemed an agent of the former.  Likewise Gallo's allegations that PCP/EnCana controlled the terms of a number of PCES policies and practices including PCES's risk management policy, performance incentive policy, and credit  policy does not establish an agent/principal relationship as a matter of law.  Risk, compensation and credit are management issues that lie at the core of corporate decision making and are well within the scope of the parent corporation's right to generally supervise finance and capital budgets and articulate general policies and procedures without establishing a principal/agent relationship.  Bestfoods, 524 U.S. at 72.

In addition to the foregoing allegations by Gallo, Gallo alleges a number of undisputed material facts that appear to allege that PCP/EnCana established an ethics policy that applied to PCES, Inc. as well as PCES Canada.  See Gallo's UMF's # 145-152.  The proffered

---

[7]    The court is mindful that the court in Calvert was concerned with the issue of alter ego, not agency.  However, a number of courts have used the cited portion of Calvert in the analysis of issues of alleged agency relationship, see, e.g., Doe v. Unocal Corp., 248 F.3d 915, 929 (9th Cir. 2001), and some district courts have suggested that the factors indicating control of one entity by another are the same whether the issue is agency or alter ego.  See, e.g., In re: Phenylpropanolamine Prod. Liab. Litig., 344 F.Supp.2d 686, 691 (W.D. Wash. 2003) ("An alter ego or agency relationship is typified by parental control of the subsidiary's internal affairs or daily operations.").  This court's discussion in Modesto City Schools is not inapposite.  In Modesto City Schools the court made note of the fact that the discussion in Calvert and as adopted in Unocal seemed to suggest that courts "should analyze the same factors in determining whether jurisdiction exists under either an alter ego or general agency theory."  Modesto City Schools, 157 F.Supp.2d at 1133.  The Modesto City Schools court carefully distinguished Unocal's approach to the question of control of the subsidiary by the parent not to suggest that the analysis of day-to-day control of the subsidiary by the parent was irrelevant to the determination of the question of agency, but to show that agency could alternatively be found under what the Sonora Diamond court called the representative services doctrine.  See Modesto City Schools, 157 F.Supp.2d at 1134-1135.

individual material facts allege that, while the ethics policy forbade illegal conduct generally, it did not specifically prohibit wash trades or other trader conduct that gave rise to this action. The point of Gallo's proffer of these undisputed material facts is not entirely clear.  To the extent Gallo alleges these facts to show that PCP/EnCana exerted control over PCES such that a principal/agent relationship existed, the court finds that the setting of an overall ethics policy by a parent that is applicable to the parent's subsidiaries is an important part of its risk management policy and lies well within the parent's accepted authority to set general policies and procedures without transforming the parent/subsidiary relationship to a principal/agent relationship.  Id.

### 3. PCES was Exclusive Marketer of Natural Gas in United States and Canada

Gallo alleges a number of facts beginning at Gallo's UMF # 155 and continuing through UMF # 215 that are generally aimed at demonstrating that PCES acted as an exclusive sales agent, rather than as an independent sales subsidiary.  Gallo makes three basic arguments to support its contention that WD/PCES is an agent of EnCana/PCP.  First, Gallo contends the terms of the contract that governed the sale of natural gas by EnCana to WD indicated that EnCana retained authority to control WD's activities with respect to the sale of natural gas. Second, Gallo points to the apparent detachment of WD's CEO from the process of negotiation of changes to the gas sales agreement from which Gallo argues that the changes were not the result of arms-length negotiations, but were simply the result of imposition of changes by EnCana on WD.  Third, Gallo argues that EnCana's control over WD is evinced by the fact that EnCana assigned the responsibility for EnCana's long-term pipeline commitments third-party pipeline companies where an independent subsidiary would not have accepted the risk.

In Gallo's UMF's 155-163, Gallo alleges facts to show that sometime between 1998 and 2000, PCP/EnCana committed to aggressively growing its natural gas production, and

PCES aggressively pursued the marketing of natural gas.  Gallo alleges that Mr. Elias, the CEO of PCES understood that PCP/EnCana wanted PCES to aggressively expand the marketing business within the areas of the United States defined by PCP/EnCana.  Gallo alleges that PCES ranked in the top 20 of marketers in North America.

PCP/EnCana decided to launch PCES in April 1998.  PCP/EnCana had previously contracted with an unnamed marketing company for sale of their natural gas in Canada and sold the gas under the terms of a marketing contract that was first put in effect in 1994.   Until 1998, the original gas sales contract was continued with periodic modifications.  Gallo's UMF's 169-185.  Gallo alleges that the sales contract, called the "Gas Sales Agreement," ("GSA") was modified in January of 1998 and again when PCES was formed in April 1998. The modifications altered the basis for computation of prices charged by PCP/EnCana for the gas it sold to PCES.  Prior to the 1998 amendments the price PCP/EnCana received was the price the marketer received in the United States, less a marketing fee and transportation costs. Gallo's UMF # 173.  After the 1998 amendments, the price for sale of gas by PCP/EnCana to PCES was determined by an index called the AECO.  Gallo's UMF # 179.  The April 1998 modification added a one-cent per million BTU fee to the AECO index price.  There were no further written amendments to the GSA until May 1, 2002.

The GSA granted WD/PCES the exclusive right to market all the natural gas EnCana/PCP produced and designated for sale in the United States.  UMF # 187.  WD was therefore the only company that marketed EnCana's equity production in the United States. The GSA required WD to "sell the Daily Contract Quantities that equated to the long-term pipeline commitments; keep [EnCana] informed on the [natural gas] market; sell the gas on terms acceptable to [EnCana]; and conform to the business and ethical standards set by [EnCana]."  Doc. # 504 at 31:14 - 16

The court has examined Gallo's undisputed material facts with respect to the content of the GSA and finds that although Gallo's representations concerning the contents of the

agreement are accurate, they do not show that PCP/EnCana controlled the activities of WD/PCES to such an extent that EnCana is conclusively shown to be the Principal and WD the agent as a matter of law.

The fact that PCP/EnCana assigned its long-term pipeline commitment to PCES at the time it decided to spin off its marketing activities into a subsidiary corporation does not require the inference that PCP/EnCana retained a right of control over PCES operations.  A parent corporation must necessarily determine the starting conditions for its subsidiary at the time the subsidiary is formed.  As will be discussed further, *infra*, because long-term pipeline commitments represent a hedge against risks of upward shifts in transportation costs on the short-term market, it is rational that PCP/EnCana would assign the long-term pipeline commitments to PCES because PCES would be most able to benefit from the hedging capability of the commitments and most able to avoid the risk of failing to fill the commitments.  Because the court must make every inference in favor of the non-moving party, the court cannot infer that EnCana simply off-loaded risk onto PCES by assigning the long-term pipeline commitments to PCES.  The court must infer that the assignment was a rational way of providing PCES with a marketing tool that would be better handled by the subsidiary than the parent.

Gallo's allegation that the GSA required PCES to sell gas on terms that were acceptable to PCP/EnCana fails to demonstrate control of the latter over the former primarily because it lacks specificity.  As previously noted, a parent may set the general policies and procedures of its subsidiary, including conditions that manage risk, without establishing a principal/agent relationship.  More broadly, a producer may set certain conditions on a third-party marketer in order to manage the producer's risk.  Thus, it would be normal for a producer to contractually require acceptable terms for the sale of its product that could encompass such things as currency requirements, minimum pricing, promotional obligations of the marketer, credit risk exposure, etc.  Since Gallo's proffered undisputed material facts

lack specificity as to exactly what is encompassed by "acceptable terms" under the GSA, the court may not infer that the requirement for such terms amounts to control of PCES by PCP/EnCana.

The requirement that PCES keep PCP/EnCana informed as to the market is similarly lacking in the sort of detail that would indicate control of the former by the latter.  Because PCP/EnCana, as producer, is aided in meeting production demands by knowing in advance what the demands will be and whether the demand will increase or decrease, it is reasonable that producer might require a marketing entity to provide such information, whether the marketer is a subsidiary or a third party.

The requirement that PCES was required to conform its conduct to PCP/EnCana's code of ethics has been discussed.  Briefly, in requiring certain ethical standards of a marketer, a producer does not necessarily step outside of what conditions would normally imposed by an arms-length marketing contract with a third party.  A producer might, for example, require that a marketer not falsely advertize its product or make unauthorized warranty representations.  Such a requirement serves the risk management requirements of the producer and imposes certain ethical requirements on the marketer without creating a principal/agent relationship.  Gallo's proffered undisputed facts fail to show that the ethical standards imposed by PCP/EnCana on PCES exceeded the scope of what might be included in a contractual arrangement to the extent that a principal/agent relationship would be established as a matter of law.

Gallo's allegations that PCP/EnCana's control over WD/PCES is evinced by the fact that PCES's CEO was apparently absent from and unaware of his company's participation in negotiation of changes in the GSA refer to two instances where the GSA was modified during the time when Mr. Elias was CEO of PCES.  Gallo alleges that the 1998 amendments to the GSA were signed by Mr. Elias but Mr. Elias was not involved in negotiating the terms of the GSA and was not familiar with the obligations of PCES under the GSA.  Gallo also alleges

29

the corporate deposition designee for PCES/EnCana could not identify anyone who was involved in negotiations.  UMF's 182-184.

Gallo's argument fails because it requires the court to make inferences in Gallo's favor.  The implication the court is invited to make is that, if the CEO of PCES did not participate in and was unaware of the terms of the GSA or the modifications thereto, it must follow that the changes were imposed by PCP/EnCana through its right of control over its agent.  Defendant's opposition to Gallo's proffered individual material facts #'s 182-184 offers the alternative inference.  In their opposition to Gallo's proposed undisputed facts, Defendants allege that WD/PCES's CFO, Brent Heagy reviewed the 1998 amendments and assignment and approved the changes and recommended adoption.  Defendants point out that the fact that a deponent cannot remember the details of a paper signed several years previously is not necessarily indicative of control of the subsidiary's processes by the parent.  The court must agree.  The court, being bound to draw all inferences in favor of the non-moving party, must infer that the undisputed facts show that WD/PCES's CEO was a person with a short memory and a propensity to delegate important decisions.

Gallo's individual proffered material facts #'s 203-215 pertain to the 2002 amendments to the GSA.  Gallo alleges, in sum, that the 2002 amendments altered both the pricing index and the pricing points both prospectively and retrospectively to 1998.  Gallo also alleges that prior to the written amendments in 2002, there were unwritten operational changes in pricing that occurred in 2001 that altered both the index and the pricing points for some of PCP/EnCana's sales to WD/PCES.  Gallo contends that the modifications brought about both by the operational changes in 2001 and the amendments in 2002 would be contrary to WD/PCES's interests and therefore both the operational changes and the adoption of the 2002 amendments evince PCP/EnCana's controls over WD/PCES.  The central UMF alleged by Gallo states that the operational changes instituted in 2001 had the effect if increasing the price WD/PCES paid for natural gas in 2001 by $50 million over the prior method of price

computation.  UMF # 215.  Defendants vigorously oppose Gallo's UMF and allege that, because of the retroactivity of the changes, PCP/EnCana was required to pay WD/PCES $11 million.  Defendants also allege the changes in computation of pricing were beneficial to WD/PCES because they brought WD/PCES practices into conformity with prevailing industry practices.

Gallo's argument with respect to the 2001 operational changes and the 2002 amendments does not provide a basis for the court to find that PCP/EnCana exerted, or had the right to exert, control over WD/PCES.  There are two reason.  First, the court finds that Defendants have raised an issue of material fact as to Gallo's central proffered undisputed material fact.  Gallo does not actually dispute Defendants' allegation that the changes resulted in a net payment of $11 million to WD/PCES.  Thus, Gallo has not established that the changes actually resulted in, or would have been understood to result in, economic disadvantage to WD/PCES.  Second, even if Gallo's proffered material fact was unopposed, the court cannot make the necessary inference that the changes were necessarily disadvantageous to WD/PCES just because WD/PCES would have had to pay more for the natural gas.  In a market where increases in cost could be passed through directly to the consumer, the marketer is not necessarily disadvantaged, and could in some cases be advantaged, by having to pay higher prices to the producer.  Again, Gallo's argument requires the court make impermissible inferences in favor of the moving party.  This the court cannot do.

With respect to WD/PCES's approval of the 2001 operational changes and the 2002 amendments to the GSA, Gallo alleges that WD/PCES's CEO, Mr. Elias, was unable to recollect approving the changes and did not participate in negotiations that produced the changes.  As with Gallo's allegations regarding the 1998 amendments to the GSA, Gallo's allegations are insufficient to support a finding that PCP/EnCana controlled WD/PCES because the court cannot make the required inferences in Gallo's favor.  As with Gallo's

allegations regarding the 1998 amendments, Defendants allege, and Gallo does not dispute, that the negotiations with respect to the 2001 operating changes and the 2002 amendments to the GSA were negotiated by WD/PCES's CFO.  As before, the court cannot infer that PCP/EnCana controlled WD/PCES's acceptance of the changes when it can, on the same evidence, infer in the non-moving party's favor that WD/PCES was headed by a person with a short memory who delegated responsibility.

### 4.  Longterm Pipeline Commitments Held by WD/PCES

Gallo's UMF's # 216 through 242 are proffered to support Gallo's contention that PCP/EnCana's assignment of long term pipeline commitments originally held by PCP/EnCana to WD/PCES evince control by the former over the latter.  Long term pipeline commitments are, so far as the court can discern from the proffered UMF's, contracts that secure constant defined rights to daily pipeline capacity for a defined term between defined points at a defined price.  Long term pipeline commitments benefit the producer by guaranteeing access to marketing destinations and by hedging against the risk of price spikes in the short-term pipeline market.  In hedging against the risks of pipeline unavailability or price increases due to competition for volume availability, the long term commitment holder takes on the risk of having to pay the contract price for the pipeline volume whether it is used or not.  The holder also takes the risk that the short-term transmission rate might fall below the long-term rate for a long period of time.

The original pipeline commitment secured by PCP/EnCana was for a term of twenty years.  The parties do not dispute that PCP/EnCana assigned its long term pipeline commitment to WD/PCES at the time the latter was formed in 1998.  Gallo contends, and the court agrees, that the assignment of the long term pipeline commitment at the inception of WD/PCES resulted in the off-loading of the risk associated with the commitment onto WD/PCES while PCP/EnCana maintained the benefit of guaranteed pipeline access for its product.  Gallo alleges that during the time period at issue, it was not normal for a marketing

company to hold pipeline commitments because the benefit accrued for the most part with the producer, not with the marketer.  Defendants contend that at the time PCP/EnCana entered into the long term commitment, the structure of the market was such that the assignment of the commitment to the marketing subsidiary would have worked to the benefit of the subsidiary. Defendants allege, and Gallo does not dispute, that in 2000, as a result of an audit by the firm Price Waterhouse Cooper ("PwC"), "EnCana made contributions to WD/PCES to offset the liabilities associated with the pipeline commitments."  Opp. to Gallo's UMF # 226. Defendants also allege, and Gallo does not dispute, that the contributions by PCP/EnCana to WD/PCES were  retroactive to 1998 so that the net effect was that PCP/EnCana assumed all liability for the long term commitments from the date of WD/PCES's beginning.

Gallo's argument that the assignment of the long term commitments to WD/PCES evinces PCP/EnCana's control over the former fails because Gallo has failed to show that the nature of the risk assigned to WD/PCES at its inception was something the new subsidiary could control.  There is no dispute that the long term pipeline commitments that were assigned to WD/PCES preexisted the formation of the subsidiary, and Gallo offers no authority for the proposition that a subsidiary has authority to determine the risk it will assume at or before the time it is created.  As previously noted, a parent company spinning off a subsidiary may broadly set the policies and procedures of that company as well as determine the subsidiary's officers and board members without establishing a principal/agent relationship with the subsidiary.  Seen in this light, the court must infer in favor of the non-moving party that the initial decision to assign the risk of the long term commitment(s) to WD/PCES was a decision made during the start-up of WD/PCES that was later reversed with the consent of both parties for their mutual benefit.  As such, the initial decision to assign the risk to WD/PCES does not conclusively evince control by PCP/EnCana, nor does the later decision by the parties to shift the risk back to PCP/EnCana evince control by the latter.

Again, Gallo proffers undisputed evidence that WD/PCES's president, Mr. Elias was

33

not involved in the assignment of the long term commitments to WD/PCES nor was he involved in the PCP/EnCana's contribution that shifted the risk back to PCP/EnCana.  As previously noted, the court cannot make the inference that because Elias was not involved, the decisions were made by or controlled by the parent company.  Again, the court must infer that, in accord with Defendants' opposition to Gallo's UMF's, the responsibility for negotiation of the shifting of risk for the long term commitments was delegated to others in the organization.

### 5.  The Audited Financial Statement

Gallo proffers undisputed material facts numbered 249 to 261 in which Gallo appears to allege that PwC prepared an audited financial statement in 2001 to cover WD/PCES's financial activities for the years 1998, 1999, and 2000.  Gallo alleges PwC's statement contained a note (note 8 of the report) that explained the decision to retroactively transfer the risk of the long term pipeline commitments to PCP/EnCana in language that was supplied by PCES, Inc.  The facts proffered by Gallo also allege Elias was not involved in any negotiations with PCP/EnCana concerning the modifications of the GSA and the CFO for WD/PCES, Mr. Heagy, did not recall any reasons given to WD/PCES by PCP/EnCana for the changes to the GSA.

Defendants vigorously oppose Gallo's proffered facts to the extent Gallo alleges Heagy was not involved in negotiations with PCP/EnCana concerning the terms of the changes to the GSA.  Regardless of Defendants' opposition to Gallo's proffered facts, the court has examined Gallo's proffered material facts and cannot see any connection between what was found in the PwC report and Gallo's overall contention that PCP/EnCana had authority to, or did, control WD/PCES.  Gallo does not dispute that WD/PCES requested the audit and the court can see no significance to the fact WD/PCES may have provided some of the language contained therein.  The court finds Gallo's proffered undisputed material facts numbered 249 through 261 informative but not particularly relevant.

### 6.  Transactions Between WD/PCES, EnCana, and Po Mex

34

In proffered undisputed material facts numbered 263 through 277 Gallo details a series of loan transactions that transpired between WD/PCES, EnCana and a natural gas company called Pan Canadian Mexico, Inc. ("PoMex"). The upshot of the alleged facts is that in 2000 EnCana found itself paying taxes on the interest generated by a loan to WD/PCES in both Canada and the United States and decided to take steps to essentially transfer the loan to the PoMex. It appears that, in essence, WD and EnCana loaned to each other and netted the loan amounts so that $54 million was owing from EnCana to WD. WD then loaned PoMex the $54 million and PoMex returned the $54 million to EnCana as a return of capital and made payments to WD on its loan at market rates. Presumably EnCana netted out its $54 million loan to WD and the payment on the $54 million loan from PoMex to WD was only subject to taxation in the United States.

The purpose of Gallo's inclusion of Gallo's UMF's ## 263 through 277 must be inferred because there is no direct reference to these facts in Gallo's moving papers or in Gallo's reply to Defendants' opposition. The court presumes Gallo's intent is to bolster its arguments that EnCana had the right to control WD because it presumably directed WD's actions in exchanging loan transactions with EnCana and with PoMex, and because it did so as part of EnCana's overall tax strategy. Defendants point out that each of the transactions involved in the tax-reduction transactions were carried out at appropriate market rates. Defendants also point out that EnCana's pay-off of the loan to WD was consistent with EnCana's rights under the terms of the loan and was beneficial for all parties.

Gallo's proffered undisputed individual material facts numbered 263 through 277 add little to Gallo's argument. Given that EnCana had need of a means to reduce its tax burden and probably approached WD and the other companies to make the necessary transactions, it does not necessarily follow that the participation of WD and PoMex in the transactions demonstrates EnCana's right of control over either of these entities. Again, Gallo's proffered undisputed material facts invite the court to improperly infer that the transactions were

35

controlled and/or direct by EnCana.  Arms-length loans between companies are common, and even where a parent intrudes into the business of a subsidiary to the point of acting as guarantor of the subsidiary's promissory notes, the relationship is not necessarily one of principal/agent.  See Calvert, 875 F.Supp. At 679 (parent guaranteeing subsidiary's promissory note is "normal feature of parent-subsidiary relationships).  The court must therefore infer in Defendants' favor that the transactions were beneficial to all parties and were the sort of transactions that would have been entered into by any truly independent corporation in similar circumstances or that were within the realm of normal parent-subsidiary relationships.

The undisputed material facts Gallo alleges to support its contention that EnCana had the right of operational control over WD fall into one of three categories.  Some of the undisputed facts are unpersuasive because they fail to show the sort of *interim control* that is necessary to establish a principal/agent relationship.  For example, allegations that WD was required to make regular reports concerning the gas market or that it was required to conduct sales according to requirements set by EnCana fails to show a level of control that is beyond the control that a producer could contractually assert over a marketer.  Some of the facts alleged by Gallo tend to support the contention that WD was controlled by EnCana, but fail to prove the contention as a matter of law.  Examples include the alleged facts that EnCana appointed WD's officers and directors or that EnCana set broad elements of WD policies and procedures with regard to compensation or risk management.  The third category of undisputed material facts alleged by Gallo fail to show EnCana had the right of operational control over WD because the facts alleged require that inferences be drawn in favor of Gallo.  Examples include Gallo's allegations that WD's CEO was non-participatory in the negotiation of the GSA or knowledgeable of its contents, or that WD was burdened with EnCana's long term pipeline contract at the time WD was formed.

As previously noted, Gallo's burden is to offer some fact or set of facts that definitely

and unequivocally proves that EnCana had the right to control WD's operations at the time of the events giving rise to this case.  Gallo's proffer of undisputed material facts fails to make this proof with respect to Gallo's contention that EnCana had operational control of WD.

### C. Representative Services Doctrine – _Unocal_ and _Modesto City Schools_

Gallo's second argument contends that WD was the agent of EnCana because WD fulfilled a significant function in the United States such that WD's presence in the United States substituted for the presence of EnCana.  In other words, Gallo contends its proffered undisputed material facts establish that WD was the agent of EnCana according to the representative services doctrine as articulated in Unocal and Modesto City Schools.  For the reasons that follow, the court finds Gallo's argument unpersuasive.

Unocal, Modesto City Schools, and Bowoto, represent decisions by district courts of this district that have analyzed the issue of agency using what the court in Bowoto described as a test focusing "on the parent's dependence on the subsidiary's services," Bowoto, 312 F.Supp.2d at 1243, and Sierra Diamond called the "representative services doctrine."  The Modesto City Schools court summarized the several "factors" examined in Chan v. Soc'y Expeditions, Inc., 1398 (9th Cir. 1994), and Bulova Watch Co., Inc. v. Hattori & Co., Ltd., 508 F.Supp. 1322 (E.D. N.Y. 1981).  The Modesto City Schools court listed the following "factors:" (1) percent of the parent's business coming from the resident subsidiary; (2) whether the subsidiary was the parent's only agent in the forum; (3) whether the parent conducted any marketing in the forum; (4) the interchange of personnel between parent and subsidiary; (5) the overlap of directors and officers; (6) percent of parent's production that moved through the subsidiary; (7) the significance of the subsidiary in the parent's organizational life; (8) the subsidiary's marketing of the parent's products; (9) the extent to which the parent was informed of activities undertaken by the subsidiary; and (10) the relationship between the cause of action alleged against the subsidiary on behalf of the parent. Modesto City Schools, 157 F.Supp.2d at 1135.

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Unocal court did not list any "factors" with respect to its analysis of the alleged agency relationship, but rather focused on whether, but for the existence and activities of the subsidiar[y], Unocal would have been required to carry out the same functions itself. See Unocal, 248 F.3d at 930 ("the general agency test requires that the agent perform some service or engage in some meaningful activity in the forum state on behalf of its principal such that [the agent's] presence substitutes for the presence of the principal"). The court in Botowo cited Modesto City Schools but went on to list the facts particular to that case that received that court's particular attention. Those "factors" included the degree and content of communications from the subsidiary to the parent, the degree to which the parent set policy, the officers and directors the parent and subsidiary had in common and the reliance by the parent on revenue produced by the subsidiary. Bowoto, 312 F.Supp.2d at 1243.

As has been previously discussed, some or most of the "factors" listed – overlap of directors and officers, extent to which parent is kept informed of subsidiary activities, degree to which parent sets policy, and reliance by parent on revenue produced by subsidiary – are factors that are not, in and of themselves, determinative of a principal/agent relationship. In addition, the other "factors" listed above, including percent of the parent's business coming from subsidiary, and percent of parent's production that moved through the subsidiary, are factors that will always be greater than zero in any parent/subsidiary relationship but do not admit of clear cut-offs or levels at which a principal/agency relationship is presumptive.

The court concludes the "factors" listed in Bowoto and Modesto City Schools are not factors in the usual sense of being elements of proof that must be addressed to make a required showing. Rather the "factors" are simply groupings of facts that were found useful on an *ad hoc* basis to explain what a court considered when it came to that particular decision. This point is important because what the courts in Bowoto, Unocal, and Modesto City Schools were deciding is whether the party asserting the agency relationship had adduced facts sufficient to make a *prima facie* case of agency such that the evidence could be presented to a

38

jury.

The district court decisions in <u>Unocal</u> and <u>Modesto City Schools</u> addressed situations where the court was called upon to decide *defensive* motions to dismiss for lack of jurisdiction.  The decision in <u>Bowoto</u>, applied the approach used by <u>Unocal</u>, <u>Modesto City Schools</u>, <u>Bulova Watch</u> and others to address a *defensive* motion for summary judgment on the issue of liability.  The defensive posture of the moving party in these cases means that the court was called upon only to decide if the non-moving party had pled or adduced facts sufficient to show a *prima facie* case for agency such that the matter could be tried before a jury.  <u>See</u> <u>Botowo</u>, 312 F.Supp.2d at 1246 (non-moving party presented facts from which a *jury* could find agency).  In that context the "factors" do not represent elements of an agency relationship, but rather are categories of facts that a *jury* could examine and weigh to determine if an agency relationship existed under the particular facts of that case.

In the present case, the court need not look at any "factors" as Gallo suggests because the court is not looking to see if there is evidence upon which a jury *could* find that WD's presence in the United States substituted for EnCana's.  What the court is looking for in this case is whether undisputed facts exist from which a jury could rationally determine that WD's presence in the United States did *not* substitute for EnCana's.

Two undisputed material facts argue in favor of the proposition that a jury could find undisputed facts upon which it could rationally decide that WD's presence in the United States did not substitute for that of EnCana.  First, EnCana sold gas to a third-party marketing company before it created WD/PCES and there is nothing  that would indicate that EnCana could not contract with a third party to market its equity production in the United States if WD were not present.  This fact is bolstered by the fact that EnCana began marketing gas through WD in 1998 and made the decision in 2002 to discontinue its marketing operations after only four years. Gallo's UMF # 290.  This strongly suggests that WD's sales activities in the United States, even they accounted for a substantial portion of EnCana's total equity sales,

were not central to EnCana's overall business.

In Modesto City Schools, the court found the size and importance of the market was an important factor in determining whether a sales subsidiary is fulfilling a function that the parent would fill but for the subsidiary's presence. Modesto City Schools, 157 F.Supp.2d at 1136. In Modesto City Schools, the court found a jury could, on the facts adduced, find that where the parent company sold about 20% of its product through a sales subsidiary that it established more than 10 years before the action, the jury *could find* that the sales subsidiary functioned as an agent of the parent. Here the situation is reversed, the court finds that the undisputed evidence of the temporary nature of EnCana's sales subsidiary in the United Sates means that a jury *could find* that the sales subsidiary *did not* fill a function that EnCana would have to fill but for the subsidiary's (WD's) presence in the United States.

Second, while WD sold all of EnCana's equity production that was sold in the United States, that equity production accounted for only about a third of WD's total sales. From this, the court may infer that EnCana's equity production could reasonably be handled by one or a small number of third-party marketers in the United States. This fact distinguishes the present case from Modesto City Schools in another important way. In Modesto City Schools, the defendant foreign corporation marketed its product through a *network* of exclusive dealers who belonged to the subsidiary marketing corporation. Id. at 1132. Here, no such network of exclusive dealers exists. Where the Modesto City Schools court found that it could not be convinced on the evidence that the parent corporation *could* sell its product in the United States in the absence of the subsidiary, id. at 1136, this court finds in the instant case that it is not convinced that EnCana *could not* sell its product in the United States through third-party marketers in the absence of WD.

It should be apparent by this point that the court's main concern with respect to Gallo's argument for application of the representative services doctrine is the nature of the proof Gallo is required to produce because of its posture as a moving party trying to affirmatively establish

a principal/agent relationship for the purpose of attaching liability to the principal.

Affirmatively proving that the presence of a subsidiary in a foreign jurisdiction substitutes for the presence of the parent as a matter of law represents a high hurdle for the moving party.

The undisputed facts need only support a colorable argument that the parent could function as well without the subsidiary in order to defeat the summary judgment motion.  Given the inherently ambiguous nature of the representative services doctrine, it is no accident that the court can find no case where a court has granted summary judgment to a party that has moved to affirmatively establish liability from a principal/agent relationship using the representative services doctrine.

Of the case authority cited by the parties, the court can only identify a single case where the court was required to consider an offensive motion to determine an agency relationship as a matter of law.  In Comind, the plaintiff, an insurer, sought complete subrogation of payments it made as a result of a helicopter crash in Brazil.  The helicopter was sold pursuant to a contract that the defendants contended contained tort disclaimer provision that prevented the suit against the sales subsidiary corporation.  Comind, 116 F.R.D. at 400-401.  In the motion before the Comind court, the manufacturing parent corporation sought summary judgment that the sales subsidiary acted as its agent in the sale thereby making the protection of the tort disclaimer provision of the sales contract available to the parent manufacturing corporation.  Id.

Significantly, the Comind court's analysis focused on the degree of operational control of the parent over the subsidiary, not on the importance of the subsidiary to the parent's business.  The court found that a principal/agent relationship was evinced by undisputed facts showing that personnel from the parent prepared the sales contract and its amendments for the subsidiary; "participated and dominated the negotiations for the [sales] contract; prepared invoices on [the subsidiaries] letterhead; arranged for the delivery of the aircraft; and prepared the bill of sale.  Additionally [the principal had the subsidiary] grant it an express power of

41

attorney authorizing [the subsidiary] to bind [the parent] to the contract." Id. at 403.

At least one other court has expressed some discomfort in granting an offensive motion for summary judgment motion for liability on a representative services theory of agency.  See Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F.Supp.2d 633, 688 (S.D. N.Y. 2006) (stating doubts that liability could be imposed where there was no proof of control of the subsidiary by the parent).  Although this court also has some doubts that the representative services doctrine presents a proper framework for the analysis of a putative principal/agent relationship where the context is an offensive summary judgment motion to impose liability, the court need not decide the issue in this case because Gallo's proof is insufficient to establish as a matter of law that WD substituted for EnCana's presence in the United States.

## CONCLUSION

Gallo's motion for summary judgment on the issue of EnCana's liability under a theory of principal/agent must fail because Gallo has failed to adduce facts sufficient to show that EnCana controlled WD or that WD's presence in the United States substituted for that of the parent company.  The reason Gallo fails to adduce sufficient facts is that many of the facts offered by Gallo require impermissible inferences in Gallo's favor or because the facts adduced do not conclusively show that EnCana retained the right of control over WD.

The court will deny the Gallo's present motion for summary judgment and will continue to take under submission the two remaining dispositive motions.  No additional briefing by the parties will be required unless and until requested by the court.

THEREFORE, for the reasons discussed above, Gallo's motion for summary adjudication on the issue of EnCana's liability under a theory of principal/agent is hereby DENIED.

IT IS SO ORDERED.

Dated:    **May 23, 2008**                      **/s/ Anthony W. Ishii**      
                                             UNITED STATES DISTRICT JUDGE