1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| E. & J. GALLO WINERY, ) | CV F 03-5412   AWI LJO |
| ) | |
| Plaintiff, ) | MEMORANDUM OPINION |
| ) | AND ORDER ON |
| v. ) | DEFENDANTS' MOTION FOR |
| ) | SUMMARY JUDGMENT OR |
| ENCANA ENERGY SERVICES, INC., ) | SUMMARY ADJUDICATION |
| a Delaware corporation, formerly known ) | ON ISSUES OF CONSPIRACY |
| as PANCANADIAN ENERGY ) | AND ANTITRUST INJURY |
| SERVICES INC.; ENCANA ) | |
| CORPORATION, a Canadian ) | |
| corporation, formerly known as and ) | |
| successor to PANCANADIAN ) | Doc. # 535 |
| ENERGY CORPORATION, ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

This is an action for damages and declaratory relief by plaintiff E. & J. Gallo Winery

("Gallo") against defendants EnCana Corp. ("EnCana"), a Canadian producer of natural gas,

and WD Energy Services, Inc. ("WD") (formerly EnCana Energy Services, formerly Pan

Canadian Energy Services, Inc.), a wholly-owned marketing subsidiary of EnCana Corp.

(collectively, "Defendants").  On January 24, 2005, Gallo filed its first amended complaint

for damages, disgorgement/restitution , constructive trust, and injunctive relief (the "FAC").

The FAC alleges both state and federal antitrust claims.  Defendants have filed two motions

for summary judgment and Gallo has filed one motion for partial summary judgment.  In this,

the last of these dispositive motions, Defendants move for summary judgment or, in the

alternative, summary adjudication on the issues of whether Gallo can show the existence of an anticompetitive conspiracy over a defined span of time and whether Gallo can show the damage they claim was caused by the conspiracy.  Federal question jurisdiction exists pursuant to 28 U.S.C., section 1331.  Venue is proper in this court.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Gallo is a wine producer and purchases large quantities of natural gas for use in its glass and bottle making facility in Stanislaus County.  Natural gas produced outside of California enters the state at one of four pricing points.  During the time period at issue in this case, Gallo purchased Canadian-produced natural gas from defendant WD, EnCana's wholly-owned subsidiary for marketing natural gas in the United States, at the pricing point called PG&E Citygate, which is located at the California-Oregon border.  "During this period, the purchase and sale contract between Gallo and EnCana did not specify how the parties would calculate the price of the natural gas.  However, both parties concede that, as a matter of practice, the purchase price was pegged to indices published in two trade publications, *Natural Gas Intelligence* ("*NGI*") and *Gas Daily*."  E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1031 (9th Cir. 2007) ("Gallo").

As the court has previously observed, the *NGI* and *Gas Daily* indices represent a compilation of submitted and verified information gathered from voluntary reports of trading activity and are intended to reflect trading activity at each pricing point.  "The process by which the prices in natural gas transaction were reported to the publishers of the indices was left largely to the traders themselves."  Id.  As the Ninth Circuit Court of Appeals observed, "[n]ot only were the indices ripe for manipulation, but also FERC's investigation confirmed that such abuse actually occurred.  Market participants had provided false reports of natural gas prices and trade volumes, and had engaged in other misconduct."  Id. at 1032 (citing FINAL REPORT ON PRICE MANIPULATION IN WESTERN MARKETS, FEDERAL ENERGY REGULATORY COMMISSION (2003) (hereinafter "FERC Final Report") at ES-1 - ES-6).

The allegations set forth in the currently-operative FAC have been summarized many times in prior orders of this court.  In its order of July 6, 2005, denying Defendants' motion to dismiss the FAC, the court summarized the claims alleged in the FAC as follows:

> Commencing in the Summer of 2000 and continuing until late 2001, by their marketplace behavior and agreement as to pricing, defendants, and the unnamed co-conspirators, avoided competing with each other in the pricing and sale of "bundled" natural gas in California, in the pricing and sale of interstate gas transportation contracts into California in the secondary (or replacement) market, and in the pricing and sale of the derivatives supposedly derived from California natural gas market prices.  This agreement is evidenced by, among other things, the daily exchange of price information by and among defendants and the unnamed co-conspirators and the use of computer software programs and websites by defendants and the unnamed co-conspirators to collusively establish Defendants' and the unnamed co-conspirators' price of "basis" and thus the price of bundled natural gas pricing (and vice-versa) at artificially high levels during the relevant time.

> [¶ . . . ¶]

> Defendants and the unnamed co-conspirators also agreed to do "wash" transactions under which they simultaneously bought and sold from each other the same natural gas and natural gas "basis" swaps and other commodities <u>at the same price on the same day</u>.  The "wash trades" created the false appearance of demand for and shortage of supply of natural gas and natural gas transportation into California.  The " wash trades" also served as a method of communicating collusive price information and collusively manipulating the supposedly independent third party published indexes of prices used to determine the settlement amount of natural gas contracts and natural gas derivatives, including "basis" swaps.

FAC at ¶¶ 19, 21.

As discussed in the court's order of July 6, 2005, as well as in other court orders, the "basis" price generally reflects the portion of the cost that goes to the pipeline company for transportation.  The basis is computed as the difference between the price paid a particular delivery or pricing point and the commodity price as set by the relevant commodity exchange market, here the New York Mercantile Exchange ("NYMEX").  The essence of Gallo's claim against Defendants is that natural gas traders working for WD manipulated the basis prices reflected in the indices by conducting simultaneous sales and purchases with counterparty traders from other companies so that pricing information was exchanged and basis prices were bid up, but no actual molecules of natural gas changed hands.  These trades are referred

to by the parties variously  as "sham trades," "wash trades," or "basis swaps."  See In re: Natural Gas Commodity Litigation, 377 F.Supp.2d 498, 504 (S.D.N.Y. 2004) ("The FERC Final Report defines wash trades a[s] 'a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership").

In the instant motion Defendants challenge the ability of Gallo to show a causal connection between any "basis swaps" it may have conducted and any damage Gallo may have incurred.  Defendants challenge Gallo's ability to provide evidence to prove both that the basis swaps actually caused the spike in natural gas prices Gallo paid, and to prove that other market factors not related to basis swaps were not the cause of price increases. Defendants also challenge Gallo's ability to produce evidence sufficient to show the conspiracy existed during the full time-period alleged in the FAC.

Defendants' instant motion for summary judgment on the issues of causation and conspiracy was filed on July 26, 2005, concurrently with Defendants' motion for summary judgment on the issue of applicability of the Filed Rate Doctrine and concurrently with Gallo's motions for summary judgment on principal/agent liability and on Gallo's motion for summary judgment on Defendants' affirmative defenses.

On October 17, 2005, the court granted Defendants' motion for certificate of applealability as to the court's order of September 30, 2005, denying Defendants' motion for summary judgment on the grounds of filed rate doctrine and federal preemption (hereinafter the "September 30 Order").  The court's order of October 17 stayed further proceedings in this case pending judgment by the Ninth Circuit Court of Appeals on Defendants' interlocutory appeal of the court's September 30 Order.  The judgment of the Ninth Circuit Court of Appeals affirming this court's order of September 30 Order, was received by this court on December 6, 2007.  The stay that had been imposed pending interlocutory appeal was lifted on November 21, 2007.

Following the lifting of the stay, the court requested statements by the parties as to the

1    need for further briefing as to any of the dispositive motions that were still pending at the

2    time.  Based on the parties responses, the court determined further briefing was not necessary

3    as to Gallo's motions for summary judgment on the issues of principle/agent liability and on

4    Defendants' affirmative defenses.  The parties differed with respect to whether additional

5    briefing would be appropriate with respect to Defendants' instant motion on causation and

6    conspiracy.  Gallo opined that further briefing is not necessary and Defendants averred that

7    further briefing  would be appropriate.

8                              **UNDISPUTED MATERIAL FACTS**

9          Basically, Defendants' proffered statement of undisputed material facts consists of a

10   series of assertions that Gallo lacks sufficient evidence to prove necessary elements of its

11   claims.  In particular, Defendants allege Gallo lacks evidence to prove when the conspiracy

12   started, or that the conspiracy involved any wrongful activities with named non-party co-

13   conspirators or among the alleged co-conspirators.  Defendants also allege Gallo lacks

14   evidence to show "any conspiracy involving any trading, reporting, transactions or other

15   conduct impacting Henry Hub natural gas prices."  Defendants Undisputed Material Fact

16   ("UMF") # 6.  Defendants also allege Gallo's evidence shows only a limited number of wash

17   trades, not enough to establish a conspiracy, and alleges further that none of the wash trades

18   cited by Gallo were reported to any index, nor did the transactions involve natural gas pricing

19   at any pricing point in California.  Defendants' UMF # 9.

20         Defendants next allege a number of undisputed material facts intended to show that

21   Gallo lacks evidence that shows that the trading activities alleged by Gallo were the cause of

22   increased natural gas pricing during the times at issue in this case.  Specifically, Defendants

23   allege Gallo has no witness testimony that establishes the link between trader activity and

24   increased prices, but rather has stated it will rely on expert testimony to establish the causal

25   connection.  Gallo vigorously disputes essentially every allegation of insufficient evidence

26   proffered by Defendants.

27

28                                              5

## GALLO'S ADDITIONAL MATERIAL FACTS

Gallo alleges a total of 155 additional material facts that are intended to controvert Defendants' allegations of insufficiency of evidence as to each claim.  Of significance to the instant motion, Gallo alleges Defendants overreported the volumes of their transaction over a period of a year and that WD traders knew they were overreporting the volumes traded.  The overreporting included reports of the volumes traded at PG&E Citygate.  Gallo also alleges that volume statement for trades reported to the trade publications over a two year period by certain WD employees were inflated over the volumes actually traded in almost every instance.  The over reporting of trading volumes caused a significant spike in reported volumes traded during beginning in the first quarter of 2001 and continuing to the first quarter of 2002.  Gallo alleges that the United States Commodities Futures Trading Commission made factual findings of false reporting by WD traders and other co-conspirators and asks the court to take judicial notice of the commissions findings.  The court will address Gallo's requests for judicial notice *infra*.  Gallo also alleges false reporting was common among co-conspiring energy companies during the period of 2001-2002, and points out that such false reporting has been acknowledged in other proceedings.

Gallo also alleges and proffers evidence of wash trades and "churning."  The former consists of simultaneous buy/sell transactions where equal volumes are traded and sold simultaneously at the same prices.  The latter, so far as the court can discern, are sequential sales by a party to a counterparty with immediate resales of identical volumes back to the original seller creating a buy/sell loop in which the basis price is bid up incrementally with each transaction.  As will be discussed in more detail *infra*, Gallo proffers evidence, primarily in the form of commission proceedings, that explain how false volume reporting, "wash trades," and "churning" all had the effect of distorting the natural gas marketplace at the time in question.

1

**LEGAL STANDARD**

2      Summary judgment is appropriate when it is demonstrated that there exists no

3 genuine issue as to any material fact, and that the moving party is entitled to judgment as a

4 matter of law.  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970);

5 <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755

6 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d

7 1310, 1313 (9th Cir. 1984).

8          Under summary judgment practice, the moving party always bears the initial
           responsibility of informing the district court of the basis for its motion, and
9          identifying those portions of "the pleadings, depositions, answers to
           interrogatories, and admissions on file, together with the affidavits, if any,"
10         which it believes demonstrate the absence of a genuine issue of material fact.

11 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Although the party moving for summary

12 judgment always has the initial responsibility of informing the court of the basis for its

13 motion, the nature of the responsibility varies "depending on whether the legal issues are

14 ones on which the movant or the non-movant would bear the burden of proof at trial."

15 <u>Cecala v. Newman</u>, 532 F.Supp.2d 1118, 1132-1133 (D. Ariz. 2007).  A party that does not

16 have the ultimate burden of persuasion at trial – usually but not always the defendant – "has

17 both the initial burden of production and the ultimate burden of persuasion on the motion for

18 summary judgment."  <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.</u>, 210 F.3d

19 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party

20 must either produce evidence negating an essential element of the nonmoving party's claim

21 or defense or show that the nonmoving party does not have enough evidence of an essential

22 element to carry its ultimate burden of persuasion at trial."  <u>Id.</u>

23      If the moving party meets its initial responsibility, the burden then shifts to the

24 opposing party to establish that a genuine issue as to any material fact actually does exist.

25 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>First Nat'l</u>

26 <u>Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968); <u>Ruffin v. County of Los</u>

27

28                                          7

1  Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this

2  factual dispute, the opposing party may not rely upon the mere allegations or denials of its

3  pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

4  admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

5  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474

6  F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in

7  contention is material, i.e., a fact that might affect the outcome of the suit under the

8  governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

9  Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute

10 is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

11 nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d

12 1433, 1436 (9th Cir. 1987).

13         In the endeavor to establish the existence of a factual dispute, the opposing party need

14 not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16 versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at

17 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

18 proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587

19 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International

20 Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

21         In resolving the summary judgment motion, the court examines the pleadings,

22 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23 any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06

24 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at

25 255, and all reasonable inferences that may be drawn from the facts placed before the court

26 must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United

27

28                                                    8

States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## JUDICIAL NOTICE

A district court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the records and reports of administrative bodies, Interstate Natural Gas Co. v. Southern California Gas Co., 209 F.2d 380, 385 (9th Cir. 1953), and of orders or decisions or proceedings of any federal or state court.  Holder v. Holder, 305 F.3d 854, 866 (9th Cir. 2000).  However, "a court may not take judicial notice of a fact that is 'subject to reasonable dispute. Fed. R. Evid. 201(b).'" Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).  A court may take judicial notice of another court's opinion "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." Id. at 690.  Subject to this limitation, the court takes judicial notice of: (1) the report of testimony given at the California State Senate proceeding titled Hearing With Regard to Natural Gas Investigation: California Senate Select Committee to Investigate Price Manipulation of the Wholesale Energy Market, (November 18, 2002) (hereinafter "Investigation Proceedings"), provided at Exhibit "B" of Gallo's Second Request for Judicial Notice in Opposition, Doc. # 594-6 thru 594-10; and (2) various orders by the Commodity Futures Trading Commission set forth at exhibits "O" through "FF" to Gallo's Request for Judicial Notice in Opposition to Defendant's Motion for Summary Judgment, Doc. # 562.

## DISCUSSION

**I  The Appellate Decision in Gallo**

The Ninth Circuit's decision in Gallo affirmed this court's denial of Defendants'

motion for summary judgment on the issue of filed Rate Doctrine; but did so on grounds that were more narrow than this court's opinion originally held.  Specifically, the appellate court held that Gallo cannot claim damages on a theory the rates it was charged were unfair due to misconduct by  Defendants so long as the rates were FERC-approved rates.  Gallo, 503 F.3d at 1044.  "To the extent Gallo's challenge to the indices is a challenge to those market-based wholesale rates subject to FERC's jurisdiction that are included in the indices, Gallo's claim would be barred by the Filed Rate Doctrine."  Id.  Conversely, "to the extent the indices are comprised of rates that are not FERC-authorized rates, the Filed Rate Doctrine does not bar Gallo's claim that such rates are unfair, and led to unfair retail rates paid by Gallo."  Id. at 1048.

As the issue is framed by the appellate court's decision in Gallo, the damages available to Gallo are limited to those that arise from inputs into the indices that represent non-jurisdictional transactions.  The question that naturally follows is precisely what kinds of transactions that were included in the indices during the period in question were non-jurisdictional?  The appellate court held the following types of transactions to be not within FERC's jurisdiction: (1) index pricing inputs that were "misreported or wholly fictitious," (2) retail consumer sales not regulated by FERC, and (3) first sales.  See Id. at 1045-1048 (discussing non-jurisdictional nature of each type).

So far as the court can discern from the pleadings of the parties, Gallo's claims of inflation of index prices do not arise from reports to indices of retail sales to end use consumers or reports of first sales.  This merely reflects the current understanding of the court and is not to be understood as precluding or permitting any claims that increases in index prices were caused by improper reporting of first sales or retail sales to end users.  The remainder of the court's discussion will therefore focus on the issue of whether the types of trading activity alleged by Gallo against WD were "misreported or wholly fictitious," transactions that would be non-jurisdictional pursuant to Gallo and could therefore give rise

10

1    to damages.

2           Evidence proffered by Gallo references three types of trader activity that have the

3    potential to distort natural gas market indices.  The first is the reporting of  volume amounts

4    in natural gas sales that were either greater than (inflated) or less than (deflated) the amounts

5    actually contracted.   The Gallo court directly held that misreported trade inputs to the indices

6    are non-jurisdictional. Id. at 1045.  At a minimum, the court interprets the Ninth Circuit's

7    holding excluding "misreported" reports of trading activity from FERC's jurisdiction to

8    encompass any trade report that was made to an indexing news service that reported volumes

9    that were either greater than or less than the volumes actually contracted for sale.

10          The second type of trading Gallo alleges WD engaged in are "wash trades," or "basis

11   swaps."  As the court understands the terms, wash trades represent simultaneous buy/sell

12   transactions wherein a trader from WD simultaneously sells to a counterparty trader a volume

13   of natural gas and buys from that counterparty the same volume of natural gas at the same

14   price at the same time.  No actual molecules of natural gas change hands and the physical

15   volume demand for the pipeline for the transmission period remains unchanged.  As the court

16   understands it, wash trades, if reported, have the effect of falsely transmitting increased

17   volume demands to the index news services in the same manner as misstated reports.

18          The third type of transaction, "churning," is, so far as the court understands the term,

19   a variant on the same theme as "wash trade."  In churning, volumes of natural gas are

20   sequentially bought and sold by a trader and counterparty so that each time a buy/sell cycle is

21   complete, the basis price has been incrementally increased without the net exchange of any

22   actual natural gas.

23          Strictly speaking, neither wash trades or churning implicate "misreporting" in the

24   sense that the buy/sell transactions actually occurred and the court presumes the terms that

25   are reported to the indices represent the actual terms of the transactions.  The question is

26   whether reports of such trading activities fall within the ambit of what the Gallo court termed

27

28                                          11

"wholly fictitious" index inputs.  The term "wholly fictitious" is ambiguous on its face.  Did the Ninth Circuit mean to include only reports to indices of trades that did not actually occur at all, or more broadly to trades reported to indices that occurred, in that they were somehow recorded, but were so constructed as to communicate false or fictitious pricing or volume information?

Two lines of reasoning lead to the conclusion that, in holding that index inputs from "wholly fictitious" transactions are not within FERC's jurisdiction, the Gallo court intended to include "wash sales" and "churning."  First, as the court previously observed in its September 30 Order:

> Three things and three only Congress drew within its own regulatory power, delegated by the act to its agent the Federal Power Commission.[1]  These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

Panhandle Eastern Pipe Line Co. v. Pub. Serv. Comm'n of Indiana, 332 U.S. 507, 516 (1947).  Taken at face value, wash trades involve neither the transportation of natural gas or its sale for resale.  As previously noted, wash trades and churning do not move natural gas through pipelines because there is no net change in the beneficial ownership of any volume of natural gas.  In re: Natural Gas Commodity Litigation, 337 F.Supp.2d at 504.  Thus, a wash trade is not a sale of any amount of natural gas, it is essentially an exchange of positions with respect to a given volume of natural gas where no pipeline volume is actually scheduled and there is no net change in actual pipeline demand.  As evidence adduced by Gallo shows, the point of wash trades is, *inter alia*, to supply a set of transactions that can form the basis for false volume reports to the indices or to provide a series of buy/sell transactions through which  the price at a given pricing point can be bid up evenly and gradually so as not to

---

[1]        Federal Power Commission was the predecessor of the FERC.

present the appearance of manipulation.[2]  See generally, Investigation Proceedings, at pp. 121-132 (discussing wash and related trades in the context of price manipulation).  Since the purpose of wash trades and related activities is not to transport natural gas or to sell natural gas for resale, such transactions and the reports they generate to the indices lie outside FERC jurisdiction.

Second, as the Gallo court observed, "barring claims that such fictitious transactions damaged purchasers in the natural gas market would not further the purpose of the filed rate doctrine." Gallo, 503 F.3d at 1045.  The purpose behind the Filed Rate Doctrine is to prevent district courts from undoing or second guessing a determination that was specifically made by FERC.  Id. at 1044; County of Stanislaus v. Pacific Gas & Electric Co., 114 F.3d 858 (9th Cir. 1997).  As the Gallo court pointed out, the Filed Rate Doctrine, although originally applied in the context of rates and tariffs set by FERC, has been maintained by the courts since Congress and FERC moved to reliance on the market to establish rates.  In the context of market-based rate setting, the Filed Rate Doctrine enables FERC to carry out its purpose of ensuring "just and reasonable rates in the evolving natural gas market [by allowing] natural gas sales to proceed at market prices." Gallo, 503 F.3d at 1042.  Because indices are intended to reflect the market, the success of  market-based rate setting hinges on clear and robust reporting of market transactions to the indices.  See Investigation Proceedings at 81 (testimony of Trina Horner on importance of indices on rate setting).  It self-evident that inaccurate reports and reports of sham or wash trades that result in distortions of either volume or pricing information undermine the clarity and robustness of information incorporated in the indices and undermine the ability of the natural gas market to produce just and reasonable rates.

---

[2]     The court does not exclude the possibility there may be legitimate reasons for booking wash trades other than to ship natural gas or to sell natural gas for resale, nor does it preclude any offer of proof by Defendants' that a particular wash trade may have had a legitimate business purpose.

The court concludes the types of trading activity Gallo alleges, sham trades, wash trades and churning, are fictitious within the meaning of the <u>Gallo</u> court's determination of non-jurisdictional transactions.  This is because these types of transactions, notwithstanding the fact they may have observed the formalities of legitimate trading activity, served to provide a conduit for false and fictitious information into the indices thereby undermining the indices and FERC's purposes.  Because such trades undermine FERC's purposes, the appellate court's decision in <u>Gallo</u> teaches that a suit by a plaintiff injured by false or fictitious reports to indices that arise out of sham or wash trades does not violate the purpose of the Filed Rate Doctrine.

## II. Defendants' Motions for Summary Judgment

Defendants allege two bases for their motion for summary judgment.  First, Defendants contend Gallo lacks evidence to prove the scope of conspiracy alleged in the FAC.  Second, Defendants contend Gallo lacks evidence to show that the anti-competitive transactions alleged against WD and the co-conspirators was the cause of the harm Gallo alleged it suffered.

### A. Gallo's Burden of Proof re: Scope of Conspiracy

As an initial matter, Gallo contends Defendants' challenge to the sufficiency of Gallo's evidence to prove the *scope* of the conspiracy is not a proper basis for summary judgment.  The court agrees.  The non-moving party's burden in response to a defensive summary judgment motion is to show "significant probative evidence tending to support the [plaintiff's] theory of recovery.  <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968).  Once there is sufficient evidence to show that the non-moving party may be entitled to *some* recovery under the legal theory pled, the non-moving party has met its burden and the summary judgment motion is defeated.  <u>William Inglis & Sons Baking Co. v. Continental Baking Co., Inc.</u>, 942 F.2d 1332, 1339 (9th Cir. 1991).

There are two claims for relief in the FAC that implicate Gallo's ability to

14

demonstrate a conspiracy.  The first is Gallo's claim for relief for violation of the Sherman

Antitrust Act, 15 U.S.C. § 1.

> Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states. [. . . .] Hence, in order to maintain a successful § 1 action, the [plaintiffs] must show (1) that there was a contract, combination or conspiracy, *i.e.*, an agreement or concerted action toward "a common goal," [. . .] (2) that the agreement "unreasonably" restrains trade, under either a per se rule of illegality or a rule of reason analysis, [. . . ], and (3) that the restraint affected interstate commerce.

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 632-633 (9th Cir.

1986).

Gallo's other claim implicating Gallo's need to demonstrate a conspiracy is Gallo's

second claim for relief which is alleged pursuant to California's Cartwright Act, California

Business & Professions Code, § 16720.  California's Cartwright Act is patterned after the

Sherman Act and requires that the plaintiff demonstrate the same elements of collusion to

restrain free trade in order to maintain an action.  See Golan v. Pingel Enter., Inc. 310 F.3d

1360, 1369 (Fed.Cir. 2002) (generally "Sherman Act decisions are applicable to cases under

the Cartwright Act").  While both the Sherman Act and the Cartwright Act require a

demonstration of conspiracy or collusion, neither requires that the conspiracy constitute more

than one other person or entity.

While proof of the *scope* of the conspiracy and the scope of WD's involvement may

be a crucial and ultimately limiting factor in Gallo's proof of damages, there is no

requirement that Gallo prove the *scope* of the conspiracy for the purposes of avoiding

summary judgment under either the Cartwright or Sherman Acts.  Such proof is for the jury.

What is necessary is proof that there was a conspiracy and that WD was part of it.  In the

context of Gallo's allegations against WD, the conspiracy or combination element of Gallo's

claims for violation of the Sherman and Cartwright Acts may be evinced either directly by

evidence of agreements between WD and counterparty traders to carry out wash trades or

other collusive non-jurisdictional trades, or indirectly by admissible testimony that such

1  trades involving WD traders occurred.  The sufficiency of Gallo's evidence to establish this

2  element will be discussed infra.

3  ***B. Gallo's Burden of Proof re: Causation and Elements of Antitrust Claims.***

4  Defendants' second basis for its motion for summary judgment contends Gallo lacks

5  sufficient evidence to show that the alleged anti-competitive trading practices by WD caused

6  harm to Gallo.  Gallo's first claim for relief is pursuant to the Sherman Act, 15 U.S.C. § 1.

7  The Sherman Act does not provide a basis for a claim for damages for individual plaintiffs.

8  If Gallo had intended to recover damages upon proof of Defendants' violation of the Sherman

9  Act, Gallo would have needed to plead a basis for such recovery under the Clayton Act, 15

10  U.S.C. § 14 et seq.  Gallo has not alleged a claim for relief under the Clayton Act, rather

11  Gallo has based its claim for recovery of damages under California's Cartwright Act and

12  under California's unfair competition law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq.,

13  and pursuant to a common law claim for unjust enrichment.

14  With respect to Gallo's claims under both the Cartwright Act and under the UCL,

15  Gallo must prove the fact of loss.  See Walker v. USAA Cas. Ins. Co., 474 F.Supp.2d 1168,

16  1172-1174 (E.D. Cal. 2007).  With respect to California's UCL, "'loss of money or property'

17  [is] required for UCL standing.  Id.  With respect to California's Cartwright Act:

18  Business and Professions Code section 16750, subdivision (a),
19  provides a private right of action for treble damages, interest, and, where
   appropriate, injunctive relief, to "[a]nyone who is injured in his or her
20  business or property" by a violation of the Cartwright Act.  The "fact of
   damage" is thus an element of the cause of action, and a precondition of
21  standing to bring it.  However, in some cases, notably those if price-fixing this
   element – not the amount of compensable damage, but the fact of damaging
22  impact on the plaintiff or plaintiff class – may be established by presumption
   or inference.

23  California Dental Ass'n v. California Dental Hygienists' Ass'n, 222 Cal.App.3d 49, 61 (2nd

24  Dist. 1990).

25  The California appellate court's holding that the fact of damage may be established by

26  "presumption or inference" is not inconsistent with federal law in antitrust cases.  With

27

28                                        16

regard to antitrust cases, the Supreme Court opined, "[w]e believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators and hostile witnesses thicken the plot." Poller, 368 U.S. at 473. Although the Ninth Circuit has held that the Supreme Court "has not abandoned the presumption that summary judgment is disfavored in complex antitrust cases that involve issues of motive and intent," T.W. Elect. Servs., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 632 (9th Cir. 1987); this statement has been reinterpreted in light of Cellotex, Anderson, and Matsushita. In its more recent formulation, the Ninth Circuit has observed that in light of modern summary judgment jurisprudence "[w]here an antitrust plaintiff's allegation of a conspiracy is based solely on indirect evidence that is capable of inferences of both lawful and unlawful behavior, the plaintiff must produce some evidence tending to exclude the possibility that the defendant acted independently." T.W. Elect. Servs., 809 F.2d at 632. Amendments to California summary judgment standards in 1992 and 1993 brought California summary judgment law "largely but not completely" into conformity with its federal counterpart. Aguilar v. Atlantic Richfield Co., 25 Cal.4th 826, 848-849 (2001). Under California summary judgment standards, as under federal standards, a plaintiff in an antitrust suit may prove elements of conspiracy and causation by inferential evidence provided that, if the evidence is ambiguous as to whether the acts alleged are lawful or unlawful, the plaintiff must present additional evidence that tends to exclude the possibility that the defendants acted lawfully in order to make a prima facie showing of antitrust violation. Id. at 855-856.

In support of their motion for summary judgment on the issue of proof of damages, Defendants set forth a number of what are essentially allegations of lack of evidence to prove facts relating to Gallo's claim that it was damaged as a result of WD's trading activities. Specifically, Defendants allege Gallo lacks evidence of any conspiracy regarding trading that impacted prices at Henry Hub. Defendants also allege Gallo has records of only a small

number of trader conversations evincing collusive trading practices, but not enough evidence to prove the larger conspiracy alleged.  Defendants allege that of the few wash trades Gallo did identify, proof is lacking that any were reported to an index, or that they involved natural gas transactions or pricing in California.  Defendants also allege Gallo has not produced evidence of any analysis it has conducted, or that any expert has conducted on Gallo's behalf, that demonstrates the alleged trading conspiracy resulted in increased prices to Gallo or that the increased prices Gallo paid during the period in question were not the result of other economic factors.

Because the standard for proof of a claim under California's Cartwright act may be made by inference or presumption, the court is not bound to consider only direct proof of the link between Defendants' conduct and the harm Gallo claims it suffered.  Thus, it is not fatal to Gallo's claim at this stage that expert or direct testimony directly linking Defendants' acts to Gallo's harm is lacking.  Rather, Gallo may, for purposes of carrying its burden of production and persuasion, defeat Defendants motion for summary judgment by citing evidence that establishes the general propositions that (1) wash trades and/or other forms of non-jurisdictional reporting discussed above occurred during the time period relevant to this action; (2) wash trades and/or other forms of non-jurisdictional reporting discussed above are more likely than not to have the effect of distorting (i.e. elevating or depressing) index prices above or below the level the indices would be had the non-jurisdictional trades not been reported; (3) WD participated in such non-jurisdictional wash trades or other trades that resulted in false reporting during the time period at issue in this action. (4) PG&E Citygate was more likely than not among the pricing points that were affected by non-jurisdictional false reporting practice that WD participated in during the time period at issue in this action.

Based on the foregoing, the court finds that, for purposes of making its prima facie case of actual harm, Gallo need not prove that a particular transaction by WD traders directly caused harm or that WD actually reported a particular transaction or transactions.  It is also

not required that Gallo show it purchased natural gas from WD at a price that was inflated directly by WD's trading activities. It is sufficient for purposes of satisfaction of Gallo's burden of proof that Gallo show it paid a price for natural gas that was higher than it would have been but for non-jurisdictional trading activity that resulted in false reporting to the indices and in which WD had a more than de minimis role.

### 1. Evidence Shows Wash and Other Non-Jurisdictional Trades Occurred

The record before the court sets forth abundant evidence that tends to prove there was substantial non-jurisdictional trading activity during the period of June 2000 through August 2001. First, deposition testimony of Sarah Allen, a WD employee, acknowledges that traders at WD were familiar with basis swaps and made basis swaps during the period of time in question with counterparties from other companies.[3] Williams Dec., Exh J at 30. Recorded telephone conversations of other traders, for example Tom Gary, evince an awareness of false reports being submitted to the indices and an awareness that such false reporting was widespread during the time period. See Williams Dec., Exh. I-3 and I-4. WD's apparent acknowledgment that various forms of wash trading and false reporting were endemic during the time period between June 2000 and August 2001 is reasonable in light of the several instances in which various trading companies, including WD, were found by the Commodity Futures Trading Commission to have engaged in false trading activity resulting in violations of section 9(a)(2) of the Commodities Exchange Act, 7 U.S.C. §§ 9, 13b, 13(a)920 and 15 (2001). See Gallo's Request For Judicial Notice, Exh. "0" through "FF", inclusive.

### 2. Reporting of Non-Jurisdictional Trading Activity to Indices Likely Resulted in Elevated Index Prices

---

[3]      The court is mindful of the previously-noted limitation on the application of judicially noticed materials to establish facts in controversy in this case. Here, the court find the proceedings of the Commodity Futures Trading Commission may be judicially noticed to support the proposition that the cited references of conversations by WD trader Gary may reasonably be interpreted as referencing the existence of a broader practice in the natural gas marketplace of reporting of false trading data to the indices. The proceedings of the Commodity Futures Trading Commission is not judicially noticed for the purpose of establishing that WD engaged in such false reporting.

1    The central element of the causal link between Defendants' trading activity and the

2    harm Gallo alleges it suffered is the ability of wash trades, churning, and other activities that

3    give rise to false reports to index publishers, to cause index prices to rise.  Because Gallo may

4    establish the causal link by inference, it is not necessary that Gallo show by direct evidence

5    that WD's wash trades or false reports caused the indices to rise; it is only necessary that

6    Gallo show that such trading activity is likely, in the abstract, to cause such harm.

7        "Wash trading can create a false impression of greater trading activity and thus greater

8    liquidity for a given item. [Citation.] Wash trading can also affect the average trading price

9    for an item. [Citation.]" In re: Natural Gas Commodity Litigation, 377 F.Supp.2d at 504

10   (citing FERC Final Report at VII-1).  The mechanisms by which the reporting of false

11   volume demand or false pricing influence index prices  was discussed by Ms. Michele

12   Markey,  who had worked as a trader for a major energy company and who most recently had

13   worked for a company that was responsible for data base management for natural gas industry

14   information.  Investigation Proceedings at 93-94.  Markey's testimony is useful to a general

15   explanation of both the nature and effect of false volume reports.  The index rates reported

16   for each pricing point reflect a range of prices for individual transactions weighted by the

17   volumes associated for the transactions. Id. at 107.  Because wash trades, or basis swaps,

18   involve no actual net transfer of actual natural gas, index prices can be manipulated either

19   upward or downward by reporting large volume wash trades that are set at prices that deviate

20   from the median by only a relatively small amount. Id. at 107-108, 110.  Thus, if a transaction

21   that is priced only a little higher than the median of the price range for a particular trading day

22   is associated with a transaction volume that is either exaggerated over the volume that was

23   actually sold, or that reports a volume as sold when there was actually no transfer of actual

24   natural gas, the indices computed from that transaction will be skewed higher than would be

25   the case if the transaction volumes had been accurately reported.  Id. at 107-108, 121.

26       As Defendants point out, for purposes of proof of causation, it is not sufficient that

27

28                                          20

Gallo simply assert that index prices spiked at the same time wash trades, basis swaps and other forms of non-jurisdictional trades were occurring.  However, when combined with evidence of the existence of a causal mechanism by which such trading activity could lead to a spike in index prices, the fact of the co-incidence of a spike in index prices and a high volume of non-jurisdictional trades lends weight to the inference there is a causal connection between the two.  Gallo presents substantial evidence that the spike in index prices that occurred between June 2000 and August 2001 coincided with unprecedented rise in volumes reported to the indices that could not be accounted for by increases in actual demand.  Investigation Proceedings at 118-119; Deposition of Sarah Allen, Williams Dec., Exh. I at 67-68.  From these facts, as well as from the explanations that the non-jurisdictional trading activities alleged have the potential to cause distortions in reported indices, the court concludes Gallo has presented evidence sufficient to carry its burden to show that it is more likely than not that the types of non-jurisdictional trading alleged caused distortions in index prices.

### 3.  WD Participated in Non-Jurisdictional Trading Activities During the Relevant Time Period

Gallo presents abundant evidence that WD participated in a substantial number of basis swaps during the time period at issue.  See, e.g., Williams Dec., Exh. #'s J-10 to J-22 (listing individual basis swaps by month with selected counterparties); Deposition of Sarah Allen, Exh. I at 139-144 (acknowledging various "wash trades"), Gallo also presents evidence that WD traders acknowledged agreeing to report only those sales where the prices met or exceeded a pre-determined pricing level.  See, Williams Dec. Exh. G(6) at 7-8; Exh H(2).  Thus, the court concludes Gallo has adduced substantial evidence that WD engaged in non-jurisdictional trades of the same or similar type that the court has concluded are more likely than not to result in false volume or price reports to indices and consequent increases in the Index prices.

For purposes of meeting its evidentiary burden, the court finds Gallo need not adduce

evidence that particular non-jurisdictional transactions were reported to the indices. From a practical point of view, if two or more parties engage in non-jurisdictional trades that cause index distortions, it is immaterial which party actually reports the transactions so long as the transactions are reported. Thus, Gallo may meet its burden by showing that: (1) there was some expression by WD traders of an intent that certain transactions be reported; (2) that WD engaged in the types of trades non-jurisdictional trades that had high potential to cause index distortions; and, (3) that reporting of such non-jurisdictional trades was commonplace during that time period.

As previously noted, Gallo has presented transcripts of recorded telephone conversations of WD traders with their counterparties that express an intent on the part of the WD traders to "report high;" which the court takes to mean to carry out trades with the intent of reporting only those that meet or exceed a preset minimum basis sales price. Williams Dec. Exh. G6 at 7-8; Exh H2. Also, as previously noted, Gallo has presented evidence that WD engaged in non-jurisdictional trades during that time period, and that the practice of submitting reports of such non-jurisdictional trades to indices was commonplace at the time. The court thus finds Gallo has presented substantial evidence from which a trier of fact could infer that WD traders engaged in reporting of non-jurisdictional trading activities during the time period at issue.

### *4. PG&E Citygate was Among the Pricing Points Affected*

Again, Gallo may carry its burden of proof by providing generalized evidence that WD participated in non-jurisdictional transactions that involved the PG&E Citygate pricing point and that pricing distortions occurred at PG&E Citygate during the time period in question. That evidence, coupled with evidence that such non-jurisdictional trading likely distorted index values is sufficient to permit the inference that Defendants' trading activity was at least contributory to distortions of index prices that directly affected prices paid by Gallo.

Summaries of trading activity between WD and Duke Energy traders submitted as exhibits J13-J25 to the Williams Declaration provide abundant evidence that WD participated in, at minimum, numerous basis swaps at PG&E Citygate.  Further, WD's non-jurisdictional trading activity coincided with the unique spike in basis price at that pricing point.  Williams Dec., Exh. J4.  Based on these uncontroverted facts, the court must conclude that Gallo has carried its burden to show evidence from which a finder of fact could reasonably infer that WD's trading activity at PG&E Citygate at least contributed to distortions in basis prices for natural gas that caused Gallo to pay higher prices for natural gas that would have been necessary had the non-jurisdictional trading not occurred.

### 5. Conspiracy and Intent

As previously noted, where a claim is based on violation of the Cartwright Act or on violation of California's UCL, the plaintiff must produce some evidence that tends to exclude the possibility that the defendant's actions were lawful where the evidence of collusive conduct is ambiguous.  T.W. Elect. Servs., 809 F.2d at 632.  Here, Gallo's claims are based on Defendants' trading practices including wash trades and selective reporting of pricing inputs to index publications services.  Defendants contend that Gallo lacks evidence to prove that the *scope* of the conspiracy Gallo has alleged is as large as Gallo claims.  As discussed above, the court has concluded that Defendants' contentions as to Gallo's proof of the scope of the alleged conspiracy are not proper in the context of the instant motion for summary judgment. Defendants have not alleged the non-existence of a conspiracy.  So far as the court can discern, Defendants have not developed the argument that the behavior Gallo has alleged is ambiguous and that wash trades, or other non-jurisdictional transactions alleged by Gallo, do not evince collusion and actually had a legitimate business purpose.

To the extent there may be an argument that Gallo's allegation of conspiracy is based on indirect evidence that is capable of inferences of both lawful and unlawful conduct, the court finds Gallo has produced sufficient evidence to carry its burden to show the conduct

was unlawful.  Specifically, previously cited transcripts of telephone conversations between WD traders and counterparties that agree to report only trades reflecting high basis prices are sufficient to show that at least some part of the purpose of wash trading was to collude to bid basis prices up or down.  See Williams Dec., Exh. G6; H2.  Further, based on other recordings of WD trader conversations, WD traders were on notice that wash trades had the potential to cause, and did in fact cause, distortions in index pricing whether or not a particular trade might have been motivated by a desire to cause such distortion.  See Williams Dec., Exh. H1; H6.

Additionally, to the extent Defendants contend that Gallo has failed to meet its evidentiary burden because it has failed to show the absence of any other cause for the spike in basis prices during the time period at issue, that contention is rejected as contrary to law. Where a plaintiff has demonstrated that the defendant's "anticompetitive activity was a 'material cause of [its] injury,' [citation,]" the plaintiff "need not rule out 'all possible alternative sources of injury.'" Dolphin Tours, 773 F.2d at 1509.  Having produced substantial evidence that Defendants' conduct materially caused at least some of the harm Gallo suffered, Gallo shifts the burden of production back to Defendants to show that some other factor was the cause of the harm.  Defendants have produced no evidence that would suggest that any other factors cause the harm Gallo claims it suffered.

The court concludes that Gallo has carried its burden to show that Defendant's anticompetitive conduct was a material cause of harm to Gallo.


THEREFORE, for the reasons discussed, Defendants' Motion for Summary Judgment on the issue of Conspiracy and Causation is hereby DENIED.


IT IS SO ORDERED.

**Dated:    September 12, 2008                          /s/ Anthony W. Ishii              **
                                                   CHIEF UNITED STATES DISTRICT JUDGE

24